# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TOBIN DOLAN; LYDIA DOLAN; TANGEE
DOLAN; DOROTHY JONES; BRIAN
RODGERS; BARBARA RODGERS;
MICHAEL SALAZAR; REYNALDO
HERRERA; and KATHY VALERA,

        Plaintiffs,

vs.                              No. CIV 23-0908 JB/JFR

FEDERAL EMERGENCY MANAGEMENT
AGENCY,

        Defendant.

-- and --

MARIANNA LANDS and CHARLES
WILLIAM PAYNTER;

        Plaintiffs,

vs.                              No. CIV 23-0869 JB/JFR

FEDERAL EMERGENCY MANAGEMENT
AGENCY; DEANNE CRISWELL, as
Administrator of FEMA; and ANGELA
GLADWELL,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Respondents' Motion to Alter or
Amend Judgment, filed January 14, 2025 (<u>Dolan v. FEMA</u>, No. CIV 23-0908 Doc. 62)("<u>Dolan</u>
Motion"); and (ii) the Respondents' Motion to Alter or Amend Judgment, filed January 14, 2025
(<u>Lands v. FEMA</u>, No. CIV 23-0869 Doc. 63)("<u>Lands</u> Motion")(collectively "Motions"). The
primary issues are: (i) whether the Court should delete its conclusion that the Hermit's Peak/Calf

Canyon Fire[1] is a nuisance and trespass; (ii) whether the Court should limit any incorporation of New Mexico law in the Hermit's Peak Fire Assistance Act, Pub. L. No. 117-180, § 104, 136 Stat. 2114, 2168 (2022)("Hermit's Peak Act"), to the calculation of damages in the categories set forth in § 104(d)(4); and (iii) whether the Court should clarify which portions of the challenged regulations violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and should not direct FEMA to pay claims under 5 U.S.C. § 706(1). The Court concludes that: (i) the Court correctly concludes that the Hermit's Peak/Calf Canyon Fire is a nuisance and trespass under New Mexico State law; (ii) New Mexico State law allows recovery of compensatory damages in the form of noneconomic damages for nuisance, trespass, and personal injury under § 104(d)(4); and (iii) the

---

[1]The Court defines the Hermit's Peak/Calf Canyon Fire in its previous Memorandum Opinion and Order in this case:

> In April 2022, a wildfire scorched over 340,000 acres of land in northeastern New Mexico, destroying over 900 structures, and forcing the evacuation of over 15,000 households throughout Mora, San Miguel and Taos Counties. See Patrick Lohmann, Were You Affected by the Massive Wildfire in Northern New Mexico? We Want to Hear From You, Were You Affected by the Massive Wildfire in Northern New Mexico? We Want to Hear From You (Mar. 2, 2023), https://www.propublica.org/getinvolved/new-mexico-wildfires-hermits-peak-calf-canyon (last accessed December 6, 2024). It is the largest wildfire in New Mexico State history. See Bryan Pietsch and Jason Samenow, New Mexico blaze is now largest wildfire in state history, The Washington Post (May 17, 2022), https://www.washingtonpost.com/nation/2022/05/17/calf-canyon-hermits-peak-fire-new-mexico/ (last accessed December 5, 2024). The first wildfire began on April 6, 2022, in Hermit's Peak, New Mexico, when the United States Forest Service ("Forest Service") initiated a prescribed burn in the Santa Fe National Forest in San Miguel County that quickly spread beyond federal land and turned into a wildfire. See Hermit's Peak Act § 102(a) Findings and Purposes, 136 Stat. 2144, 2168 ("Hermit's Peak Act § 102(a)"). A second wildfire began on April 19, 2022, in Calf Canyon, New Mexico, when a dormant pile burn[1] from the prior winter re-emerged. See Hermit's Peak Act § 102(a). Within the same month, on April 27, 2022, the wildfires at Hermit's Peak and Calf Canyon merged and formed the Hermit's Peak/Calf Canyon Fire. See Hermit's Peak Act § 102(a).

Dolan v. FEMA, 760 F. Supp. 3d 1200, 1208 (D.N.M. 2024)(Browning, J.)(footnote omitted).

Court clearly states in its earlier Memorandum Opinion and Order which regulations violate the APA and does not instruct improperly FEMA to pay claims under 5 U.S.C. § 706(1).  The Court, therefore, denies the United States' Motions.

**FACTUAL BACKGROUND**

First, the Court describes the Hermit's Peak/Calf Canyon Fire and the creation of the Hermit's Peak Act.  Second, the Court quotes the Hermit's Peak Act's Findings and Purposes section, § 102.  The Court then quotes the three Hermit's Peak Act sections relevant to the Motion: the NM State Law provision, § 104(c)(2); the Extent of Damages provision, § 104(c)(3); and the Allowable Damages provision, § 104(d)(4).  The Court then summarizes the relevant Hermit's Peak Act Regulations.  Finally, the Court describes the Plaintiffs.

1.     **Overview of the Hermit's Peak/Calf Canyon Fire and the Hermit's Peak Act.**

The Hermit's Peak/Calf Canyon Fire began in northeastern New Mexico on April, 2022, when the United States Forest Service ("Forest Service") initiated a prescribed burn in the Santa Fe National Forest in San Miguel County that quickly spread beyond federal land and turned into a wildfire.  See Dolan v. FEMA, 760 F. Supp. 3d 1200, 1208-09 (D.N.M. 2024)(Browning, J.)("APA MOO")(citing Hermit's Peak Act § 102(a) Findings and Purposes, 136 Stat. 2144, 2168 ("Hermit's Peak Act § 102(a)")).  A second wildfire also began nearby on April 19, 2022, when a dormant pile burn[2] from the prior winter reemerged.  See APA MOO, 760 F. Supp. 3d at 1209 (citing Hermit's Peak Act § 102(a)).  The two wildfires merged and scorched 340,000 acres of land in northeastern New Mexico, destroying over 900 structures and forcing over 15,000

---

[2]A pile burn "is a type of prescribed fire where firefighters pile and burn forest debris to reduce an area's wildfire risk."  Pile Burning, United States Forest Service, https://www.fs.usda.gov/detail/arp/landmanagement/resourcemanagement/?cid=fsm91_058291 (last accessed Dec. 6, 2024).

households to evacuate. <u>See</u> APA MOO, 760 F. Supp. 3d at 1208 (citing Hermit's Peak Act § 102(a)). In September, 2022, Congress establishes a dedicated relief fund to compensate victims of the Hermit's Peak/Calf Canyon Fire by enacting the Hermit's Peak Act. <u>See</u> Hermit's Peak Act § 102(b), 136 Stat. at 2169 ("§ 102(b)").

    2.    **<u>Congress Makes Findings About the Hermit's Peak/Calf Canyon Fire</u>.**

        The Hermit's Peak Act makes the following findings:

        Sec. 102.        Findings and Purposes.

(a)    FINDINGS. -- Congress finds that --

        (1)    on April 6, 2022, the Forest Service initiated the Las Dispensas-Gallinas prescribed burn on Federal land in the Santa Fe National Forest in San Miguel County, New Mexico, when erratic winds were prevalent in the area that was also suffering from severe drought after many years of insufficient precipitation;

        (2)    on April 6, 2022, the prescribed burn, which became known as the "Hermit's Peak Fire", exceeded the containment capabilities of the Forest Service, was declared a wildfire, and spread to other Federal and non-Federal land;

        (3)    on April 19, 2022, the Calf Canyon Fire, also in San Miguel County, New Mexico, began burning on Federal land and was later identified as the result of a pile burn in January 2022 that remained dormant under the surface before re-emerging;

        (4)    on April 27, 2022, the Hermit's Peak Fire and the Calf Canyon Fire merged, and both fires were reported as the Hermit's Peak Fire or the Hermit's Peak/Calf Canyon Fire, which shall be referred to hereafter as the Hermit's Peak/Calf Canyon Fire;

        (5)    by May 2, 2022, the fire had grown in size and caused evacuations in multiple villages and communities in San Miguel County and Mora County, including in the San Miguel county jail, the State's psychiatric hospital, the United World College, and New Mexico Highlands University;

        (6)    on May 4, 2022, the President issued a major disaster declaration for the counties of Colfax, Mora, and San Miguel, New Mexico;

(7)    on May 20, 2022, U.S. Forest Service Chief Randy Moore ordered a 90-day review of prescribed burn policies to reduce the risk of wildfires and ensure the safety of the communities involved;

(8)    the U.S. Forest Service has assumed responsibility for the Hermit's Peak/Calf Canyon Fire;

(9)    the fire resulted in the loss of Federal, State, local, Tribal, and private property; and

(10)    the United States should compensate the victims of the Hermit's Peak/Calf Canyon Fire.

**3.    <u>The NM State Law provision, Hermit's Peak Act § 104(c)(2).</u>**

The portion of the Hermit's Peak Act section that provides compensation for victims of the Hermit's Peak/Calf Canyon Fire is at issue in this case. <u>See</u> Hermit's Peak Act § 104, 136 Stat. at 2170-76 ("§ 104"). Section 104 has several key provisions that are important to determining whether the Plaintiffs can recover emotional damages.

The first key provision governs the applicability of State law:

(2)    APPLICABILITY OF STATE LAW. -- Except as otherwise provided in this Act, the laws of the State of New Mexico shall apply to the calculation of damages under subsection (d)(4).

Hermit's Peak Act § 104(c)(2). The Court hereinafter refers to § 104(c)(2) as the "NM State law provision."

**4.    <u>The Extent of Damages provision, Hermit's Peak Act § 104(c)(3).</u>**

The second key provision governs the extent of damages:

(3)    EXTENT OF DAMAGES. -- Any payment under this Act --

(A)    shall be limited to actual compensatory damages measured by injuries suffered; and

(B)    shall not include --

(i)    interest before settlement or payment of a claim; or

        (ii)     punitive damages.

Hermit's Peak Act § 104(c)(3).  The Court hereinafter refers to § 104(c)(3) as the "Extent of Damages provision."

### 5.    The Allowable Damages provision, Hermit's Peak Act § 104(d)(4)(A)-(C).

The third key provision governs allowable damages:

        (4)     ALLOWABLE DAMAGES. --

        (A)     LOSS OF PROPERTY. -- A claim that is paid for loss of property under this Act may include otherwise uncompensated damages resulting from the Hermit's Peak/Calf Canyon Fire for --

        [. . .]

               (vi)     any other loss that the Administrator determines to be appropriate for inclusion as loss of property.

        (B)     BUSINESS LOSS. -- A claim that is paid for injury under this Act may include damages resulting from the Hermit's Peak/Calf Canyon Fire for the following types of otherwise uncompensated business loss:

        [. . .]

        (vi)     Any other loss that the Administrator determines to be appropriate for inclusion as business loss.

        (C)     FINANCIAL LOSS. -- A claim that is paid for injury under this Act may include damages resulting from the Hermit's Peak/Calf Canyon Fire for the following types of otherwise uncompensated financial loss:

        [. . .]

        (x)     Any other loss that the Administrator determines to be appropriate for inclusion as financial loss.

Hermit's Peak Act § 104(d)(4)(A)-(C).  The Court hereinafter refers to Hermit's Peak Act § 104(d)(4)(A)-(C) as the "Allowable Damages provision."

### 6.    The Hermit's Peak Regulations.

FEMA's Hermit's Peak Act regulations include guidance on receiving, evaluating, processing, and paying "actual compensatory damages for injuries resulting from the Hermit's Peak/Calf Canyon Fire." 44 C.F.R. § 296.1 ("Hermit's Peak Regulations"). To receive compensation, a claimant "must be an Injured Person who suffered injury as a result of the Hermit's Peak/Calf Canyon Fire and sustained damages." 44 C.F.R. § 296.20. A claimant first must file a Notice of Loss form that briefly describes each injury with the FEMA Claims Office. See 44 C.F.R. § 296.5(b); § 296.10(a). Second, a Claims Reviewer will review and evaluate the claim. See 44 C.F.R. § 296.5(c). Third, an Authorized Official[3] will determine whether compensation is due to the claimant. See 44 C.F.R. § 296.5(d). The Hermit's Peak Regulations contain an overview of the Hermit's Peak Act damages provisions, and states that, under the Allowable Damages provision, allowable damages of "property, business loss, and financial loss" exclude noneconomic damages. See 44 C.F.R. § 296.21(a).

Finally, claimants may appeal the Authorized Official's determination. See 44 C.F.R. § 296.41(a). A claimant dissatisfied with the outcome of an Administrative Appeal may seek judicial review of the decision by filing a civil lawsuit against FEMA in the United States District Court for the District of New Mexico. See 44 C.F.R. § 296.43.

**7.    The Plaintiffs.**

The Plaintiffs in both Dolan and Lands are long-time, multigenerational residents of northeastern New Mexico and assert that the Hermit's Peak/Calf Canyon Fire destroyed their homes and forced them to relocate. See APA MOO, 760 F. Supp. 3d at 1213. The Plaintiffs allege

---

[3]The Hermit's Peak Regulations define Authorized Official as "an employee of the United States who is delegated with authority by the Director of the Claims Office to render binding determinations on claims and to determine compensation due to claimants under the Act." 44 C.F.R. § 296.4.

that they "suffered and continue to suffer significant interference with personal comfort, annoyance, and inconvenience beyond the economic cost of their lost property."  See APA MOO, 760 F. Supp. 3d at 1213.  The Court hereinafter refers to the Lands Plaintiffs and Dolan Plaintiffs as "the Plaintiffs," and the alleged losses which include pain and suffering, annoyance, discomfort, and inconvenience as "noneconomic damages."

## PROCEDURAL BACKGROUND

The Court first describes the Plaintiffs' initial Notice of Loss Claims and FEMA's denial of compensation for noneconomic damages.  The Court then summarizes its previous Memorandum Opinion and Order, the APA MOO, which holds that FEMA's regulations and actions denying compensation for noneconomic damages violate the APA's arbitrary-and-capricious provision, 5 U.S.C. § 706(2)(A).  The Court also summarizes its most recent Memorandum Opinion and Order, which concludes that Hermit's Peak Act claimants, including the Plaintiffs among others, have exhausted their administrative remedies and, thus, appropriately seek judicial review of their claim denials.  Next, the Court briefly summaries the United States' Motion, the Plaintiffs' separate responses, and the United States' separate replies.  Finally, the Court summarizes the hearing for the Dolan Plaintiffs and the hearing for the Lands Plaintiffs.

### 1.    FEMA's Denial of Noneconomic Damages Claims.

The Plaintiffs filed Notice of Loss Claims with FEMA in 2023 which include losses for both economic and noneconomic damages.  See APA MOO, 760 F. Supp. 3d at 1214.  The Plaintiffs seek claims for various losses, including: (i) real property such as repair, replacement, decreased value, and reforestation; (ii) personal property such as vehicles and equipment; (iii) lost wages and personal income; (iv) temporary living and relocation expenses; (v) emotional distress, nuisance, annoyance, discomfort and inconvenience; and (vi) attorney's fees.  See APA MOO,

760 F. Supp. 3d at 1214.  As an example of a noneconomic damages claim, the Dolan family asserts that they have a "sentimental connection to the land," and that the "land they poured all their financial resources into and worked so hard to improve upon to leave a legacy for future generations is now gone."  APA MOO, 760 F. Supp. 3d at 1214.  FEMA denies the Plaintiffs' claims for noneconomic damages, stating in at least one final determination letter that "Emotional Distress" losses are "[n]ot compensable under law."  APA MOO, 760 F. Supp. 3d at 1214-15.

**2.**    **The Court's Memorandum Opinion and Order on Recovery of Noneconomic Damages Under the Hermit's Peak Act.**

In the APA MOO, the Court resolves the Plaintiffs' APA challenge to the Hermit's Peak Regulation which reflects FEMA's position that the Hermit's Peak Act does not allow for recovery of noneconomic damages, such as for emotional distress.  See APA MOO, 760 F. Supp. 3d at 1208.  The Court concludes that the relevant Hermit's Peak Regulation violates the APA's arbitrary-and-capricious provision, 5 U.S.C. § 706(2)(A), and compels FEMA to award noneconomic damages under the Hermit's Peak Act under the APA, 5 U.S.C. § 706(1).  See APA MOO, 760 F. Supp. 3d at 1208.  The Court concludes that the Hermit's Peak Act waives FEMA's sovereign immunity for the Plaintiffs' claims seeking noneconomic damages in three ways.  See APA MOO, 760 F. Supp. 3d at 1238.  First, the NM State law provision, § 104(c)(2), allows the Plaintiffs to recover damages that are available under New Mexico State law, which includes noneconomic damages for nuisance, and which the Court predicts also includes noneconomic damages for trespass.  See APA MOO, 760 F. Supp. 3d at 1238.  Second, the Extent of Damages provision § 104(c)(3)'s statement that "actual compensatory damages" are recoverable includes noneconomic damages, because the Hermit's Peak Act only explicitly excludes punitive damages and pre-judgment interest.  APA MOO, 760 F. Supp. 3d at 1238.  Third, the Allowable Damages

- 9 -

provision § 104(d)(4)'s list of recoverable property, business, and financial loss is nonexhaustive; thus, noneconomic damages are recoverable as well.  See APA MOO, 760 F. Supp. 3d at 1238.

3.    **The Court's Memorandum Opinion and Order on Exhaustion of Administrative Remedies**.

In Gallegos v. FEMA, No. CIV 24-0170 JB/JFR, 2025 WL 961665 (D.N.M. March 31, 2025)(Browning, J.), the Court resolves a series of motions to dismiss in related cases involving claims under the Hermit's Peak Act.  See 2025 WL 961665, at *1 ("Gallegos").  FEMA -- the same defendant as in this case -- argues that the plaintiffs fail to exhaust administrative remedies, but the Court holds that: (i) the Hermit's Peak Act requires FEMA to issue judicially reviewable claim determinations within 180 days of a claimant submitting a Notice of Loss; (ii) the Hermit's Peak Act's sovereign immunity waiver applies even when FEMA fails to issue internal administrative appeal decisions, so long as claimants follow FEMA's regulations consistent with the 180-day deadline; (iii) no general waiver of the exhaustion requirement exists under Vigil v. FEMA, No. CIV 23-0941 JB/JFR, 2024 U.S. Dist. LEXIS 92879, at *1 (D.N.M. May 23, 2024)(Browning, J.), because although exhaustion is futile and would cause irreparable harm, the plaintiffs do not assert a collateral Constitutional claim; and (iv) the plaintiffs state a plausible claim that FEMA's regulations violate the 180-day deadline, deprive them of a meaningful opportunity to be heard on noneconomic damages, and are arbitrary and capricious under the APA. See Gallegos, 2025 WL 961665, at *1.

4.    **The Motion Briefing**.

FEMA moves to alter or amend the Court's APA MOO under rule 59(e) of the Federal Rules of Civil Procedure.  See Motion at 1.  FEMA's motion makes two arguments and two requests for clarification.  See Motion at 2-3.  First, FEMA argues that the Court's conclusion that the Hermit's Peak/Calf Canyon Fire is a nuisance and trespass under New Mexico law is incorrect

and contrary to New Mexico law.  See Motion at 2.  Specifically, FEMA argues that N.M.S.A. §
68-5-3 states that prescribed burns are "'considered in the public interest and not a public or private
nuisance.'"  Motion at 2 (quoting N.M.S.A. § 68-5-3).  Second, FEMA argues that the Court
incorrectly incorporates damages recoverable under New Mexico law -- which allows for recovery
of noneconomic damages for nuisance and trespass -- into the damages recoverable under the
Allowable Damages provision, § 104(d)(4).  See Motion at 2.  FEMA then requests that the Court:
(i) clarify which specific Hermit's Peak Regulation violates the APA's arbitrary-and-capricious
provision, 5 U.S.C. § 706(2)(A); and (ii) clarify that the Court compels FEMA to process claims
for noneconomic damages as opposed to pay claims for noneconomic damages without evaluating
a claim's merits.  See Motion at 3.

### 5.      The Dolan Response.

The Dolan Plaintiffs respond to each of FEMA's four points.  See Dolan Response at 7-8.
First, the Dolan Plaintiffs argue that the Court's conclusion that the Hermit's Peak/Calf Canyon
Fire is a nuisance or trespass under New Mexico law is consistent with New Mexico law and
common law, and that the Hermit's Peak Act concedes the Forest Service acts negligently in
starting the fire.  See Dolan Response at 7.  Second, the Dolan Plaintiffs argue that the Court's
reading of the Allowable Damages provision as permitting recovery of damages available under
New Mexico State law, in particular noneconomic damages, is correct according to statutory
interpretation principles.  See Dolan Response at 7.  Third, the Dolan Plaintiffs assert that the mere
lack of the word "noneconomic damages" in the Hermit's Peak Regulations is immaterial to
finding the Regulations arbitrary-and-capricious for precluding noneconomic damages.  See Dolan
Response at 8.  Fourth, the Dolan Plaintiffs argue that the Court's order to compensate claimants

for noneconomic damages imposes no additional burdens on FEMA, and still requires FEMA to evaluate each claim's merits.  See Dolan Response at 8.

>    6.    **The Lands Response.**

The Lands Plaintiffs first assert that they have "come to rely on the finality of the Court's judgment."  See Lands Response at 1.  Then, the Lands Plaintiffs also respond to FEMA's points. See Lands Response at 1.  First, the Lands Plaintiffs summarize the standard of review for rule 59(e) motions to alter or amend a judgment, and emphasize that reconsideration under rule 59(e) is a relatively high standard to meet.  See Lands Response at 3.  The Lands Plaintiffs describe the Court's three-factor analysis for rule 59(e) motions to reconsider a prior ruling, which considers how thoroughly the Court addresses the specific challenged conclusions in the prior ruling, how far the case has progressed and how much the opposing party has relied on the prior ruling, and whether there is "clear error."    Lands Response at 4 (quoting Chandhok v. Companion Life Insurance Co., 555 Fed. Supp. 3d 1092, 1112-18 (D.N.M. 2021)(Browning, J.).  The Lands Plaintiffs first argue that the Court makes no error, and certainly not a clear error, under the rule 59(e) legal standard.  See Lands Response at 4.  In response to FEMA's first argument, the Lands Plaintiffs argue that the Court correctly analyzes: (i) whether the Forest Service is liable for nuisance and trespass torts under New Mexico law because of their actions resulting in the Hermit's Peak/Calf Canyon Fire; and (ii) whether nuisance and trespass torts under New Mexico law permit recovery of noneconomic damages.  See Lands Response at 6.

Next, the Lands Plaintiffs argue that the New Mexico Prescribed Burn Statute, N.M.S.A. § 68-5-3, which establishes that a prescribed burn is not a public or private nuisance, applies only to private landowners and not to the federal government.  See Lands Response at 7.  In response to FEMA's second argument, the Lands Plaintiffs assert that FEMA rehashes the same arguments

it made before the Court's prior ruling and, therefore, the Court makes "no manifest clear error." Lands Response at 10. The Lands Plaintiffs explain that the Court correctly and thoroughly concludes that the Allowable Damages provision, § 104(d)(4), is a nonexhaustive list of damages, and that the NM State law provision, § 104(c)(2), waives sovereign immunity for all damages recoverable under NM State law. See Lands Response at 11. As to FEMA's requests for clarification, the Lands Plaintiffs note that the Court identifies Hermit's Peak Regulation 44 C.F.R. § 296.21(a) as violating the APA's arbitrary-and-capricious provision, and also note that the Court explicitly "compels FEMA to adjudicate the plaintiffs' claims for noneconomic damages resulting from the Hermit's Peak/Calf Canyon Fire." Lands Response at 13 (quoting APA MOO at 95). The Lands Plaintiffs, therefore, conclude that the Court should deny entirely FEMA's Motion. See Lands Response at 14.

       **7.**     **FEMA's Reply in Dolan.**

FEMA argues that the Hermit's Peak Act's language "itself does not contain a finding of negligence." See Dolan Reply at 3. FEMA argues that the Forest Service's explicit assumption of responsibility under § 102(a)(8) does not imply a finding of negligence and also the definition of "injury" under § 103(5) does not include a finding of negligence. Dolan Reply at 4. FEMA then emphasizes that New Mexico's Prescribed Burning Act excludes prescribed burns from nuisance law and that prescribed burns are in the public interest. See Dolan Reply at 6-7.

FEMA then argues that the Dolan Plaintiffs do not defend the Court's incorporation of New Mexico tort law through the NM State Law provision, § 104(c)(3). See Dolan Reply at 8-9. FEMA argues that the Allowable Damages provision, § 104(d)(4), is an exclusive list of allowable damages:

> In the context of a preceding "may," followed by a list with a final catch-all category, and a reference to those damages that are "allowable," Section 104(d)(4)

- 13 -

should be construed as an exclusive list. See Resp. Br. At 21 (providing these arguments in more detail); Navajo Nation v. Dalley, 896 F.3d 1196, 1212-16 (10th Cir. 2018)(interpreting the Indian Gaming Regulatory Act's list of topics that Tribal-State compacts "may include" as exclusive and not expanded by a broad catch-all provision); Pueblo of Pojoaque v. Biedscheid, 689 F. Supp. 3d 1033, 1120-23 (D.N.M. 2023)(Browning, J.)(same).

Dolan Reply at 9. FEMA next argues that the Allowable Damages provision does not render the Extent of Damages provision, § 104(c)(3), superfluous. See Dolan Reply at 10. FEMA explains that the Extent of Damages provision further limits the damages available under the Allowable Damages provision, which otherwise would allow recovery of the following damages under New Mexico law: nominal damages, see 13-1832 NMRA, punitive damages for reckless tortfeasors, see 13-1827 NMRA, and pre-judgment interest, see N.M.S.A. § 56-8-4(B). See Dolan Reply at 11. Finally, FEMA asserts that its interpretation of the Allowable Damages provision offers the most administrable claims processing system. See Dolan Reply at 11.

### 8.    FEMA's Reply in Lands.

FEMA contends that any of the Lands Plaintiffs' reliance interests are minimal and that the Lands Plaintiffs do not specify what actions they take in reliance of the Court's APA MOO. See Lands Reply at 2-3. FEMA next argues that the Court makes numerous conclusions that the parties do not litigate before the APA MOO, such as the "factual findings" that the Forest Service was negligent and reckless, that New Mexico law allows recovery for noneconomic damages for private nuisance, and that prescribed burns are ultrahazardous or abnormally dangerous activities. See Lands Reply at 4. FEMA also argues that the Forest Service's assumption of responsibility for the Hermit's Peak/Calf Canyon Fire "is not a finding of negligence but an acknowledgement that the Forest Service's actions contributed to the fire and that the United States would provide certain compensation for its damages." See Lands Reply at 7. FEMA argues that Congress otherwise would have found expressly that the Forest Service was negligent. See Lands Reply at

7.  FEMA also argues that the New Mexico Prescribed Burning Act declares that prescribed burns are not public or private nuisances, and that prescribed burns are not ultrahazardous activities.  See Lands Reply at 8-9.  FEMA again asserts that the Court's conclusion will discourage the use of prescribed burns.  See Lands Reply at 10.  FEMA argues that the Court improperly interprets the NM State Law provision and the Allowable Damages provision.  See Lands Reply at 11.  FEMA argues that the NM State Law provision limits payments otherwise available under the Hermit's Peak Act and is "not an independent basis for the waiver of sovereign immunity"; neither does the Allowable Damages provision independently waive sovereign immunity.  Lands Reply at 11.  FEMA also argues that, under the Lands Plaintiffs' argument that the Hermit's Peak Act "presupposes" the Forest Service's liability, see Lands Response at 12, much of the Court's APA MOO which analyzes what tort claims are recoverable under New Mexico State law is unnecessary.  See Lands Reply at 12.

Finally, FEMA argues that the APA MOO does not reference 44 C.F.R. § 296.21(a), nor does 44 C.F.R. § 296.21(a) explicitly preclude noneconomic damages.  See Lands Reply at 13.  FEMA argues that the APA MOO improperly compels FEMA to award noneconomic damages without first determining whether a claimant has suffered compensable injury and whether a claimant has alleged facts that establish causation and injury.  See Lands Reply at 13.

    9.    **The Dolan and Lands Hearings.**

The Court holds a hearing on the Motions with FEMA and the Dolan Plaintiffs.  See Dolan Hearing Transcript at 1 (taken April 23, 2025)("Dolan Hearing Tr.").[4]  A week later, the Court holds the hearing on the Motion with FEMA and the Lands Plaintiffs.  See Lands Hearing

---

[4]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Transcript at 1 (taken May 2, 2025)("Lands Hearing Tr.").  At the hearings, the parties assert the

arguments in their briefs and discuss them in more detail and answer the Court's questions.  See

Dolan Hearing Tr.; Lands Hearing Tr.

## LAW REGARDING MOTIONS TO RECONSIDER

Motions to reconsider in civil cases fall into three categories:

(i) a motion to reconsider filed within [twenty-eight][5] days of the entry of judgment
is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion
to reconsider filed more than [twenty-eight] days after judgment is considered a
motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider
any order that is not final is a general motion directed at the Court's inherent power
to reopen any interlocutory matter in its discretion.  See Price v. Philpot, 420 F.3d
1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See

Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

While the civil rules are not applicable expressly to criminal cases, the courts have used the

principles somewhat interchangeably.  See United States v. Christy, 739 F.3d at 539-40; United

States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  The case law for the civil side can inform

when a motion to consider is appropriate in a criminal case.  See United States v. Christy, 739 F.3d

---

[5]Former rule 59 provided for a ten-day period after entry of judgment to file motions to
reconsider.  In 2009, the rule was amended, extending the filing period to twenty-eight days:

Experience has proved that in many cases it is not possible to prepare a
satisfactory post-judgment motion in 10 days, even under the former rule that
excluded intermediate Saturdays, Sundays, and legal holidays. These time periods
are particularly sensitive because Appellate Rule 4 integrates the time to appeal
with a timely motion under these rules. Rather than introduce the prospect of
uncertainty in appeal time by amending Rule 6(b) to permit additional time, the
former 10-day periods are expanded to 28 days.

Federal    Rules    of    Civil    Procedure,    Rule    59,    Legal    Information    Institute,
https://www.law.cornell.edu/rules/frcp/rule_59.

at 534, 539-40 (10th Cir. 2014); United States v. DeLeon, No. CR 15-4268 JB, 2016 WL 7242579,

at *29 (D.N.M. October 28, 2016)(Browning, J.).

1.    **Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files

within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167

n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief

from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion for

reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones

the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355 F. App'x

117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-eight days

from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 is not only a question of timing, but also "depends on the reasons expressed by the movant."

Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

1200 (10th Cir. 2011).   Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751,

753 (10th Cir. 1989)).  In other words, if the reconsideration motion seeks to alter the district

court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's

constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  A rule 59(e) motion to alter or amend the

judgment should be granted only "to correct manifest errors of law or to present newly discovered

evidence."  Phelps v. Hamilton, 122 F.3d at 1324 (quoting Committee for the First Amendment v.

Campbell, 962 F.2d 1517, 1523 (10th Cir. 1992)).

In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> > (1)    mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2)    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > (3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> >
> > (4)    the judgment is void;
> >
> > (5)    the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> >
> > (6)    any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

> Neither a rule 59 nor a rule 60 motion for reconsideration are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion . . . .  Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge the

time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12 Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012).  Nevertheless, a court generally will not treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)."  Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines.  See Yapp v. Excel Corp., 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists, because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962)).  The Tenth Circuit holds that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and notes that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991).  "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  Moore, supra, § 60.48[2], at 60-182. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 (quoting Ackermann v. United States, 340 U.S. 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief.  See Ackermann v. United States, 340 U.S. at 202 ("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").  Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discusses in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)].  In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured."  Pierce v. Cook & Co., 518 F.2d at 723.  However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6).  Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

### 2.    **Motions to Reconsider Interlocutory Orders.**

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  This confusion originates from the fact that neither the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them.  A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions in civil

cases -- motions to alter or amend a judgment -- as "motions to reconsider,"[6] compounded that baseline confusion.  204 F.3d at 1005.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."). In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of a civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court

---

[6]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.  204 F.3d at 1005.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.[7]  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.  See Fed. R. App. P. 4(a)(4)(A)(vi).

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill]

---

[7]Rule 60(a), which allows the district court to correct clerical errors, provides that, "after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave."  Fed. R. Civ. P. 60(a).  Rule 60(b), which provides for the correction of substantive legal errors, has an interestingly one-sided application when the case is up on appeal: "[A] notice of appeal does not divest a district court of jurisdiction to consider a Rule 60(b) motion, although it prevents a district court from granting such a motion unless it notifies this court of its intention to grant the motion upon proper remand."  West v. Ortiz, No. CIV 06-1192, 2007 WL 706924, at *5 n.5 (10th Cir. Mar. 9, 2007)(unpublished)(Broby, J.)(citing Allison v. Bank One-Denver, 289 F.3d 1223, 1243 (10th Cir. 2002)); Aldrich Enters., Inc. v. United States, 938 F.2d 1134, 1143 (10th Cir. 1991)).  In other words, "a district court does have the authority 'to consider on the merits and deny a 60(b) motion after a notice of appeal, because the district court's action is in furtherance of the appeal,'" but the district court does not have the authority to grant a rule 60(b) motion without first asking the Court of Appeals to remand the case. United States v. Edmonson, 928 F. Supp. 1052, 1053 (D. Kan. 1996)(Crow, J.)(emphasis in original)(quoting Winchester v. U.S. Att'y for the S. Dist. of Tex., 68 F.3d 947, 949 (5th Cir. 1995)).

be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.  The "touchstone document" for this jurisdictional handoff is the notice of appeal, and not the final judgment, Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void."); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction."), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit or even requiring appeal of a case that

might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit incorporates traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice"); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not mention specifically motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added). Rule 54(b) thus (i) provides that a district court freely can reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability reconsider, other than that it must do so "before the entry of judgment." Fed. R. Civ. P. 54(b). See e.g., Anderson Living Trust v. ConocoPhillips, No. CIV12-0039 JB/SCY, 2025 WL 950473 at *58-70 (D.N.M. March 28, 2025)(Browning, J.)(reconsidering class certification of oil-and-gas royalty underpayment claims under rule 54(b) instead of rule 59(e) or rule 60, because the original order denying class certification is a interlocutory order, not a final judgment).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007). In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'" Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. See Austin v. Kroger Tex., L.P., 864 F.3d 326, 336 (5th Cir. 2017)("The trial court is free to consider and reverse its decision for any reason it deems sufficient."). It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

3.    **Motions to Reconsider Interlocutory Orders - Three Factor Analysis**.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'").  First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addresses the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point is addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling is on a criminal suppression motion, class certification motion, or preliminary injunction,[8] than when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addresses the exact point or points

---

[8]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b)(bold in original).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to 28 days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See § 4478.1 Wright & Miller's Federal Practice & Procedure at 664-65 (3d ed. 2024 Update)("Stability becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests

itself without the need for in-depth analysis or review of the facts -- that the Court erred. See, e.g., Anderson Living Trust v. ConocoPhillips, No. CIV12-0039 JB/SCY, 2025 WL 950473 at *59 (D.N.M. March 28, 2025)(Browning, J.)(concluding that the Court makes no legal error on the oil-and-gas royalty underpayment claim in its order denying class certification); id. at 2025 WL 950473 at *65 (granting reconsideration of the rule 23(a)(2) commonality requirement for class certification because the Court only briefly addresses commonality in its order denying class certification and has not fully analyzed the issue.).

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court always should apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling is harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court is wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by restricting its review is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the

motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling and should try to prevent that party from having to bear the same impositions again.  Even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion which produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the Court denies the injunction and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time that the Court considered the motion.

In light of these statements, it is best to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling and not by starting anew.  Parties opposing reconsideration can also start where the Court finished, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they convincingly must refute both the counterarguments and evidence that the opposing party used to win the prior ruling, and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is

stacked against a movant for reconsideration, and, if such a movant hopes to prevail, he or she

must have not only a winning legal position, but the work ethic and tenacity to lead single-handedly

the Court to his or her way of thinking.

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

The APA states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702.  The APA empowers reviewing courts, "[t]o the extent necessary to decision and

when presented," to "decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C.

§ 706.  Such a reviewing court "shall":

> (1)    compel agency action unlawfully withheld or unreasonably delayed; and

> (2)    hold unlawful and set aside agency action, findings, and conclusions found to be --

>> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> (B)    contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.  This statutory provision provides the "default standard" of review under the APA, which applies unless the agency's enabling act -- or another statute -- provides otherwise.  See Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995)("[T]he APA provides a default standard of judicial review -- arbitrary or capricious -- precisely for situations, such as this one, where a statute does not otherwise provide a standard of judicial review.").  Technically, 5. U.S.C. § 706 provides standards -- not "a standard" -- of review, and different provisions in 5. U.S.C. § 706 are used according to the subject of the review: for example, the arbitrary-and-capricious standard is used to review "[i]nformal agency action," and informal (notice and comment) rulemaking, City of Colorado Springs v. Solis, 589 F.3d 1121, 1131 (10th Cir. 2009), and that standard is "'very deferential' to the agency's determination," Kobach v. U.S. Election Assistance Comm'n, 772 F.3d 1183, 1197 (10th Cir. 2014)(quoting W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1273 (10th Cir. 2013)).  Section 706's substantial evidence test, on the other hand, "applies almost exclusively to formal adjudication," Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 745 F.2d 677, 686 n.6 (D.C. Cir. 1984)(Scalia, J.)., because "a case subject to sections 556 and 557 of this title" refers to the APA's formal adjudication and formal rulemaking provisions, 5 U.S.C. § 706(2)(E).  De novo review, provided in 5 U.S.C. § 706(2)(F), the APA's least deferential standard of review, is limited to use

in two instances: "(1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to <u>enforce</u> a nonadjudicatory action."  <u>Franklin Sav. Ass'n v. Dir., Off. of Thrift Supervision</u>, 934 F.2d 1127, 1142 n.7 (10th Cir. 1991)(emphasis in original)(citing <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971), <u>abrogated on other grounds by Califano v. Sanders</u>, 430 U.S. 99 (1977)).[9]  Importantly, 5. U.S.C. § 706 also instructs the reviewing court, "[i]n making the foregoing determinations," to "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  <u>See</u> <u>Pennaco Energy, Inc. v. U.S. Dep't of Interior</u>, 377 F.3d 1147, 1157 (10th Cir. 2004)(rejecting the notion that the reviewing court's analysis "should be limited to those passages expressly relied upon by the [agency]").

In the United States Court of Appeals for the Tenth Circuit, pursuant to <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d 1560, 1580 (10th Cir. 1994)("<u>Olenhouse</u>"), "[r]eviews of

---

[9]In 1947, shortly after the APA's passage, President Truman's Attorney General -- and future Associate Justice of the Supreme Court of the United States -- Tom Clark published the Attorney General's Manual on the Administrative Procedure Act, which was prepared as a guide to the then-nascent APA.  <u>See</u> United States Department of Justice, Tom C. Clark, Attorney General, <u>Attorney General's Manual on the Administrative Procedure Act</u> (1947)("AG's Manual on the APA"). Therein, Attorney General Clark remarks -- contrary to the Supreme Court's later interpretation of 5. U.S.C. § 706(2)(F) in <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. at 415 -- that "to the extent that the facts are subject to trial de novo by the reviewing court," 5. U.S.C. § 706(2)(F), "obviously refers only to those existing situations in which judicial review has consisted of a trial de novo."  AG's Manual on the APA at 109.  In essence, AG's Manual on the APA indicates that it was the Attorney General's view -- in 1947 -- that 5. U.S.C. § 706(2)(F) does not establish a standard by which courts could apply the de novo standard of review to situations outside of those which existed at the time of the APA's passage.  While this interpretation is not binding on any court, perhaps owing to its temporal proximity to the APA's passage, even the Supreme Court has acknowledged that "some deference" should be afforded to the AG's Manual on the APA: "[T]he Attorney General's Manual on the Administrative Procedure Act 31, 35 (1947), a contemporaneous interpretation previously given some deference by this Court because of the role played by the Department of Justice in drafting the legislation, further confirms that view." <u>Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.</u>, 435 U.S. 519, 546 (1978)(footnote removed).

agency action in the district courts [under the APA] must be processed as <u>appeals</u>.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  <u>Olenhouse</u>, 42 F.3d at 1580 (emphasis in original).  <u>See WildEarth Guardians v. U.S. Forest Serv.</u>, 668 F. Supp. at 1323.  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant."   <u>Northern New Mexicans Protecting Land and Water Rights v. United States</u>, No. CIV 15-0559 JB/LF, 2015 WL 8329509, at *9 (D.N.M. Dec. 4, 2015)(Browning, J.).

### 1.    <u>Reviewing Agency Factual Determinations</u>.

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).  The APA's two linguistic formulations amount to a single substantive standard of review.  <u>See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys.</u>, 745 F.2d at 683-84 (explaining that, as to factual findings, "there is no <u>substantive</u> difference between what [the arbitrary-or-capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)).  <u>See also Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys.</u>, 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.  The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found <u>within the</u>

record of closed-record proceedings to which it exclusively applies." (emphasis in original)).

Again, in reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record. See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted."). See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, [T]he Supreme Court [of the United States] has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had."). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing rule 201(b) of the Federal Rules of Evidence)("We take judicial notice of this document, which is included in the record before us in [another case]."); New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof."). In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits -- as well as decisions from the United States District Court for the

District of Columbia -- hold that taking judicial notice is generally inappropriate in APA review, subject to extraordinary circumstances or inadvertent omission from the administrative record. See Fence Creek Cattle Co. v. United States Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010); National Min. Ass'n v. Sec'y United States Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016); Dist. Hosp. Partners, L.P. v. Sebelius, 971 F. Supp. 2d 15, 32 (D.D.C. 2013)(Huvelle, J.)("The Court, however, notes that taking judicial notice is typically an inadequate mechanism for a court to consider extra-record evidence when reviewing an agency action."), aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46 (D.C. Cir. 2015).  Broadly, the Tenth Circuit has expressed that, "[w]hile judicial review of agency action is normally restricted to the administrative record, we have recognized that consideration of extra-record materials is appropriate in 'extremely limited' circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record."  Lee v. U.S. Air Force, 354 F.3d 1229, 1242 (10th Cir. 2004)(quoting Am. Min. Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985)).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the whole record before it when determining whether an agency's decision survives arbitrary-or-capricious review.  Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 415).  The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Env't Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).  Arbitrary-or-capricious

review requires a district court "to engage in a substantive review of the record to determine if the

agency considered relevant factors and articulated a reasoned basis for its conclusions,"

Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision,

see Colo. Env't Coal. v. Dombeck, 185 F.3d at 1172.  The agency must articulate the same

rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings.

See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943)("[T]he orderly functioning of the process of

review requires that the grounds upon which the administrative agency acted by clearly disclosed

and adequately sustained.").  While the court may not supply a reasoned basis for the agency's

action that the agency does not give itself, the court should "uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-

Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

### 2.    Reviewing Agency Legal Interpretations.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their

own regulations, and the Constitution, and courts reviewing those interpretations apply three

different deference standards, depending on the law at issue.  First, as it pertains to federal statutes,

between 1984 and 2024, courts had to defer to agency interpretations of ambiguous statutes that

the federal agency administered, and this deference was known as Chevron deference -- named

after the 1984 case of Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S.

837 (1984)("Chevron").  Chevron deference was a two-step process[10] that first asked whether the

---

[10]There was, additionally, a threshold step -- which Professor Cass Sunstein famously
called "step zero" -- which asked whether Chevron deference applies to the agency decision at all.
See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 191 (2006).

statutory provision in question is clear and, if it is not clear, then asks whether the agency's interpretation of the unclear statute is reasonable. Chevron, 467 U.S. at 843. The Supreme Court, however, overturns this deferential approach during its October 2023 term in Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 369 (2024)("Loper Bright").

In Loper Bright, in an opinion that the Honorable John Roberts, Chief Justice of the United States Supreme Court, authors, the Supreme Court reviews the traditional understandings of the judicial function, quoting Alexander Hamilton for the proposition that "[t]he Framers . . . envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts,'" Loper Bright, 603 U.S. at 384 (quoting The Federalist no. 78 (Hamilton)), and the Honorable John Marshall, former Chief Justice of the United States, for the oft-cited principle that "'[i]t is emphatically the province and duty of the judicial department to say what the law is,'" Loper Bright, 603 U.S. at 384 (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803)). The Supreme Court describes that, although the New Deal "ushered in a 'rapid expansion of the administrative process,'" the Supreme Court continued to "adhere to the traditional understanding that questions of law were for courts to decide, exercising independent judgment." Loper Bright, 603 U.S. at 384 (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)). The Supreme Court then reads and analyzes the plain language of the APA's § 706 -- which states at the outset that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 -- and concludes that the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to Marbury: that courts decide legal questions by applying their own judgment." Loper Bright, 603 U.S. at 391-92.

The Supreme Court then explains that "[t]he deference that <u>Chevron</u> requires of courts reviewing agency action cannot be squared with the APA," <u>Loper Bright</u>, 603 U.S. at 391, largely because "[t]he 'law of deference' . . . built on the foundation laid in <u>Chevron</u> [is] '[h]eedless of the original design' of the APA," <u>Loper Bright</u>, 603 U.S. at 398 (quoting <u>Perez v. Mortg. Bankers Ass'n</u>, 575 U.S. 92, 109 (2015)(Scalia, J., concurring in the judgment)).  Moreover, according to the Supreme Court, "agencies have no special competence in resolving statutory ambiguities. Courts do." <u>Loper Bright</u>, 603 U.S. at 400.  In lieu of <u>Chevron</u>'s presumption, the Supreme Court observes that "[t]he better presumption is . . . that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch." <u>Loper Bright</u>, 603 U.S. at 401-02.  This statement's rule, therefore, is what takes the place of <u>Chevron</u> deference: ordinary judicial interpretation of statutes, and courts are free to review and reject statutory interpretations that federal agencies offer.[11]

---

[11]The Supreme Court notes, however, that its holding does not forbid Congress from conferring some degree of statutory authority on agencies:

> That is not to say that Congress cannot or does not confer discretionary authority on agencies.  Congress may do so, subject to constitutional limits, and it often has. But to stay out of discretionary policymaking left to the political branches, judges need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA.  By forcing courts to instead pretend that ambiguities are necessarily delegations, <u>Chevron</u> does not prevent judges from making policy.  It prevents them from judging.

<u>Loper Bright</u>, 603 U.S. at 403.  In addition, <u>Loper Bright</u> affirms that deference under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139-40 (1944), continues to apply.  <u>See</u> <u>Loper Bright</u>, 603 U.S. at 393-397.  Under this species of deference, "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions." <u>Loper Bright</u>, 603 U.S. at 388 (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. at 139-40)(ellipses in <u>Loper Bright</u> and brackets in <u>Loper Bright</u>).

Second, despite Chevron's demise, when agencies interpret their regulations -- to, for example, adjudicate whether a regulated party is in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).  This deference is applied in the same manner as the erstwhile Chevron deference and is substantively identical. There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, uncertain.  Justice Scalia, after years of applying the doctrine followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." Talk America, Inc. v. Michigan Bell Telephone Co., [564] U.S. [50, 67] . . . (2011) (Scalia, J., concurring).  This is generally called Seminole Rock or Auer deference.  See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S. Ct. 1215, 89 L. Ed. 1700 (1945); Auer v. Robbins, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997).
>
> . . . .
>
> The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  Seminole Rock, supra, at 414, 65 S. Ct. 1215, 89 L. Ed. 1700.  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for Auer to do.  In practice, Auer deference is Chevron deference applied to regulations rather than statutes.  See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for <u>Auer</u> deference. The first case to apply it, <u>Seminole Rock</u>, offered no justification whatever -- just the <u>ipse dixit</u> that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." 325 U.S., at 414, 65 S. Ct. 1215, 89 L. Ed. 1700. Our later cases provide two principal explanations, neither of which has much to be said for it. <u>See generally</u> Stephenson & Pogoriler, <u>Seminole Rock</u>'s Domain, 79 Geo. Wash. L. Rev. 1449, 1454-1458 (2011). First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it. <u>E.g.</u>, <u>Martin v. Occupational Safety and Health Review Comm'n</u>, 499 U.S. 144, 150-153, 111 S. Ct. 1171, 113 L. Ed. 2d 117 (1991). The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." <u>The Theory of Legal Interpretation</u>, 12 Harv. L. Rev. 417, 419 (1899). Whether governing rules are made by the national legislature or an administrative agency, we are bound <u>by what they say</u>, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" <u>See</u>, <u>e.g.</u>, <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994). That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of <u>rulemaking</u>, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." <u>Marbury v. Madison</u>, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803). Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation <u>will be given effect</u> if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that <u>Congress</u> enacted, as we do per <u>Chevron</u>, it is <u>a fortiori</u> reasonable to defer to them regarding the meaning of regulations <u>that they themselves crafted</u>. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems

quite odd.

But it is not odd at all. The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. <u>See</u> <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735, 740-741, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996). While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949). Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out <u>by someone else</u>. <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its <u>own</u> rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." <u>Thomas Jefferson Univ.</u>, <u>supra</u>, at 525, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (Thomas, J., dissenting). Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." 1 W. Blackstone, Commentaries on the Laws of England 58 (1765). And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961). <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." Anthony, <u>The Supreme Court and the APA: Sometimes They Just Don't Get It</u>, 10 Admin. L. J. Am. U. 1, 11-12 (1996). <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power. <u>See</u> <u>Talk America</u>, 564 U.S., at 68-69, 131 S. Ct. 2254, 180 L. Ed. 2d 96 Scalia, J., concurring); Manning, <u>Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules</u>, 96 Colum. L. Rev. 612 (1996).

It is true enough that Auer deference has the same beneficial pragmatic effect as Chevron deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. See 77 Fed. Reg. 72974 (2012) (to be codified in 40 C.F.R. pt. 122, subpt. B). It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of Chevron-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 616-21 (Scalia, J., dissenting). Although the Court

shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land,

and, as a federal district court, the Court must apply it.[12]

Moreover, courts afford agencies no deference in interpreting the Constitution. See U.S.

West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is

---

[12]The Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable Neil Gorsuch, Associate Justice of the Supreme Court, recently have echoed Justice Scalia's concerns with Auer deference, and have called on the Supreme Court to reconsider and overrule Auer. See Garco Construction, Inc. v. Speer, 583 U.S. 1193, 1193-1195 (2018)(dissenting from denial of certiorari).

not entitled to <u>Chevron</u> deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." Courts have superior competence in interpreting -- and Constitutionally vested authority and responsibility to interpret -- the Constitution's content. The presence of a Constitutional claim does not take a court's review outside of the APA, however -- 5. U.S.C. § 706(2)(B) specifically contemplates adjudication of Constitutional issues -- and courts still must respect agency fact-finding and the administrative record when reviewing agency action for Constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. <u>See</u>, <u>e.g.</u>, <u>Robbins v. U.S. Bureau of Land Mgmt.</u>, 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [Constitutional] due process claim against the [agency] under the framework set forth in the APA.").

Last, the most recent development in <u>Chevron</u>-adjacent jurisprudence is the rise of the "major questions doctrine."[13]    <u>W. Virginia v. Env't Prot. Agency</u>, 597 U.S. 697, 724

---

[13]The novelty -- or, alternatively, the historical basis -- of this doctrine is a source of debate, even among the Justices. <u>Compare</u> <u>West. Virginia v. EPA</u>, 597 U.S. 697, 766 (2022)(Kagan, J., dissenting)(stating that the majority opinion "announces the arrival of the 'major questions doctrine'" (quoting Majority Op. at 724)), <u>with</u> <u>West Virginia v. EPA</u>, 597 U.S. at 740 (Gorsuch, J., concurring)(stating that "[s]ome version" of the major questions doctrine "can be traced to at least 1897"). <u>See</u> Thomas W. Merrill, <u>The Major Questions Doctrine: Right Diagnosis, Wrong Remedy</u> at 2, Hoover Inst., Legitimacy of Administrative Law Essay Series, available at https://www.hoover.org/sites/default/files/research/docs/ Merrill_WebReadyPDF.pdf (last visited November 16, 2024)(arguing that <u>West Virginia v. EPA</u> crystalized previous expressions of skepticism about "agency assertions of 'broad and unusual authority through an implicit delegation,'" into a distinct "doctrine" (quoting <u>Gonzalez v. Oregon</u>, 546 U.S. 243, 267 (2006)); Kevin O. Leske, <u>Major Questions About the "Major Questions" Doctrine</u>, 5 Mich. J. Env't & Admin. L. 479, 480 (2016)("After over a decade of hibernation, the United States Supreme Court has awoken the 'major questions' doctrine, which has re-emerged in an expanded form." (source of quoted material not cited)). Nevertheless, the Court is comfortable saying that <u>West Virginia v. EPA</u> marks the "rise" of the major questions doctrine, because that case is the first time that the Supreme Court states that it is applying something called the "major questions doctrine." <u>West Virginia v. EPA</u>, 597 U.S. at 724. Justice Kavanaugh, when serving as a Judge on the United

(2022)(Roberts, C.J.)("West Virginia v. EPA").  Concisely put, under this doctrine, a court should

not sustain an agency action that involves regulation of "major questions" -- those of great

"'economic and political significance,'" West Virginia v. EPA, 597 U.S. at 721 (quoting Food &

Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 147

(2000)(O'Connor, J.)) -- unless the agency can point to clear Congressional authorization for such

an action, see West Virginia v. EPA, 597 U.S. at 720-24.  Although the majority opinion in

Supreme Court in West Virginia v. EPA never mentions the erstwhile Chevron doctrine, many

academic commentators have conceptualized the major questions doctrine as a "exception" or

"carve-out" to Chevron analysis.  See Merrill, The Major Questions Doctrine: Right Diagnosis,

Wrong Remedy at 2 ("[T]he major questions doctrine should be seen as a carve-out from the

Chevron doctrine, one that all six justices in the conservative majority could agree on as a partial

corrective to some of the most frequently cited failings of the Chevron regime."); William N.

Eskridge, Jr. et. al., Textualism's Defining Moment, 123 Colum. L. Rev. 1611, 1675

(2023)("Recently, the Major Questions Doctrine (MQD) has become a prominent textualist-

favored, policy-based exception to Chevron[.]"); Daniel T. Deacon & Leah M. Litman, The New

Major Questions Doctrine, 109 Va. L. Rev. 1009, 1020-21 (2023)("In a set of cases, the [Supreme]

Court has suggested either that an issue should not be analyzed using the Chevron framework

because Congress did not authorize agencies to resolve the issue due to its majorness, or that the

Chevron analysis operates differently because the agency policy is a major one."); Mila Sohoni,

---

States Court of Appeals for the District of Columbia Circuit, once referred to something called the "major rules doctrine" -- which he defined by quoting Justice Scalia's observation that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."  United States Telecom Ass'n v. Fed. Commc'ns Comm'n, 855 F.3d 381, 417 (D.C. Cir. 2017)(Kavanaugh, J., dissenting)(quoting Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 324 (2014)).

The Major Questions Quartet, 136 Harv. L. Rev. 262, 263-64 (2022)(arguing that West Virginia v. EPA and its companion cases "unhitched the major questions exception from Chevron, which has been silently ousted from its position as the starting point for evaluating whether an agency can exert regulatory authority."). While many questions remain about the application of the major questions doctrine, at least for "major" questions, an agency will be presumed to have no authority to act unless Congress has "clearly" conferred on that agency the authority to act. West Virginia v. EPA, 597 U.S. at 716.

### 3.    Waiving Sovereign Immunity.

The United States, as the sovereign, "cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.). A court has no jurisdiction over a suit against the United States unless the United States consents to be sued. See FDIC v. Meyer, 510 U.S. 471, 475 (1983)("Sovereign immunity is jurisdictional in nature."); United States v. Mitchell, 463 U.S. 206, 212 (1983)(holding that it is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction"); Cortez v. E.E.O.C., 585 F. Supp. 2d 1273, 1282 (D.N.M. 2007)(Browning, J.)("If Congress has not waived sovereign immunity, the federal court does not have jurisdiction to hear the claim."). The United States' agencies have sovereign immunity absent a waiver. See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); Cortez v. E.E.O.C., 585 F. Supp. 2d at 1283. Furthermore, "[w]hen the acts complained of by the plaintiff pertain to actions of defendants in their official capacity as agents of the United States, the claim is, in actuality, against the United States." Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1190 (D.N.M. 2010)(Browning, J.). See Kentucky v. Graham, 473 U.S. 159, 165-166 (1985)(recognizing that suits against officials in their official capacities

"represent only another way of pleading an action against an entity of which an officer is an agent"). "The party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived." James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).

Congress often has waived the United States' sovereign immunity by statute. Such statutory waivers of the United States' sovereign immunity "must be unequivocally expressed in statutory text" and cannot be "implied." Lane v. Pena, 518 U.S. 187, 192 (1996). See Pueblo of Jemez v. United States, 430 F. Supp. 3d 943, 1149-50 (D.N.M. 2019)(Browning, J.), amended on reconsideration, 483 F. Supp. 3d 1024 (D.N.M. 2020), aff'd in part, vacated in part, rev'd in part, 63 F.4th 881 (10th Cir. 2023); Vigil v. FEMA, No. CIV 23-0941 JB/JFR, 2024 U.S. Dist. LEXIS 92879, *85 (D.N.M. May 23, 2024)(Browning, J.)(concluding that, because the Hermit's Peak Act § 104(i)(1) unequivocally expresses the claimant's right to sue FEMA in federal court, it constitutes a limited waiver of sovereign immunity); Oschwald v. Fed. Emergency Mgmt. Agency, No. CIV 04-0667, 2005 WL 8164370, at *2 (D.N.M. January 26, 2005)(Torgerson, M.J.)(concluding that the judicial review provision of the Cerro Grande Fire Assistance Act, Pub. L. 106-246, 114 Stat. 511, does not include a waiver of sovereign immunity). Accordingly, a "statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text." Lane v. Pena, 518 U.S. at 192. "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. at 192. For example, the FTCA waives sovereign immunity "for certain torts that United States employees cause while acting within the scope of their office or of their employment." De Baca v. United States, 403 F. Supp. 3d 1098, 1121 (D.N.M. 2019)(Browning, J.)(citing 28 U.S.C. §§ 2671-2680), affirmed Ohlsen v. United States, 998 F.3d 1143 (10th Cir. 2021). See Cortez v. E.E.O.C., 585 F. Supp. 2d at 1284 ("The only statutory authority to sue the United States for

common-law torts is under the Federal Tort Claims Act . . . .").  Similarly, the Tucker Act, 28 U.S.C. § 1491, establishes a waiver of sovereign immunity for non-tortious claims seeking money damages "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491.

Perhaps the most important waiver of the United States' sovereign immunity is found in 5 U.S.C. § 702, which waives sovereign immunity for challenges to agency action with respect to non-monetary claims.  See 5 U.S.C. § 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . .

5 U.S.C. § 702 (ellipses added).  While claims for money damages seek monetary relief "to substitute for a suffered loss," claims that do not seek monetary relief or that seek "specific remedies that have the effect of compelling monetary relief" are not claims for monetary damages.  Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir. 2009)(emphasis in original).  To determine whether a claim seeks monetary relief, a court must "look beyond the face of the complaint," and assess the plaintiff's prime object or essential purpose; "[a] plaintiff's prime objective or essential purpose is monetary unless the non-monetary relief sought has significant prospective effect or considerable value apart from the claim for monetary relief."  Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting Burkins v. United States, 112 F.3d 444, 449 (10th Cir. 1997)).  See, e.g., United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir. 1996)(explaining

that, through 5 U.S.C. § 702, Congress provides "a general waiver of the government's sovereign immunity from injunctive relief."); Aero Tech, Inc., v. United States Department of the Interior, No. CIV 23-0726 JB/JHR, 2024 WL 4581545 at *12 n. 6 (D.N.M. October 25, 2024)(Browning, J.)(stating that the APA "waives sovereign immunity for all actions that seek 'relief other than money damages,' 5 U.S.C. § 702, which includes nonparty subpoenas" (citing Exxon Shipping Co. v. U.S. Dept. of the Interior, 34 F.3d 774, 778-79 n.9 (9th Cir. 1994)). Further, the waiver in 5 U.S.C. § 702 "is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005)("Simmat"); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d 1191, 1223 (D.N.M. 2014)(Browning, J.)(quoting Simmat, 413 F.3d at 1233). Because "the APA does not grant subject-matter jurisdiction," however, the APA cannot waive sovereign immunity "when the relevant statute 'precludes judicial review' or when 'agency action is committed to agency discretion by law.'" New Mexico v. McAleenan, 450 F. Supp. 3d at 1194-95 (quoting 5 U.S.C. § 701(a)(1)-(2)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief. See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295.

Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated?  Second, does the Tucker Act expressly or impliedly forbid the relief that [the plaintiff] seeks, such that the APA's waiver does not apply?"  Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING STATUTORY INTERPRETATION

When interpreting statutes, the Court must start with the plain language:

We review issues of statutory construction de novo, "interpret[ing] the words of the statute in light of the purposes Congress sought to serve."  In so doing, we begin with the "language employed by Congress," and we "read the words of the statute in their context and with a view to their place in the overall statutory scheme."

Been v. O.K. Indus., Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)(quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233-34 (10th Cir. 2006)).  See United States v. Wright, 48 F.3d 254, 255 (7th Cir. 1995).  "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'"  Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)).  See In re Trans Ala. Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "would lead to absurd results . . . or would thwart the obvious purpose of the statute")(quoting Commissioner v. Brown, 380 U.S. 563, 571 (1965)).  "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute

as Congress has drafted it.'"  United Kingdom Ministry of Defence v. Trimble Navigation Ltd.,

422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir.

2000)).  See Pub. Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)("[W]e assume

that the words chosen by Congress are employed in their ordinary sense and accurately express

Congress's legislative purpose.").  See also Hamdan v. Chertoff, 626 F. Supp. 2d 1119, 1126

(D.N.M. 2007)(Browning, J.).

The Supreme Court has "frequently cautioned that 'it is at best treacherous to find in

congressional silence alone the adoption of a controlling rule of law.'"  United States v. Wells,

519 U.S. 482, 496 (1997)(quoting Nat'l Lab. Rels. Bd. v. Plasterers' Local Union No. 79, 404 U.S.

116, 129-130 (1971)).  An omission of a substantive or procedural aspect in a statute does not

invite "a judicial guess as to what Congress would have wanted."  Sec. Exch. Comm'n v. Traffic

Monsoon, LLC, 245 F. Supp. 3d 1275, 1290 (D. Utah 2017)(Parrish, J.).  In the face of

Congressional silence, the judiciary must be cautious to avoid "insert[ing] convenient language to

yield the court's preferred meaning."  Borden v. United States, 141 S. Ct. 1817, 1829 (2021).

When Congress does not provide a cause of action, the Court is not authorized[14] "to create

causes of action -- decreeing them to be 'implied' by the mere existence of a statutory or

---

[14]In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388
(1971), the Supreme Court creates a cause of action under the Fourth Amendment to the
Constitution of the United States against federal agents who allegedly "manacled the plaintiff in
front of his wife and children, and threatened to arrest the entire family."  402 U.S. at 389.  While
the Supreme Court recognizes that "the Fourth Amendment does not in so many words provide
for its enforcement by an award of money damages" a remedy was deemed appropriate under
general principles of federal jurisdiction.  Bivens v. Six Unknown Named Agents of Fed. Bureau
of Narcotics, 403 U.S. at 396.  Since that decision the Supreme Court has not "implied additional
causes of action under the Constitution.  Now long past 'the heady days in which this Court
assumed common-law powers to create causes of action' we have come 'to appreciate more fully
the tension between' judicially created causes of action and 'the Constitution's separation of
legislative and judicial power.'"  Egbert v. Boule, 142 S. Ct. at 1802 (quoting Corr. Servs. Corp.

constitutional prohibition." Corr. Servs. Corp. v. Malesko, 542 U.S. 61, 75 (2001)(Scalia, J., concurring). "At bottom, creating a cause of action is a legislative endeavor. Courts engaged in that unenviable task must evaluate a 'range of policy considerations,'" which Congress is better equipped to consider. Egbert v. Boule, 142 S. Ct. 1793, 1802-03 (2022)(quoting Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 407 (1971)).

## LAW REGARDING FEDERAL DISTRICT COURT INTERPRETATIONS OF STATE LAW

Federal district courts must apply State law under certain circumstances, such as when a statute requires or when exercising diversity jurisdiction. Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). If a district court looks to New Mexico State law when exercising diversity jurisdiction, for example, but cannot find a Supreme Court of New Mexico opinion that governs a particular area of substantive law, the federal court "must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3]. See Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)("[A]n intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (quoting West v. A.T.&.T. Co., 311 U.S. 223, 237 (1940))(ellipses and emphasis in Comm'r v. Estate of Bosch). See also Siloam Springs Hotel, L.L.C. v. Century Sur. Co., 906 F.3d 926, 932 (10th Cir. 2018)(holding that, because the majority of the Oklahoma Supreme Court declines to

---

v. Malesko, 534 U.S. at 75 (Scalia, J., concurring); Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020)).

reach the merits of the issue, "we must predict how that court would likely rule on this issue if the issue were properly before it"); Peña v. Greffet, 10 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.)("Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court."); Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 (D.N.M. 2014)(Browning, J.)(same); Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.)(same).[15]  If the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley

---

[15]In performing its Erie-mandated duty to predict what a State supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1987), a federal court may sometimes contradict the State supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should be reticent to formulate an Erie prediction that conflicts with State court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in State and federal courts, as the old State supreme court precedent usually binds State trial and appellate courts.  The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court explicitly has called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if mostly dissenting justices from the earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a State supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent State-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only

opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court

sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case

were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state")).[16]    The Court also may rely on

---

[16]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the State's highest court:

> The highest state court is the final authority on state law (Beals v. Hale, 4 How. 37, 54; Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.    See Ruhlin v. New York Life Insurance Co., 304 U.S. 202, 209.    An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.    We have declared that principle in West v. American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.    It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . .

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, (Erie Railroad Co. v. Hilt, 247 U.S. 97, 100, 101; Erie Railroad Co. v. Duplak, 286 U.S. 440, 444), and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

Tenth Circuit decisions interpreting New Mexico law.[17]   See Anderson Living Trust v. WPX

Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.  Ultimately, "the Court's task is to predict what

---

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(Court adds ellipses).  The Supreme Court has softened this position over the years; federal courts are no longer bound by State trial or intermediate court opinions, but "while the decrees of 'lower state courts' should be 'attributed some weight . . . the decision [is] not controlling . . .' where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (quoting King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)(brackets and ellipses in Comm'r v. Estate of Bosch).  See 17A Moore's, § 124.20 ("[F]ederal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently.").

[17]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the court must balance the need for uniformity between federal court and State court interpretations of State law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a State's law in the ensuing years, then parties litigating State law claims will be subject to a different body of substantive law, depending on whether they litigate in State court or federal court.  This result frustrates the purpose of Erie, which holds that federal courts must apply State court interpretations of State law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight and according State court decisions issued in the ensuing years more weight.  On the other hand, when the State law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same Circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a State's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects State law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.
The Court must decide how to weigh Tenth Circuit case law against more-recent State court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the State's highest court, on one end; and independently interpreting the State law, regarding the Tenth Circuit

precedent as persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the State courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.   More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the State law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the State's common law in making his or her determination -- the same as a State judge would.  Systemic inconsistency between the federal courts and State courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting State law, and the State courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the State forum, or vice versa.

       The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law.  Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts' are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the State's courts themselves and federal district courts do.  As such, Tenth Circuit precedent can lag behind developments in State law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular State's law is wasted.  Other than Oklahoma, every State encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one State.  It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State(s) than it is for the Tenth Circuit to monitor separate legal developments in eight States.

       Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the State law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on State court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that x is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is x.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.

Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of State law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of State law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

Erie's purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or State forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the States' highest court would rule if confronted with the issue."  Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 (stating that intermediate appellate courts are "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise")).  This one formulation may not be the most precise if the goal is to ensure identical outcomes in State and federal court -- the Honorable Milton I. Shadur, United States District Judge for the United States District Court of the Northern District of Illinois, looks to State procedural rules to determine in which State appellate circuit the suit would have been filed were it not in federal court, and then applies the State law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the State supreme court's holdings often will lead to litigants obtaining a different result in federal court than they would in State court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative State supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider State appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by State supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of State law.

---

The <u>Erie</u> doctrine results in federal cases that interpret State law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (States must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting State law often become stale.  New State court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree.  In <u>Wankier v. Crown Equipment Corp.</u>, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.) the Tenth Circuit says:

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of <u>stare decisis</u>.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866.  From this passage, it seems clear the Tenth Circuit permits a district court to deviate from the Tenth Circuit's view of State law only on the basis of a subsequent case "of the state's highest court."  <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest State court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition.  In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of <u>Allen</u> [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or

the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. See Rimbert

v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M. 2008)(Browning, J.)("The Court's task is

to divine, as much as possible, what the Supreme Court of New Mexico would do if the legal

question was presented to it."); Estate of Anderson v. Denny's, Inc., No. CIV 12-0605 JB/GBW,

2013 WL 6506319, *32 & n. 16 (D.N.M. Nov. 13, 2013)(Browning, J.)(noting that the Court's

task is to predict what the Supreme Court of New Mexico would do).

## LAW REGARDING THE FTCA

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity

for some tort actions against the United States seeking money damages. See 28 U.S.C. § 1346(b);

Fed. Deposit Ins. v. Meyer, 510 U.S. 471, 475 (1994); Warren v. United States, 244 F. Supp. 3d

---

an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at
1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867. Regardless whether the decision to limit the
intervening authority a district court can consider was intentional, the Tenth Circuit has picked it
up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown
Equipment Corp., refuses to consider an opinion from the Court of Appeals of Colorado holding
directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v.
Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)(holding that the Colorado Court
of Appeals case Biosera Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998) is not
an "intervening decision of the state's highest court")(quoting Wankier v. Crown Equip. Corp.,
353 F.3d at 866)(emphasis in Kokins v. Teleflex, but not in Wankier v. Crown Equip. Corp.).
The Tenth Circuit has set forth a stringent restriction on its district courts' ability to administer
independently the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension
with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists
the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate
decision [interpreting State law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut.
Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is
bound to abide by the Tenth Circuit's interpretation of Erie. This scheme may be inefficient,
because the plaintiffs may appeal, after trial, the Court's ruling on an issue; the Tenth Circuit may
certify the question to the Supreme Court of New Mexico, and the Tenth Circuit may then have to
reverse the Court after a full trial on the merits.

1173, 1212 (D.N.M. 2017)(Browning, J.).  In enacting the FTCA, Congress waives the United

States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January
> 1, 1945, for injury or loss of property, or personal injury or death caused by the
> negligent or wrongful act or omission of any employee of the Government while
> acting within the scope of his office or employment, under circumstances where the
> United States, if a private person, would be held liable to the claimant in accordance
> with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez

v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "If the claim does not fall

within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not

cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at

1284 (citing Williams v. United States, 50 F.3d at 304-05).  Moreover, the only proper party in an

action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Smith v. United States, 561

F.3d 1090, 1099 (10th Cir. 2009)(quoting Oxendine v. Kaplan, 241 F.3d 1272, 1275 n.4 (10th Cir.

2001))("The United States is the only proper defendant in an FTCA action."); De Baca v. United

States, 399 F. Supp. 3d at 1183-84 (concluding that Isleta Pueblo is not a federal employee for

FTCA purposes because the facts show that Isleta Pueblo entered an independent contractor

agreement with the Forest Service).

Even when the FTCA waives the United States' sovereign immunity, the United States is

liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private

individual under like circumstances."  28 U.S.C. § 2674.  "The Tort Claims Act was designed

primarily to remove the sovereign immunity of the United States from suits in tort and, with certain

specific exceptions, to render the Government liable in tort as a private individual would be under

like circumstances."  Richards v. United States, 369 U.S. 1, 6 (1962).  The FTCA leaves untouched

the States' laws that might apply to the United States once Congress removes that immunity. The

Supreme Court notes:

> Rather, [the FTCA] was designed to build upon the legal relationships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the generally interstitial character of federal law. If Congress had meant to alter or supplant the legal relationships developed by the States, it could specifically have done so to further the limited objectives of the Tort Claims Act.

Richards v. United States, 369 U.S. at 6-7. Accordingly, "the United States is placed in the same

position as a private individual by rendering the United States liable for the tortious conduct of its

employees if such conduct is actionable in the State in which the United States' action or inaction

occurred." Cortez v. EEOC, 585 F. Supp. 2d at 1284. Cf. Garcia v. United States, No. CIV 08-

0295 JB/WDS, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)("The law of the

place where the alleged negligent conduct took place determines the scope of employment under

the FTCA.")(citing 28 U.S.C. § 1346(b)). See Richards v. United States, 369 U.S. at 9; Williams

v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th

Cir. 1970).

The United States' liability is coextensive with that of private individuals under the

respective States' law, even if comparable government actors or public entities would have

additional defenses or additional obligations under that State's law. See United States v. Olson,

546 U.S. 43, 44-47 (2005); In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs),

668 F.3d 281, 288 (5th Cir. 2012)(citing LaBarge v. Cty. of Mariposa, 798 F.2d 364, 366-69 (9th

Cir. 1986)("Because the federal government could never be exactly like a private actor, a court's

job in applying the standard is to find the most reasonable analogy. Inherent differences between

the government and a private person cannot be allowed to disrupt this analysis."); United States v.

Olson, 546 U.S. at 47)); DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir.

2007)("Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties."); Ewell v. United States, 776 F.2d at 248-49; Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)( "This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute."); Proud v. United States, 723 F.2d 705, 706 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law.").  The Tenth Circuit in Ewell v. United States explains the reasoning behind the FTCA's waiver of sovereign immunity:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed. There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . .  The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. [61]at 65 [(1955)] . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.
>
> Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances.

Ewell v. United States, 776 F.2d at 249.

The Tenth Circuit emphasizes that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010).[18]  It has explained: "'A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.'"  Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)).  The Tenth Circuit holds in Mecca v. United States that the district court improperly dismisses with prejudice the plaintiff's FTCA claims after it concludes that it lacks jurisdiction over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile.  We therefore remand with instructions to enter dismissal of these claims without prejudice.").

---

[18]Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010), is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Mecca v. United States, West v. Ortiz, No. CIV 06-1192, 2007 WL 706924 (10th Cir. Mar. 9, 2007)(Broby, J.), Jones v. United States, 355 F. App'x 117 (10th Cir. 2009), Morrison v. Kache, 576 F. App'x 715 (10th Cir. 2014), Ruppert v. Aragon, 448 F. App'x 862 (10th Cir. 2012), Stevens v. United States, 61 F. App'x 625 (10th Cir. 2003), Woodward Stuckart LLC v. United States, 650 F. App'x 380 (9th Cir. 2016), Backfire 2000 v. United States, 273 F. App'x 661 (9th Cir. 2008), Clark v. United States, 695 F. App'x 378 (10th Cir. 2017), and Garling v. U.S. Envtl. Prot. Agency, 849 F.3d 1289, 2017 WL 894432 (10th Cir. 2017), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

**LAW REGARDING THE FTCA'S EXHUASTION REQUIREMENT AND STATUTE OF LIMITATIONS**

Two procedural steps limit the plaintiff's abilities to sue pursuant to the FTCA: (i) an administrative exhaustion requirement; and (ii) a statute of limitations. See Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015). Together the steps define the time period within which the plaintiff may bring a suit. See Barnes v. United States, 776 F.3d at 1139. A plaintiff must provide the agency notice of his, her, or its claims, see 28 U.S.C. § 2675(a), and must present the claim within a limited time after the claim accrues, see 28 U.S.C. § 2401(b).

1.      **Exhaustion Requirements.**

The FTCA's exhaustion requirement is "'jurisdictional and cannot be waived.'" Morrison v. Kache, 576 F. App'x 715, 717 (10th Cir. 2014)(unpublished)(quoting Bradley v. United States ex rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)). Before bringing an action in federal court, a claimant must present the claim to the appropriate federal agency; the FTCA's jurisdictional statute provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a). This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim." Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 (quoting Bradley v. U.S. ex. rel. Veterans Admin., 951 F.2d at 270).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'"  Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d 881, 884 (10th Cir. 2005)(quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853).  The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853.  Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law.  See Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d at 884; Warren v. United States, 244 F. Supp. 3d at 1213.

## 2.    **Filing Deadlines.**

Once a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim in writing to the appropriate federal agency.  See 28 U.S.C. § 2401(b) (explaining that a claim is "forever barred" unless presented within two years).  If the agency denies the claim, the claimant has six months to file suit in federal court.  See 28 U.S.C. § 2401(b). The Tenth Circuit has clarified that a party must satisfy both of § 2401's prongs: "28 U.S.C. § 2401(b) bars a tort claim against the United States 'unless it is presented to the proper agency within two years of its accrual and suit is commenced within six months of notice of the claim's denial by the agency.'"  Ponce v. United States, No. CIV 13-0334 JB/ACT, 2013 WL 6503535, at *14 (D.N.M. Nov. 25, 2013)(Browning, J)(quoting Indus. Constructors Corp. v. United States Bureau of Reclamation, 15 F.3d 963, 968 (10th Cir. 1994))(emphasis in Indus. Constructors Corp. v. United States Bureau of Reclamation).

If the agency fails to make a final disposition of the claim within six months, the claimant may "deem . . . " that failure a "final denial of the claim," and proceed with his or her suit under the FTCA.  28 U.S.C. § 2675(a).  In the Tenth Circuit, "(at least until there has been a final denial

by the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a deemed denial." Barnes v. United States, 776 F.3d at 1140. An agency may "trigger . . . § 2401(b)'s six-month limitations period through final denial of administrative FTCA claims after a 'deemed denial.'" Barnes v. United States, 776 F.3d at 1141. See Warren v. United States, 244 F. Supp. 3d at 1213.

    **3.**    **Effect of Failure to Exhaust.**

    "[A]s a general rule, a premature 'complaint cannot be cured through amendment, but instead, plaintiff must file a new suit.'" Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. 1999)(quoting Sparrow v. U.S. Postal Serv., 825 F. Supp. 252, 255 (E.D. Cal. 1993)(Wagner, J.)). This rule exists, because "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Courts must dismiss these claims "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012)(unpublished). Even the filing of an amended complaint may not serve to cure a prematurely filed original complaint. See Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(unpublished).

    There is at least one limited exception to the general rule. Duplan v. Harper recognizes an exception where the United States "expressly agreed" to the district court's decision to treat the amended complaint as a new action. 188 F.3d at 1199. See Mires v. United States, 466 F.3d 1208, 1211 (10th Cir. 2006)(concluding that there is a new action where plaintiff "sought permission to file -- and, with the government's consent and district court's permission, did file -- an amended complaint"). See also Warren v. United States, 244 F. Supp. 3d at 1214.

4.    **Definition of "Sufficient Notice."**

Courts define "sufficient notice" based on the facts of each case before them. In Estate of Trentadue ex rel. Aguilar v. United States, the United States contends that the plaintiffs' administrative claim is insufficient for notice of intentional infliction of emotional distress, because it is based on a theory that prison officials murdered Trentadue, the inmate, and the allegations do not discuss the specific grounds on which the district court relies in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval." 397 F.3d at 852. The Tenth Circuit disagrees, holding that the "plaintiffs' administrative claim provided notice that [the United States Department of Justice ('DOJ')] should investigate the prison officials' conduct." 397 F.3d at 853. The Tenth Circuit reasons that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints." 397 F.3d at 853.

The Tenth Circuit contrasts Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34 (1st Cir. 2000), where the United States Court of Appeals for the First Circuit holds that the plaintiff's administrative claim does not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arises out of two separate incidences. 221 F.3d at 40. The First Circuit states: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it." 221 F.3d at 40. The First Circuit thus concludes that, "regardless of the labels employed in the amended complaint,

that complaint, <u>in substance</u>, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim."  221 F.3d at 40.

In <u>Glade ex rel. Lundskow v. United States</u>, 692 F.3d 718 (7th Cir. 2012), a man receiving mental health treatment at a Veterans Administration ("VA") facility alleges that his therapist worsens his condition by initiating a sexual relationship with him.  <u>See</u> 692 F.3d at 720.  He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist."  692 F.3d at 722.  The United States Court of Appeals for the Seventh Circuit, reviewing the notice, comments that "reading the administrative claim you would think the plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery, and we know that such a theory won't fly under the Tort Claims Act."  692 F.3d at 722.  The plaintiff recognizes this problem before filing his complaint and thus instead asserts a "special relationship" theory of liability.  692 F.3d at 723.  The Seventh Circuit affirms the district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts that would clue a legally trained reader to the theory's applicability.  <u>Palay v. United States</u>, 349 F.3d 418, 425-26 (7th Cir. 2003); <u>Murrey v. United States</u>, 73 F.3d 1448, 1452-53 (7th Cir. 1996).  The plaintiff's claim didn't do that.  The legally trained reader would assume that the plaintiff simply was unaware that the mere fact of a battery by a VA employee would not impose liability on the employer.  We're about to see that the "special relationship" tort theory advanced in the plaintiff's complaint (as distinct from the administrative claim) is outside the bounds of plausibility -- hardly the sort of theory that the VA's legal department should have guessed would be the ground of a lawsuit.

<u>Glade ex rel. Lundskow v. United States</u>, 692 F.3d at 722-23.  <u>See</u> <u>Warren v. United States</u>, 244 F. Supp. 3d at 1215.

## <u>LAW REGARDING THE FTCA'S EXCEPTIONS</u>

The FTCA contains several exceptions to its waiver of immunity.  <u>See</u> 28 U.S.C. § 2680. The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness

to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).  These exceptions must be strictly construed in the United States' favor.  See United States Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992).

### 1.      The Discretionary-Function Exception.

One exception is the discretionary-function exception, which provides that the immunity waiver in the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on that part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Its application is a threshold jurisdictional issue in any FTCA case.  See Johnson v. United States Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991).  Cf. Warren v. United States, 244 F. Supp. 3d at 1233 (noting that, at the motion-to-dismiss stage, in an FTCA case, a plaintiff "must establish more than . . . abstract negligence" "and, instead, must also first establish that her claims are not based upon actions immunized from liability under the FTCA's discretionary function exception").  In Berkovitz by Berkovitz v. United States, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary-function exception applies. See 486 U.S. at 536; Domme v. United States, 61 F.3d at 789-90; Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73 (10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-03 (10th Cir. 1993).  First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'"  United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536).  An action is not discretionary where a statute, regulation, or policy mandates certain conduct, because the employee has "no room for choice."

United States v. Gaubert, 499 U.S. 315, 324 (1991).  See Garcia v. United States Air Force, 533
F.3d at 1176 ("Conduct is not discretionary if 'a federal statute, regulation, or policy specifically
prescribes a course of action for an employee to follow.  In this event, the employee has no rightful
option but to adhere to the directive.'" (quoting Berkovitz by Berkovitz v. United States, 486 U.S.
at 537)).  On the other hand, the Supreme Court states:

> [W]here Congress has delegated the authority to an independent agency or
> to the Executive Branch to implement the general provisions of a regulatory statute
> and to issue regulations to that end, there is no doubt that planning-level decisions
> establishing programs are protected by the discretionary function exception, as is
> the promulgation of regulations by which the agencies are to carry out the
> programs.

United States v. Gaubert, 499 U.S. at 323.

Second, the conduct must be "'based on considerations of public policy.'"  United States
v. Gaubert, 499 U.S. at 323 quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537).
See Garling v. U.S. Envtl. Prot. Agency, 849 F.3d 1289, 1294-95, 2017 WL 894432, at *3 (10th
Cir. 2017)(unpublished).  This principle is a result of the rule that the second prong requires that
the challenged conduct must be, by its nature, "susceptible to policy analysis."  United States v.
Gaubert, 499 U.S. at 325.  Where agency policy allows an employee to exercise discretion, there
is a "strong presumption" that the acts authorized by the policy are grounded in public policy.
United States v. Gaubert, 499 U.S. at 324.  Where a plaintiff alleges a negligent omission, it is
"irrelevant whether the [omission] was a matter of 'deliberate choice,' or a mere oversight," Kiehn
v. United States, 984 F.2d at 1105 (quoting Allen v. United States, 816 F.2d 1417, 1422 n.5 (10th
Cir. 1987)), because "[t]he failure to consider some or all critical aspects of a discretionary
judgment does not make that judgment less discretionary and does not make the judgment subject
to liability," Kiehn v. United States, 984 F.2d at 1105.

The two-prong test in <u>Berkovitz by Berkovitz v. United States</u> applies equally to all United States employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. at 813. <u>See</u> <u>United States v. Gaubert</u>, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. at 811 ("'Where there is room for policy judgment and decision there is discretion.  It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.'" (quoting <u>Dalehite v. United States</u>, 346 U.S. 15, 35-36 (1953))).

In applying the <u>Berkovitz by Berkovitz v. United States</u> analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'" <u>Redman v. United States</u>, 934 F.2d 1151, 1157 (10th Cir. 1991)(quoting 28 U.S.C. § 2680(a)).  A court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the United States' duties under the common law.  <u>Domme v. United States</u>, 61 F.3d at 789.  The Tenth Circuit explains:

> Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place.  Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a <u>federal</u> policy incorporating state tort law as a limit on the discretion of federal employees with the meaning of the FTCA.

Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008)(emphasis in Sydnes v. United States).[19]

In De Baca v. United States, 399 F. Supp. 3d 1052, the Court holds that the FTCA's discretionary-function exception applies to the Forest Service's various actions that result in the

---

[19]Post-Berkovitz by Berkovitz v. United States and United States v. Gaubert, the Tenth Circuit limits the theory that the discretionary-function exception does not protect the United States from its duty to exercise due care.  See, e.g., Domme v. United States, 61 F.3d at 789 n.1. Although, in Smith v. United States, the Tenth Circuit suggests that the discretionary-function exception cannot defeat the United States' duties of due care as a landowner, see Smith v. United States, 546 F.2d at 876, the Tenth Circuit recognizes that it decided Smith v. United States before the Supreme Court decided Berkovitz by Berkovitz v. United States.  See Domme v. United States v. Smith, 61 F.3d at 789 n.1.  The Tenth Circuit consequently narrows Smith v. United States' holding.  See, e.g., Clark v. United States, 695 F. App'x 378, 387-88 (10th Cir. 2017)(focusing on Smith v. United States' facts); Domme v. United States, 61 F.3d at 789 (describing Smith v. United States as fact-specific); Zumwalt v. United States, 928 F.2d 951, 955 (10th Cir. 1991)(describing the failure to warn in Smith v. United States as not based on a policy decision).  The Tenth Circuit has likewise cabins the import of Indian Towing Co. v. United States, wherein the Supreme Court holds that, once the Coast Guard decided to undertake service of a lighthouse, it had a duty to perform the task with due care.  See Indian Towing Co. v. United States, 350 U.S. at 69; Sydnes v. United States, 523 F.3d at 1186 n.6.  The Tenth Circuit notes that, after United States v. Gaubert, Indian Towing Co. v. United States does not provide particularly persuasive authority on the discretionary-function exception, see Sydnes v. United States, 523 F.3d at 1186 n.6, because, in Indian Towing Co. v. United States, the United States concedes the discretionary-function issue, see Black Hills Aviation, Inc. v. United States, 34 F.3d at 977, and because the Supreme Court has since rejected the distinction between high-level policy and operational decisions on which Indian Towing Co. v. United States relies, see Harrell v. United States, 443 F.3d 1231, 1237 (10th Cir. 2006).  But cf. Lopez v. United States, 376 F.3d 1055, 1059 (10th Cir. 2004)(discussing the plaintiffs' arguments about Indian Towing Co. v. United States and distinguishing Indian Towing Co. v. United States without noting the limits on Indian Towing Co. v. United States' persuasive authority).

Although the Court previously relied on Indian Towing Co. v. United States and Smith v. United States, see Coffey v. United States, 906 F. Supp. 2d at 1157 (stating that "when the government exercises its discretion and chooses to participate in an activity, the discretionary-function exception does not protect the government from failing to provide due care in its performance of the activity" (citing Indian Towing Co. v. United States, 350 U.S. at 69),)); Coffey v. United States, 906 F. Supp. 2d at 1161-64, it recognizes the limits on the common law duty of due care's ability to overcome the discretionary-function exception.  Once the United States makes a discretionary decision, it cannot undertake without due care the non-discretionary conduct that the decision or policy dictate.  See Coffey v. United States, 906 F. Supp. 2d at 1163.  The duty of due care does not narrow, however, the discretionary-function exception's bounds.

June 15, 2015, Dog Head Fire in Cibola National Forest, New Mexico.  See 399 F. Supp. 3d at 1071, 1211.  The Court holds that the Forest Service's "fire prevention and management decisions rest in policy concerns."  See De Baca v. United States, 399 F. Supp. 3d at 1212.  The Forest Service, therefore, acts within its discretion in deciding where to position fire engines, has no mandatory duty to implement site-specific fire restrictions, has no policy about site-specific assessments before the Dog Head Fire, and does not have a mandatory duty to protect against destruction by fire.  See De Baca v. United States, 399 F. Supp. 3d at 1211-13.  Additionally, the Court holds that the Forest Service's decision to contract with Isleta Pueblo and to delegate responsibility to "thin the project site and to adhere to the maximum slash[20] depth are within the Forest Service's discretion," 399 F. Supp. 3d at 1213, and that the decision to hire an independent contractor is a discretionary function, see 399 F. Supp. 3d at 1213 (citing Coffey v. United States, 906 F. Supp. 2d at 1158).

### 2.    The Independent Contractor Exception.

The FTCA excepts torts committed through independent contractors' acts, although not pursuant to 28 U.S.C. § 2680's exceptions.  See Curry v. United States, 97 F.3d at 414 (citing United States v. Orleans, 425 U.S. at 814; Logue v. United States, 412 U.S. 521, 527 (1973)).  The

---

[20]The Court defines "slash" earlier in De Baca v. United States' factual background section:

"In forestry, slash, or slashings are coarse and fine woody debris generated during logging operations or through wind, snow or other natural forest disturbances. Slash generated during logging operations may increase fire hazard, and some North American states have passed laws requiring the treatment of logging slash." Slash (logging), Wikipedia, https://en.wikipedia.org/wiki/Slash_(logging)(last visited May 17, 2019).

De Baca v. United States, 399 F. Supp. 3d at 1073 n.20.

FTCA's waiver of sovereign immunity applies to United States employees acting within their employment's scope, see, e.g., Tsosie v. United States, 452 F.3d at 1163 (citing Curry v. United States, 97 F.3d at 414), and the statute defines the term "federal employees" for FTCA purposes as "officers or employees of any federal agency," and "federal agency" to include "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States," but not to "include any contractor with the United States," 28 U.S.C. § 2671. Accordingly, United States employees include "officers and employees of federal agencies," but not independent contractors and their employees. Tsosie v. United States, 452 F.3d at 1163 (citing Curry v. United States, 97 F.3d at 414).

"[T]he question whether one is an employee of the United States is to be determined by federal law." Waconda v. United States, No. CIV 06-0101 JB/ACT, 2007 WL 2219472, at *10 (D.N.M. May 23, 2007)(Browning, J.)(quoting Lurch v. United States, 719 F.2d 333, 337 (10th Cir. 1983)). Under federal law, the analysis focuses on whether the alleged principal controls the contractor's physical performance of his, her, or its work. See Lurch v. United States, 719 F.2d at 337 (citing United States v. Orleans, 425 U.S. at 814).[21] If the principal controls the conduct, the contractor is an employee rather than an independent contractor. See Lurch v. United States, 719

---

[21]In drawing this distinction between independent contractors and employees, the Supreme Court imports the common law of tort's test for identifying employer-employee relationships, see Logue v. United States, 412 U.S. at 525-28, and, as early as 1973, describes this test as one of the alleged principal's control, and, thus, of the alleged principal's supervision, over the contractor's work, see Logue v. United States, 412 U.S. at 527; cf. United States v. Orleans, 425 U.S. at 814-15 (describing that, as in Logue v. United States, and in Maryland v. United States, 381 U.S. 41 (1965), "the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government").

F.2d at 337.  "The key inquiry under this control test is whether the Government supervises the

day-to-day operations of the individual."  Lurch v. United States, 719 F.2d at 337 (citing United

States v. Orleans, 425 U.S. at 815).  The Tenth Circuit has directed courts engaging in this inquiry

to consider:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Curry v. United States, 97 F.3d at 414 (citing Lilly v. Fieldstone, 876 F.2d 857, 859 (10th Cir.

1989)).

### RELEVANT LAW REGARDING THE FTCA'S DISCRETIONARY-FUNCTION EXCEPTION AS APPLIED TO THE FOREST SERVICE'S FOREST-FIRE RELATED ACTIONS

The  discretionary-function  exception  generally  bars  FTCA  claims  against  the

United States concerning the Forest Service's forest-fire related actions.  The Ninth Circuit and

the Eleventh Circuit both apply the discretionary-function exception to the Forest Service's

decision to forest fire management decisions.  In Miller v. United States, 163 F.3d 591 (9th Cir.

1998), the Ninth Circuit holds the discretionary function bars plaintiff's suit against the Forest

Service where a forest fire spreads from Ochoco National Forest onto the plaintiff's property.  163

F.3d at 592, 597.  In Esquivel v. United States, 21 F.4th 565, 572-73 (9th Cir. 2021), the Ninth

Circuit similarly finds the discretionary function bars suit against the Forest Service's actions when

a wildfire threatened private property and a fire crew obtained a resident's verbal consent before

starting suppression activities, but the crew's fire suppression activities damages plaintiff's

property.  21 F.4th 565 at 572-73.  In Woodward Stuckart LLC v. United States, 650 F. App'x

380, 383 (9th Cir. 2016), the Ninth Circuit also applies the discretionary function exception to the

Forest Service's decisions whether and when to suppress a naturally caused wildfire, explaining that the Forest Service's response to "multiple wildland fires as being grounded on competing public policy considerations." 650 F. App'x at 383. The Ninth Circuit in Woodward Stuckart LLC v. United States, 650 F. App'x at 383 bases its conclusion on the identical holding in Miller v. Gammie, 335 F.3d 889, 899 (9th Cir. 2003), in which the Ninth Circuit describes the Forest Service's allocation of fire-suppression resources to multiple fires as involving a balancing of competing policy interests. Miller v. Gammie, 335 F.3d at 899. In Backfire 2000 v. United States, 273 F. App'x 661, 662-63 (9th Cir. 2008), the Ninth Circuit explicitly holds that the Forest Service's use of backfires to fight the Bitterroot wildfires is subject to the discretionary-function exception. The Eleventh Circuit applies the discretionary function exception even when a Forest Service's prescribed fire in a national forest escapes and damages private property. See Foster Logging, Inc., v. United States, 973 F.3d 1152, 1167 (11th Cir. 2020). In Foster Logging, Inc., v. United States, the Eleventh Circuit holds that the Forest Service is "shielded from judicial second-guessing" by the discretionary-function exception when the Forest Service's initiated prescribed burn escapes and causes damage to the plaintiffs' property. Foster Logging, Inc., v. United States, 973 F.3d at 1167. There, the Eleventh Circuit concludes that, even assuming the Forest Service acts negligently in observing, monitoring, and maintaining the controlled burn as the complaint alleges, "that alleged conduct -- the steps and measures taken to safely execute a controlled burn -- by its nature, involves an exercise of discretion and considerations of social, economic, political, and public policy." 973 F.3d at 1167.

Additionally, the Tenth Circuit holds that, when a wildfire naturally occurs and the Forest Service responds to -- but does not initiate -- the fire, the discretionary-function exception bars FTCA lawsuits against the United States. See Knezovich v. United States, 82 F.4th 931, 934 (10th

Cir. 2023)(concluding that the discretionary-function exception bars suit against the Forest Service

for allegedly negligently delaying suppression response to the 2018 Roosevelt Fire in Wyoming);

Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d 1216, 1222-23 (10th Cir. 2016)(reasoning

that a Forest Service decision only to partially suppress a wildfire requires a "balancing of the

needs to protect private property, ensure firefighter safety, reduce fuel levels, and encourage

natural ecological development," and that "[t]he nature of the [Forest Service's] actions in fighting

the . . . [f]ire are susceptible to a policy analysis grounded in social, economic, or political

concerns"); Miller v. United States, 163 F.3d at 595-96 (concluding that "the decision regarding

how to best approach the Bald Butte fire also required consideration of fire suppression costs,

minimizing resource damage and environmental impacts, and protecting private property," as well

as safety, and that "the Forest Service's decision is susceptible to a policy analysis grounded in

social, economic, or political concerns").  In Ohlsen v. United States, 998 F.3d 1143 (10th Cir.

2021), the Tenth Circuit affirms the Court's decision De Baca v. United States, 403 F. Supp. 3d

1098, 1121 (D.N.M. 2019)(Browning, J.), in which the Court holds that the FTCA's discretionary-

function exception applies to the Forest Service's various actions that result in the June 15, 2015,

Dog Head Fire in Cibola National Forest, New Mexico.  See 399 F. Supp. 3d at 1071, 1211.  There,

the Court concludes that the FTCA's discretionary-function exception applies to several of the

Forest Service's fire-related decisions including whether to protect fire-based destruction and

implement site-specific fire restrictions, as well as whether to implement a policy about site-

specific assessments and delegate site-thinning projects to contractors.  See 399 F. Supp. 3d at

1211-13.  The Court reasons that the FTCA discretionary-function applies, because the Forest

Service's decisions are "discretionary in nature, acts that 'involve an element of judgment or

choice,'" and are "based on considerations of public policy."  399 F. Supp. 3d at 1206-07 (quoting

United States v. Gaubert, 499 U.S. at 322-3.  The Forest Service, therefore, acts within its discretion in deciding where to position fire engines, has no mandatory duty to implement site-specific fire restrictions, has no policy about site-specific assessments before the Dog Head Fire, and does not have a mandatory duty to protect against destruction by fire.  See De Baca v. United States, 399 F. Supp. 3d at 1211-13.  Additionally, the Court holds that the Forest Service's decision to contract with Isleta Pueblo and to delegate responsibility to "thin the project site and to adhere to the maximum slash[22] depth are within the Forest Service's discretion," 399 F. Supp. 3d at 1213, and that the decision to hire an independent contractor is a discretionary function,  see 399 F. Supp. 3d at 1213 (citing Coffey v. United States, 906 F. Supp. 2d at 1158).

## ANALYSIS

The Court's overarching reasoning in concluding that the Hermit's Peak Act permits recovery of noneconomic damages remains the same from the APA MOO: (i) the Hermit's Peak Act's NM State law provision incorporates all damages recoverable under New Mexico law: (ii) New Mexico allows recovery of noneconomic damages for nuisance and trespass; (iii) the Forest Service's actions constitute nuisance and trespass; and (iv) the Plaintiffs can, therefore, recover for noneconomic damages.  See APA MOO, F. Supp. 3d at 1208, 1241.  The Court

---

[22]The Court defines "slash" in De Baca v. United States' factual background section:

"In forestry, slash, or slashings are coarse and fine woody debris generated during logging operations or through wind, snow or other natural forest disturbances. Slash generated during logging operations may increase fire hazard, and some North American states have passed laws requiring the treatment of logging slash." Slash (logging), Wikipedia, https://en.wikipedia.org/wiki/Slash_(logging) (last visited May 17, 2019).

De Baca v. United States, 399 F. Supp. 3d at 1073 n.20.

addresses FEMA's reconsideration arguments, which challenge the Court's reasoning in the APA MOO, in three sections.  First, the Court concludes that the NM State law provision's language and the Allowable Damages provision's language indicate that the Hermit's Peak Act incorporates damages recoverable under New Mexico law, including tort damages.  Second, the Court predicts that the Supreme Court of New Mexico would consider the Hermit's Peak/Calf Canyon Fire a nuisance, trespass, and ultrahazardous or abnormally dangerous activity.   In making this prediction, the Court explains that it must identify New Mexico torts which permit recovery of noneconomic damages, and assess the Forest Service's liability under such torts, to decide whether the Plaintiffs can recover noneconomic damages under the Hermit's Peak Act.  Also as part of this prediction, the Court disagrees with FEMA that New Mexico's Prescribed Burning Act, which declares that prescribed burns are not a nuisance, applies to the Hermit's Peak/Calf Canyon Fire. Third, the Court holds unlawful and sets aside 44 C.F.R. § 296.21(a), and FEMA shall undergo the claims review process before paying Plaintiffs' noneconomic damages claims.

I.    **THE HERMIT'S PEAK ACT INCORPORATES DAMAGES RECOVERABLE UNDER NEW MEXICO LAW.**

The Court concludes that the Hermit's Peak Act awards the Plaintiffs damages recoverable under New Mexico law for two reasons.  First, the correct reading of the NM State Law provision, Hermit's Peak Act § 104(c)(2), is that it incorporates New Mexico law.  Second, the correct reading of the Allowable Damages Provision, Hermit's Peak Act § 104(d)(4), is that it contains a nonexhaustive list of damages that are recoverable in addition to those recoverable under New Mexico law.

    A.    **THE NM STATE LAW PROVISION INCORPORATES NEW MEXICO LAW.**

FEMA's primary argument is that the Allowable Damages provision's plain language in the Hermit's Peak Act, not the NM State law provision's incorporation of New Mexico torts, defines the scope of damages.  See Motion at 12-17; Hearing Tr. at 15-16 (Sydow).  In the APA MOO, the Court concludes that the NM State law provision incorporates New Mexico torts, after applying both a plain language reading and other principles of statutory interpretation to the Hermit's Peak Act.  See APA MOO, 760 F. Supp. 3d at 1238.  First, the Court concludes that the NM State law provision incorporates damages for New Mexico torts and that the Allowable Damages provision provides an additional, nonexhaustive list of recoverable damages.  See APA MOO, 760 F. Supp. 3d at 1238-1241.  The Court explains:

> FEMA argues that New Mexico State law applies only to the "calculation" of the property, business, and financial losses within the Allowable Damages provision, as opposed to the broader determination of which damages apply.  Hermit's Peak Act § 104(c)(2).  See Dolan Response at 19-20.  The NM State law provision, § 104(c)(2), states that "the laws of the State of New Mexico shall apply to the calculation of damages" under the Allowable Damages provision, § 104(4).  Hermit's Peak Act § 104(c)(2).
>
> FEMA argues that only New Mexico State law which pertains to the mathematical "calculation" of damages in the Allowable Damages provision, § 104(d)(4), applies.  Dolan Response at 12, 19.  But FEMA merely implies this overly narrow definition of "calculation," and overlooks other legitimate yet broader definitions of "calculation," as well as relevant New Mexico State law that more broadly concerns the determination of damages.  See Hearing Tr. 82:19-85:2 (Sydow).  First, Merriam-Webster defines "calculation" as: (i) the process or an act of calculating; and (ii) studied care in analyzing or planning.  Calculation, Merriam-Webster, https://www.merriam-webster.com/dictionary/calculation (last updated November 30, 2024).  Merriam-Webster also defines "calculating" as: (i) to determine by a mathematical process; (ii) to reckon by exercise of practical judgment; (iii) to solve or probe the meaning of; (iv) to design or adapt for a purposes.  Calculate, Merriam-Webster, https://www.merriam-webster.com/dictionary/calculate (last accessed November 1, 2024).

Looking to the dictionary definition of "calculation," the Court explains that it "does not interpret 'calculation' to exclusively mean a mathematical calculation, at the expense of other practical

definitions such as a judgment, determination, analysis, plan, or design." APA MOO, 760 F. Supp.

3d at 1239. Then, the Court explains that, even under FEMA's interpretation of "calculation,"

New Mexico Civil Uniform Jury Instructions ("NM Civil Jury Instructions") includes instructions

on deciding damages for pain and suffering, and loss of enjoyment of life. APA MOO, 760 F.

Supp. 3d at 1239-40 (citing NMRA 13-1807, 13-1807A). The Court concludes:

> [T]he instructions on deciding such noneconomic damages for pain and suffering
> and loss of enjoyment of life reflect the "laws of the State of New Mexico" that
> "shall apply to the calculation of damages under [the Allowable Damages
> provision]." Hermit's Peak Act § 104(c)(2) . . . . The NM State law provision,
> § 104(c)(2), thus waives FEMA's sovereign immunity. Even if using FEMA's
> definition of "calculation" were to mean mathematical calculation -- which it does
> not, the NM Civil Jury Instructions on determining damages such as noneconomic
> damages for pain and suffering function as applicable New Mexico State law.

APA MOO, 760 F. Supp. 3d at 1240 (Court adds first brackets, second brackets in original)(Court

adds ellipses). Finally, the Court notes that FEMA's Cerro-Grande Fire Regulations from 2001

interpret an identical statute, the Cerro-Grande Fire Act, as waiving sovereign immunity for claims

pursuing noneconomic damages. See APA MOO, 760 F. Supp. 3d at 1240-41. The Court states:

"The Cerro-Grande Fire Act Regulations also note that the property, business, and financial losses

in the Cerro-Grande Fire Act's Allowable Damages provision are 'in addition' to damages

recoverable under New Mexico State law." APA MOO, 760 F. Supp. 3d at 1241 (quoting 44

C.F.R. § 295.21(a)). FEMA here, however, interprets the Hermit's Peak Act "curiously to reach

the opposite conclusion" and has no explanation why the current interpretation is so different.

APA MOO, 760 F. Supp. 3d at 1241.

FEMA does not explain how the Court incorrectly defines the word "calculation" to mean

a practical concept such as "determination," so that the NM State law provision applies New

Mexico State law to determine what damages are recoverable. Additionally, FEMA has no

response to the Court's point that the NM Civil Uniform Jury Instructions include instructions on

deciding noneconomic damages such as for pain and suffering, and loss of enjoyment of life. Finally, FEMA does not explain why, when the language in the Hermit's Peak Act and the Cerro-Grande Fire Act are nearly identical, FEMA awards noneconomic damages recoverable under New Mexico State law for the Cerro-Grande Fire. The Court concludes that its interpretation of the NM State law provision as incorporating damages recoverable under New Mexico State law is correct.

## B. THE ALLOWABLE DAMAGES PROVISION CONTAINS A NONEXHAUSTIVE LIST OF DAMAGES.

FEMA argues that, regardless of the definition of "calculation of damages," recoverable damages are only the property, business, and financial losses that the Allowable Damages provision explicitly lists -- not anything recoverable under New Mexico law. Motion at 12-13. In the APA MOO, the Court concludes that the Allowable Damages provision contains a nonexhaustive list of recoverable damages by applying a plain language reading and other principles of statutory interpretation. See APA MOO, 760 F. Supp. 3d at 1260-63. First, the Allowable Damages provision describes the listed damages as "otherwise uncompensated," and, secondly, the Allowable Damages provision provides categories of damages that the Plaintiffs "may" recover. APA MOO, 760 F. Supp. 3d at 1260 (quoting Hermit's Peak Act § 104(d)(4)). The Court then explains:

> Congress did not say that 'allowable damages' are 'exclusive' damages; rather, "allowable damages" provides categories of damages that the Plaintiffs "may" recover. Hermit's Peak Act § 104(d)(4).
>
> . . .
>
> Here, the Allowable Damages provision's use of the word "allowable" is more like the word "permissive" than the word "exclusive." Bryan A. Garner, Black's Law Dictionary (12th ed. 2024)(defining "permissive" as "Recommending or tolerating, but not compelling or prohibiting: giving power of choice"). There is also no express limiting language in the Allowable Damages provision.

APA MOO, 760 F. Supp. 3d at 1261. The Court also explains:

Principles of statutory interpretation affirm the Court's reading of the listed property, business, and financial losses in the Allowable Damages provision as "otherwise uncompensated," i.e., as nonexclusive of the damages recoverable under the Hermit's Peak Act. The Supreme Court first recognizes a presumption against rendering language superfluous in the landmark case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803)("It cannot be presumed that any clause in the [C]onstitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it.")(brackets added). This presumption against superfluity, also known as the "Surplusage Canon," requires that, "if possible, every word and every provision is to be given effect. None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia & Garner, supra at 174. Further, "because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant." Scalia & Garner, supra at 176. Here, under the presumption of superfluity, the Court accords legal significance to every phrase in the Allowable Damages provision, § 104(d)(4). See Scalia & Garner, supra at 174. FEMA's position that the Allowable Damages provision allows recovery exclusively for property, business, and financial loss would render the description of those losses as "otherwise uncompensated" in § 104(d)(4) redundant. The provision's phrase "otherwise uncompensated" would have no effect, and Congress could have left it out altogether. On the other hand, reading the property, business, and financial losses as recoverable in addition to those losses "otherwise uncompensated" under New Mexico State law per § 104(c)(2), gives independent effect to every word and phrase within § 104(d)(4). The Court, therefore, reads the Allowable Damages provision § 104(d)(4) with a presumption against superfluity.

FEMA argues that interpreting the Allowable Damages provision, § 104(d)(4), as "supplementing" the damages recoverable under New Mexico law renders the provision superfluous, because New Mexico State law already allows recovery for damages resulting from the listed property, business, and financial loss. Dolan Response at 21. FEMA, however, does not cite any New Mexico State law that provides recovery for all of the listed losses in § 104(d)(4) that may be "otherwise uncompensated" under the Hermit's Peak Act. Nor could it. The Court is not able to find, for example, any New Mexico State law that specifically here provides recovery for uninsured property loss, § 104(d)(4)(A)(i), for an unrealized decrease in the value of real property, § 104(d)(4)(A)(ii), or for damage to acequia systems, 23 § 104(d)(4)(A)(iii). See Hermit's Peak Act § 104(d)(4). Nor is the Court able to find any New Mexico State law that specifically here provides

---

[23]Acequias are community irrigation systems in the villages and Pueblos of New Mexico. The New Mexico Legislature has provided that acequias are "political subdivisions" or local government entities with all the attendant rights and responsibilities. Brigette Buynak, Esq. & Jerold Widdison, Acequias, University of New Mexico Utton Center (2017), https://uttoncenter.unm.edu/resources/research-resources/acequias.pdf (last visited November 25, 2024).

recovery of financial losses from paying an insurance deductible, § 104(d)(4)(C)(ii); of financial losses from reasonable efforts to reduce wildfire, flood, and other natural disaster risk by the impacted counties, § 104(d)(4)(C)(vii); or of financial losses greater than are recoverable under a Small Business Administration disaster assistance loan, § 104(d)(4)(C)(ix).  See Hermit's Peak Act § 104(d)(4).  The Court adheres to the presumption against superfluity to read the Allowable Damages provision, § 104(d)(4), as allowing recovery for property, business, and financial losses for what New Mexico State law otherwise does not compensate under the NM State law provision, § 104(c)(3).

APA MOO, 760 F. Supp. 3d at 1262-63.  FEMA's interpretation of the Allowable Damages provision renders the phrase "otherwise uncompensated" superfluous, and the Court must give every word in the provision effect.

The Court then addresses the use of the word "may" in the Allowable Damages provision:

Furthermore, the Allowable Damages provision states that a plaintiff's claim "may" include "otherwise uncompensated damages resulting from the Hermit's Peak/Calf Canyon Fire."  Hermit's Peak Act § 104(d)(4)(A).  In contrast to the word "shall," "may" is "generally used to indicate a permissive provision, ordinarily implying some degree of discretion."  Shall, Legal Information Institute Wex Definitions, https://www.law.cornell.edu/wex/shall (last updated August 2021).  The use of "may," as opposed to "shall only," "must only," or "is limited to," indicates clearly that the provision's listed damages are permissive and not exclusive.  None of the Allowable Damages provision's language indicates that the listed property, business, and financial losses are a closed universe of recoverable damages.

APA MOO, 760 F. Supp. 3d at 1261-62.  The Court also makes the point that, because "Congress explicitly enumerates exclusions" of prejudgment interest and punitive damages in Hermit's Peak Act § 104(c)(3), "the Court declines to imply additional ones."  APA MOO, 760 F. Supp. 3d at 1259.  The Court does not read the Allowable Damages as excluding damages beyond those it says it excludes.  To summarize, the NM State Law provision incorporates damages recoverable under New Mexico law, and the Allowable Damages provision prefaces a list of recoverable property, business, and financial losses with the permissive word "may" and the phrase "otherwise uncompensated" to indicate its nonexhaustive extent.  APA MOO, 760 F. Supp. 3d at 1260-63.

FEMA's attempt to convince the Court to interpret the Allowable Damages provision differently is unavailing.

FEMA now contends that the Allowable Damages provision's description of the explicitly recoverable property, business, and financial losses as "otherwise uncompensated" requires that plaintiffs first exhaust other remedies.  Motion at 15-16.  For example, FEMA explains, claimants first may need to seek compensation under the Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 68 §§ 5121-5208 ("Stafford Act"), the authority for most federal disaster response activities, before going through the Hermit's Peak Act claims process.  Dolan Hearing Tr. at 49-50 (Sydow).  The Stafford Act authorizes a range of emergency and disaster assistance programs, the two most relevant being: (i) Individual Assistance, the FEMA program which provides assistance to individuals and families adversely affected by a major disaster or an emergency; and (ii) Public Assistance, which provides grants to States, local governments, Indian Tribes and private nonprofit organizations for emergency measures and repair, restoration, and replacement of damaged facilities.  See 44 CFR 296.4 (Definitions).

FEMA's argument that the Stafford Act provides a first round of relief for victims of the Hermit's Peak/Calf Canyon Fire is incorrect for three reasons.  First, the Stafford Act does not include any language requiring claimants to exhaust remedies before pursuing relief under a different statute.  See Stafford Act, 42 U.S.C. 68 §§ 5141-5165g (Subchapter III -- Major Disaster and Emergency Assistance Administration); id. at §§ 5170-5189h (Subchapter IV -- Major Disaster Assistance Programs).  Second, the Hermit's Peak Act's plain language instructs claimants to submit claims for direct relief:

> (b) SUBMISSION OF CLAIMS. -- Not later than 2 years after the date on which regulations are first promulgated under subsection (f), an injured person may submit to the Administrator a written clam for 1 or more injuries suffered by the

injured person in accordance with such requirements as the Administrator determines to be appropriate.

Hermit's Peak Act § 104(b).  Then, the Administrator "shall, on behalf of the United States, investigate, consider, ascertain, adjust, determine, grant, deny, or settle any claim for money damages asserted" under § 104(b).  Hermit's Peak Act § 104(c)(1)("Claims Investigation Provision").  The Hermit's Peak Act's plain language does not require exhaustion of Stafford Act remedies, or any other remedies, prior to filing a claim.  The Hermit's Peak Act does not reference the Stafford Act at all.  Third, FEMA's Final Rule for the Hermit's Peak Act states that the Hermit's Peak Act "operates independently of FEMA's other programs," provides direct compensation to victims, and is separate from the Stafford Act's public assistance programs:

> The Claims Office operates independently of FEMA's other programs, and it provides a great deal more flexibility in the process of applying for and receiving compensation than these more traditional grant programs.  Unlike FEMA's Individual Assistance and Public Assistance, which provide disaster assistance to individuals and households impacted by declared disasters, the Claims Office is not subject to any caps on the amount of assistance it can provide.  Unlike FEMA's Public Assistance Program, which provides grants to States, Federally recognized Tribal governments, U.S. territories, local governments, and certain private non-profit (PNP) organizations, the Claims office does not have any cost share requirements, and there are no conditions placed on the receipt of the compensation.

88 Fed. Reg. 59,735 (Aug. 29, 2023).  Accordingly, the Hermit's Peak Act does not require claimants to seek relief first under the Stafford Act; it allows for the direct submission of claims to FEMA's Administrator.  See Hermit's Peak Act § 104(b)("Claims Submission Provision").  Based on the Stafford Act's and the Hermit's Peak Act's statutory language, as well as on FEMA's Final Rule for the Hermit's Peak Act, the Hermit's Peak Act establishes an independent -- not subsequent -- claims process for compensating losses resulting from the Hermit's Peak/Calf Canyon Fire.

The Hermit's Peak Act's plain language indicates that it is a specific statute tailored to victims of the Hermit's Peak/Calf Canyon Fire, and that it functions as a direct and immediate avenue for compensation.  Under the canon that "the specific governs the general," RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012)(quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992)), courts construe a specific statutory remedy as prevailing over a more general statutory scheme where both address the same subject matter, see Scalia & Garner, Reading Law: The Interpretation of Legal Texts at 183 (noting that when provisions irreconcilably conflict, "the specific provision is treated as an exception to the general rule.").  The idea is that "the specific provision comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence."  Scalia & Garner at 183.  Scalia & Garner note that this "General/Specific Canon" also applies when a more general provision in one statute contradicts a more specific statute in a later statute.  Scalia & Garner at 185.  In this case, "[t]he specific provision does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  Scalia & Garner at 185.

This canon applies to the case here.  The Hermit's Peak Act provides a targeted statutory relief for the victims of the Hermit's Peak/Calf Canyon Fire, whereas the Stafford Act provides more broadly a general statutory relief for victims of disaster relief, in a wide range of emergencies.  Thus, while the Stafford Act and the Hermit's Peak Act provide overlapping forms of fire disaster relief, one does not negate the other, nor do they cancel each other out.  Rather, the more specific one, the Hermit's Peak Act, governs claims for disaster relief stemming from the Hermit's Peak/Calf Canyon Fire.  The Allowable Damages provision's description of the explicitly recoverable property, business, and financial losses as "otherwise uncompensated" is not an ambiguous requirement that plaintiffs first exhaust other remedies, like the Stafford Act.  Hermit's

Peak Act § 104(d)(4).     Furthermore, describing the explicitly listed losses as "otherwise uncompensated" supports that they are nonexclusive and supplement the damages recoverable under other provisions within the Hermit's Peak Act, or from insurance or other sources.  See Hermit's Peak Act § 104(d)(5); APA MOO, 760 F. Supp. 3d at 1261.  In conclusion, the Allowable Damages provision's language that a plaintiff's claim "may" include damages for property, business, and financial losses that are "otherwise uncompensated" may suggest that victims can recover under multiple avenues, such as through insurance claims or through other provisions of the Hermit's Peak Act, such as the provision that incorporates New Mexico torts.  The statutory language, however, does not mandate exhaustion of other avenues before filing a Hermit's Peak Act claim.  Notably, the Stafford Act's plain language does not require exhaustion of its remedies before seeking other relief.

Finally, FEMA's argument in its Dolan reply brief belies its principal position that the Allowable Damages provision is an exhaustive list of recoverable damages.  FEMA argues that, but for the Extent of Damages provision's explicit exclusion of nominal damages, punitive damages, and prejudgment interest, "[t]he calculation of damages under New Mexico law" -- referring to the NM State Law provision -- "could otherwise include" three damages: nominal damages under UJI 13-1832 NMRA, punitive damages under UJI 13-1827 NMRA, and prejudgment interest under N.M.S.A. § 56-8-4(B).  See Dolan Reply at 10-11.  FEMA's argument concedes that the NM State Law provision incorporates many damages recoverable under New Mexico law, even if the Allowable Damages provision does not explicitly list those damages.  The Allowable Damages provision does not explicitly list nominal damages, punitive damages, and prejudgment interest, and therefore, FEMA's logic in the Dolan Reply contradicts its repeated assertion that only the listed damages in the Allowable Damages provision are recoverable.

Moreover, incorporating the New Mexico Uniform Jury Instructions into the Allowable Damages provision, as FEMA attempts to do, thus also incorporates the specific jury instruction on noneconomic damages for pain and suffering, and loss of enjoyment of life.  See APA MOO, 760 F. Supp. 3d at 1239-40.  The Court explains in the APA MOO that the New Mexico Uniform Jury Instruction on noneconomic damages applies to the "calculation" of damages under the NM State law provision, § 104(c)(2):

> What FEMA misses, however, is that the NM Civil Jury Instructions includes jury instructions on deciding personal injury damages, which include instructions on deciding damages for pain and suffering, and loss of enjoyment of life:
>
>> 13-1807.  Pain and suffering.
>>
>> The pain and suffering experienced [and reasonably certain to be experienced in the future] as a result of the injury.
>>
>> No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount to compensate the plaintiff for the pain and suffering.
>>
>> 13-1807A. Loss of enjoyment of life.
>>
>> The loss of enjoyment of life experienced [and reasonable certain to be experienced in the future] as a result of the injury.
>>
>> No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount to compensate the plaintiff for the loss of enjoyment of life.
>
> NMRA 13-1807, 13-1807A [brackets in original].  Like the NM Civil Jury Instructions on determining personal property damages, the instructions on deciding such noneconomic damages for pain and suffering and loss of enjoyment of life reflect the "laws of the State of New Mexico" that "shall apply to the calculation of damages under [the Allowable Damages provision]."  Hermit's Peak Act § 104(c)(2).

APA MOO, 760 F. Supp. 3d at 1239-40.  FEMA's simultaneous reliance on and disavowal of the New Mexico Uniform Jury Instructions in its Motions underscore the inconsistency of its position. Adopting the New Mexico Uniform Jury Instructions to calculate damages, as FEMA argues, only

reinforces that the Allowable Damages provision includes noneconomic damages, as per the jury

instruction on noneconomic damages for pain and suffering and loss of enjoyment of life.  See UJI

13-1807, 13-1807A NMRA.

## II.    THE COURT PREDICTS THAT THE SUPREME COURT OF NEW MEXICO WOULD CONSIDER THE HERMIT'S PEAK/CALF CANYON FIRE A NUISANCE AND TRESPASS.

Next, as a corollary argument, FEMA asserts that the Court's APA MOO incorrectly deems

the Hermit's Peak/Calf Canyon Fire a private nuisance and trespass.  See Motion at 12-17.  In the

APA MOO, the Court first sets forth the elements of private nuisance:

> The elements of private nuisance are:
>
> > General Rule.  One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of the land, and the invasion is either
> >
> > (a)    intentional and unreasonable, or
> >
> > (b)    unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.
>
> Scott v. Jordan, 1983-NMCA-022, ¶ 12, 99 N.M. 567, 570, 661 P.2d 59, 62 (citing Restatement (Second) of Torts § 822 (1979)).

APA MOO, 760 F. Supp. 3d at 1242.  Then, the Court concludes that the Hermit's Peak/Calf

Canyon Fire meets private nuisance's three elements: (i) the fire is an invasion into the Plaintiff's

land because it burns property and causes flooding; (ii) the invasion is unintentional, because the

Forest Service lost control of the fire; and (iii) the Forest Service's actions meet New Mexico's

definitions for negligent, reckless, and abnormally dangerous activity.  See APA MOO, 760 F.

Supp. 3d at 1242-43.  Similarly for trespass, the Court cites two Court of Appeals of New Mexico

cases, which adopt the Restatement's definition of trespass.  See APA MOO, 760 F. Supp 3d at

1247 (citing <u>Padilla v. Lawrence</u>, 1984-NMCA-064, ¶ 26, 101 N.M. 556, 563, 685 P.2d 964, 971, and <u>North v. Pub. Serv. Co. of N.M.</u>, 1980-NMCA-031, ¶ 4, 94 N.M. 246, 247, 608 P.2d 1128, 1129).    Under the Restatement, a person can commit a trespass, meaning an "invasions of the interest in the exclusive possession of land and its physical condition," Restatement (Second) Torts, Chapter 7, §§ 157-66, specifically based on "reckless or negligent entries on land and those resulting from extra hazardous activities," Restatement (Second) Torts, Chapter 7, §165.    <u>See</u> APA MOO, 760 F. Supp 3d at 1248.    The Court concludes, based on Congress' findings, as it does in the previous section on nuisance, that the Forest Service's conduct is reckless and negligent, and therefore the Hermit's Peak/Calf Canyon Fire is also a trespass under New Mexico law.    <u>See</u> APA MOO, 760 F. Supp 3d at 1248.[24]

---

[24]Of all New Mexico torts that the Hermit's Peak Act incorporates, the Court looks only at private nuisance and trespass, but not other torts like public nuisance or personal injury negligence, because the Plaintiffs propose only those two as examples for the Court to determine whether New Mexico torts permit recovery of noneconomic damages.    <u>See</u> <u>Dolan</u> Motion at 23-30 (arguing that the Hermit's Peak/Calf Canyon Fire constitutes a nuisance and trespass under New Mexico law, and that New Mexico law permits noneconomic damages for nuisance and trespass), <u>Lands</u> Motion at 22 (arguing that fire is a private nuisance and trespass, and that New Mexico law permits noneconomic damages for private nuisance and trespass).    Furthermore, the Attorney General of New Mexico's Opinion specifically discusses nuisance and trespass, noting that it is "unlikely" that a noneconomic damage award for nuisance or trespass "would be permitted based solely on emotional distress."    In Re: Opinion Request - Noneconomic Damages for Nuisance and Trespass at 2, Opinion No. 2024-05, New Mexico Department of Justice (March 7, 2024).

The Court summarizes the Plaintiffs' analysis of private nuisance and trespass.    The <u>Dolan</u> Plaintiffs do not distinguish between public and private nuisance, and cite to caselaw that concerns both nuisances.    <u>See</u> <u>Dolan</u> Motion at 26; <u>Kaywal, Inc. v. Avangrid Renewables, LLC</u>, 2021-NMCA-037, ¶ 42, 495 P.3d 550, 569 (relying in part on the Restatement (Second) of Torts when stating that "[p]rivate nuisance is akin to trespass: it is an in personam action for tortious interference with one's use and enjoyment of land."); <u>City of Sunland Park v. Harris News, Inc.</u>, 2005-NMCA-128, ¶ 41, 138 N.M. 588, 598, 124 P.3d 566, 577 (defining public nuisance based on N.M.S.A. § 30-8-1 and private nuisance based on the Restatement (Second) of Torts § 821E).    As an initial matter, these citations are sound because the Court thinks that the Supreme Court of New Mexico would follow <u>Kaywal, Inc. v. Avangrid Renewables, LLC</u> and <u>City of Sunland Park v. Harris News, Inc.</u>'s reliance on the Restatement and the N.M.S.A. to define both nuisances.    <u>See</u> <u>infra</u> at 122 n. 29 (explaining why the Supreme Court of New Mexico would follow the

FEMA makes three contentions in response to the Court's conclusions. First, FEMA argues that the Court's factual determinations about the Forest Service's negligence and recklessness are outside of the scope of APA review and lack support in the record. See Motion at 8. Second, FEMA argues the Prescribed Burning Act bars the Court from concluding that the Hermit's Peak/Calf Canyon Fire is a private nuisance. See Motion at 9. Third, FEMA argues that the Court incorrectly concludes that prescribed burns are an abnormally dangerous or ultrahazardous activity subject to strict liability, and that a strict liability determination here deters the Forest Service from conducting prescribed burns in the future. See Motion at 10. The Court addresses each of FEMA's arguments below.

### A.    THE COURT MUST ASSESS THE FOREST SERVICE'S LIABILITY FOR INCORPORATED NEW MEXICO CAUSES OF ACTION, INCLUDING TORTS.

Restatement's definitions of various torts, including nuisance and trespass). Furthermore, the Dolan Plaintiffs do not explain why the Hermit's Peak/Calf Canyon Fire constitutes public nuisance under New Mexico's public nuisance statute, N.M.S.A. § 30-8-1, or common law public nuisance, which both define public nuisance as an "unreasonable interference with a right common to the general public." State ex rel. Village of Los Ranchos De Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶ 52, 119 N.M. 150, 163, 889 P.2d 185, 198. The Lands Plaintiffs cite to Padilla v. Lawrence, 1984-NMCA-064, ¶ 26, 101 N.M. 556, 563, 685 P.2d 964, 971, for the definition of private nuisance and analogize the Hermit's Peak/Calf Canyon Fire to the "odors, noise, and dust coming from a nearby plant" that the New Mexico Supreme Court concludes is a private nuisance. Lands Motion at 22. Both Plaintiffs raise trespass as so similar to private nuisance that the New Mexico courts would find trespass where they find private nuisance. See Dolan Motion at 20; Lands Motion at 22. The Court, therefore, looks only at private nuisance and trespass.

The Lands Plaintiffs also raise the existence of a personal injury tort, such as bodily injury, but only in half a page, and they do not explain how a personal injury tort applies here as a result of the Hermit's Peak/Calf Canyon Fire. See Lands Motion at 22. Subsequently, FEMA also does not address a personal injury tort in its Response briefs. See Dolan v. FEMA, No. CIV 23-0908 JB/JFR, Response Brief on the Merits of Petitioners' APA Challenge To Hermit's Peak/Calf Canyon Fire Assistance Act Final Rule, filed September 13, 2024 (Doc. 51); Lands v. FEMA, No. CIV 23-0869 JB/JFR, Response Brief on the Merits of Petitioners' APA Challenge To Hermit's Peak/Calf Canyon Fire Assistance Act Final Rule, filed September 13, 2024 (Doc. 50). The Court, therefore, considers only private nuisance which the Lands Plaintiffs substantially analyze, and trespass, which both the Dolan and Lands Plaintiffs sufficiently analyze.

At the Hearing, FEMA argues that the Court unnecessarily determines tort liability.  See Hearing Tr. at 18-19 (Sydow).  FEMA argues that, because the Hermit's Peak Act assumes the Forest Service's responsibility for the Hermit's Peak/Calf Canyon Fire, all which remains is calculating the property, business, and financial loss damages that the Allowable Damages provision allows.  See Hearing Tr. at 18-19 (Sydow)("Our interpretation of the act has suggested that liability is not litigated.  Certain damages are available under the act, and those damages are compensable, subject to the determination, the specific determinations that FEMA is called to make in the act.  So you don't need to make a liability determination.").  The Court disagrees with FEMA's argument.  While FEMA's interpretation of the Hermit's Peak Act bypasses liability and has the Court jump to damages calculations, the Court interprets the Hermit's Peak Act as incorporating New Mexico law, including torts.  Calculating damages for those torts involves identifying New Mexico torts relevant to the Hermit's Peak/Calf Canyon Fire and whether those torts permit recovery of noneconomic damages.

The Court also entertains, however, the idea that, because the Forest Service "has assumed responsibility for the Hermit's Peak/Calf Canyon Fire," Hermit's Peak Act § 102(a)(8), the Court may not need to make conclusions about nuisance and trespass torts.  The Court reasons, however, that whether the Hermit's Peak Act cedes legal liability, the Court must identify the applicable tort law to calculate damages.  What torts apply, what damages those torts provide, and how to calculate those damages are relevant questions of law in the Court's APA review analysis.  The strongest reason that the Court sees for continuing to tie damages to a particular tort is that it does not know how it can determine damages if it does not know what the tort is.  The Court and FEMA do not agree on what the word "calculation" means in the phrase "the laws of the State of New Mexico shall apply to the calculation of damages under [§ 104](d)(4)," see Hermit's Peak Act §

104(c)(2), but everyone agrees that the Court looks to New Mexico law to calculate damages,  see
Dolan Hearing Tr. at 15 (Sydow)("So you can still look to New Mexico law to determine the
amount of those damages once the damages are recognized by the act."); id. at 24:20-22
(Siminou)(agreeing with the APA MOO in full).  If there is not a particular tort, the Court is not
certain at what body of "calculation" law to look.  Hermit's Peak Act § 104(c)(2).

      The law calculates damages differently depending on the tort.  For example, for a personal
injury claim, the jury instructions tell the jury to calculate damages for, among others: (i) the
"amount of money which will reasonably and fairly compensate" for personal injury, UJI 13-1802
NMRA; (ii) measure of the loss of a chance, see UJI 13-1802a NMRA; (iii) earnings, see UJI 13-
1803 NMRA; (iv) medical expense, see UJI 13-1804 NMRA, (v) nonmedical expense, see UJI 13-
1805 NMRA; (vi) pain and suffering, see UJI 13-1807 NMRA; (vii) loss of enjoyment of life, see
UJI 13-1807a NMRA; (viii) aggravation of preexisting condition, see UJI 13-1808 NMRA; (ix)
loss of a spouse's services, see UJI 13-1810 NMRA; and (x) loss of consortium, see UJI 13-1810
NMRA.  A wrongful death claim, however, has different damages calculations and components;
wrongful death instructs the jury to calculate damages for, among others: (i) "the reasonable
expenses of necessary medical care and treatment and funeral and burial," (ii) pain and suffering
between the time of injury and death; (iii) lost earnings, lost earning capacity, and value of the
decedent's lost household services, less future earning power of damages awarded; (iv) the value
of the decedent's life apart from his or her earning capacity; (iv) mitigating or aggravating
circumstances attending to the wrongful act; (v) loss of guidance and counseling to the decedent's
minor children.  See UJI 13-1830 NMRA.  For a tort claim that alleges property damage, the jury
instructions instruct the jury to calculate damages for: (i) the fair market value of the property
immediately before the damage, see UJI 13-1812 NMRA, (ii) the cost of repair, see UJI 13-1813

NMRA; (iii) when damaged beyond repair, the difference between the fair market value before

and after the damage, see UJI 13-1814 NMRA; (iv) loss of use, UJI 13-1818 NMRA, among

others.  The Supreme Court of New Mexico has specific guidance on nuisance calculations in

Aguayo v. Village of Chama, 1969-NMSC-005, ¶ 7, 79 N.M. 729, 449 P.2d 331, which holds that,

for nuisance damages, the factfinder must determine the amount of noneconomic damages for

discomfort or annoyance, see 1969-NMSC-005, ¶ 7, 79 N.M. at 731, 449 P.2d at 333.  Unless the

Court identifies the tort, it does not know to what body of "calculation" damages to go.  law.[25]

---

[25]FEMA cites to several examples as evidence of New Mexico "calculation" law:

HPCC Act, §§ 104(d)(4)(A)(ii)(decrease in value of real property, recognized at N.M. Civ. UJI 13-1814 NMRA); 104(d)(A)(iii), (v) (damage to physical infrastructure and cost of reforestation, recognized as cost of repair at N.M. Civ. UJI 13-1813 NMRA); 104(d)(4)(B)(v) (loss of business net income, recognized in Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc., 2013-NMSC-017, ¶¶ 25– 39, 301 P.3d 387, 396-98 (affirming award of lost business profits for negligence tort); 104(d)(4)(C)(iii) (temporary living or relocation expenses, recognized as rental value of similar property during repair period at N.M. Civ. UJI 13-1818 NMRA).

Dolan Reply at 9.  These examples have detailed instructions for calculating several damages that the Allowable Damages provision explicitly includes.  UJI 13-1814 NMRA's property damage instruction instructs the jury to "award the difference between the fair market value of the damaged personal property immediately before the occurrence and its fair market value immediately after the occurrence."  UJI 13-1813 NMRA's personal property cost of repair instruction instructs the jury to "award the reasonable expense of necessary repairs to the property which was damaged." Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc., 2013-NMSC-017, 301 P.3d 387 holds that the correct calculation for negligence tort damages is lost profits from the lost crops that is "supported by substantial evidence," 2013-NMSC-017, ¶ 28, 301 P.3d at 396.  Finally, UJI 13- 1818 NMRA's personal property loss-of-use instruction instructs the jury to award "the reasonable rental value of similar property during the period reasonably required for the repair of the damaged property."  As FEMA demonstrates, New Mexico law provides calculations for some of the Hermit's Peak Act's explicitly listed damages.
     The majority of the Hermit's Peak Act's explicitly listed damages, however, do not have a corresponding New Mexico civil jury instruction or case that guides the calculation, including: (i) lost subsistence from activities such as hunting, fishing, firewood fathering, timbering, grazing, or other agricultural activities conducted on damaged land, under § 104(d)(4)(A)(iv); (ii) business overhead costs, under § 104(d)(4)(B)(iii); (iii) employee wages for work not performed, under §

Thus, even though some Plaintiffs and FEMA do not think that the Court needs to identify the tort, the Court concludes that it must do so for its "calculation" analysis to make any sense and for the Court to know what damages to award. Hermit's Peak Act § 104(c)(2). A comparison to the FTCA is not perfect, but in an FTCA action, the Court still has to know what the tort is to award damages. Again, the damages differ by tort. It makes sense in all situations to know the wrong so the Court knows what body of damages law to apply. The Court, therefore, correctly determines whether the Forest Service is liable for incorporated New Mexico torts such as nuisance and trespass. The Court's reasoning remains: (i) the Hermit's Peak Act's NM State law provision incorporates all damages recoverable under New Mexico law: (ii) New Mexico allows recovery

---

104(d)(4)(B)(iv); (iv) increased mortgage interest costs, under § 104(d)(4)(C)(i); (v) an insurance deductible, under § 104(d)(4)(C)(ii); (vi) emergency staffing expenses, under § 104(d)(4)(C)(v); (vii) debris removal and other cleanup costs, under § 104(d)(4)(C)(vi); and (viii) costs of reasonable efforts to reduce future natural disaster risk, under § 104(d)(4)(C)(vii). New Mexico's laws for calculating various tort damages do not cover all of the damages recoverable under the Hermit's Peak Act, which cuts against FEMA's interpretation of the New Mexico State law provision.

Finally, in the APA MOO, the Court also cites the New Mexico Uniform Jury Instruction that includes an instruction on noneconomic damages, including damages for pain and suffering, and loss of enjoyment of life. See supra at 88-89. The Court explains:

> Like the NM Civil Jury Instructions on determining personal property damages, the instructions on deciding such noneconomic damages for pain and suffering and loss of enjoyment of life reflect the "laws of the State of New Mexico" that "shall apply to the calculation of damages under [the Allowable Damages provision]." Hermit's Peak Act § 104(c)(2). The NM Civil Jury Instructions, moreover, show that New Mexico State law has no "fixed standard" or mathematical calculation for determining noneconomic damages, because such a calculation is legal instead of factual. See NMRA 13-1807, 13-1807A. A juror must calculate noneconomic damages based on what is reasonable. See NMRA 13-1807, 13-1807A.

APA MOO, 760 F. Supp 3d at 1239-40. FEMA does not respond to the Court's analysis in the APA MOO that the New Mexico Uniform Jury Instructions include an instruction on noneconomic damages. Not only are the New Mexico Uniform Jury Instructions that FEMA points to fragmentary as they do not provide calculations for many of the explicitly recoverable damages, but they also provide a calculation for the very type of damage that FEMA argues is barred: noneconomic damages.

of noneconomic damages for nuisance and trespass; (iii) the Forest Service's actions constitute nuisance and trespass; and (iv) the Plaintiffs can, therefore, recover for noneconomic damages.

FEMA contends that the Court cannot make a factual finding that the Hermit's Peak/Calf Canyon Fire constitutes a nuisance or trespass, as the Court allegedly does in the APA MOO, and FEMA argues that such determinations are beyond the scope of APA review.  See Motion at 5-9. Both the Lands and Dolan Plaintiffs also do not seek a factual ruling that the fire is a nuisance or trespass; rather, they invoke these torts as ones that demonstrate that New Mexico law permits recovery of noneconomic damages.  See Lands v. FEMA, No. CIV 23-0869 JB/JFR, Opening Brief of Plaintiffs Marianna Lands and Charles Payner at 22-23, filed July 17, 2024 (Doc. 41)("Lands APA Motion")(giving examples of New Mexico law that permit or likely permit recovery for noneconomic damages, such as personal injury, private nuisance, and trespass); Dolan v. FEMA, No. CIV 23-0908 JB/JFR, Plaintiffs' Opening Brief at 19, filed July 29, 2024 (Doc. 44)(D.N.M.)("[A]t common law, noneconomic damages are available for property torts like nuisance and trespass")("Dolan APA Motion").  Because the Hermit's Peak Act incorporates New Mexico law, FEMA's regulatory bar on noneconomic damages is inconsistent with the scope of damages recoverable under New Mexico tort law.  See Dolan APA Motion at 16; Lands APA Motion at 17-18; Lands Response at 6 ("[D]etermination of the applicable torts to recovery of damages under New Mexico law in the circumstances of this fire was a 'relevant' question of law, 5 U.S.C. § 706.").  According to the Plaintiffs, the relevant question under the APA is not whether a nuisance or trespass occurred as a matter of fact, as FEMA believes, but whether FEMA's regulation arbitrarily and capriciously excludes categories of damages that the Act, read in light of New Mexico law, permits.  See Dolan APA Motion at 16; Lands APA Motion at 17-18.  The Court reiterates its conclusion above: because the Hermit's Peak Act incorporates New Mexico State

law, analyzing which New Mexico State laws allow for noneconomic damages and whether the Hermit's Peak Fire violates those State laws is inevitable. At some point, someone must determine what incorporated New Mexico State laws are relevant and what damages the Plaintiffs can recover from those State laws. The Court concludes that it is necessary to decide what torts apply so it can determine what damages are recoverable, because certain damages are recoverable for certain torts.

FEMA also argues that the Court's alleged factual findings in the APA MOO are incorrect. FEMA argues that the Court relies on the Forest Service's "90-day review of prescribed burn policies," Hermit's Peak Act § 102(a)(8), after the Hermit's Peak/Calf Canyon Fire is contained as the sole authority to conclude that the Forest Service is negligent by mishandling the prescribed burn and burn pile. Motion at 8-9. FEMA is incorrect. First, the Court does not make any factual findings. The Court relies on the findings that Congress makes. These findings are sufficient for the Court to determine what tort the Forest Service committed. Second, the Court relies on Congress' findings in the Hermit's Peak Act, § 102(a), that a prescribed burn "exceeded the containment capabilities of the Forest Service" to become the Hermit's Peak Fire and that a dormant pile burn "reemerged" to become the Calf Canyon Fire, and Congress' finding that the Forest Service reviews its prescribed burn policies as a result of the Hermit's Peak/Calf Canyon Fire. See Hermit's Peak Act § 102(a). The full language of the relevant findings is as follows:

> (2)     On April 6, 2022, the prescribed burn, which became known as the "Hermit's Peak Fire", exceeded the containment capabilities of the Forest Service, was declared a wildfire, and spread to other Federal and non-Federal land;

> (3)     On April 19, 2022, the Calf Canyon Fire, also in San Miguel County, New Mexico, began burning on Federal land and was later identified as the result of a pile burn in January 2022 that remained dormant under the surface before re-emerging;

> . . .

(7)    on May 20, 2022, U.S. Forest Service Chief Randy Moore ordered a 90-day review of prescribed burn policies to reduce the risk of wildfires and ensure the safety of the communities involved;

Hermit's Peak Act § 102(a).

Using these three Congressional findings to conclude that the Hermit's Peak/Calf Canyon

Fire is negligent and reckless for a private nuisance claim's third element, the Court explains:

> "Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 47-48, 73 P.3d 181, 186. Here, the Forest Service's conduct was negligent, because the Forest Service has a duty to not damage people's property and breached that duty by failing to contain a prescribed burn and allowing a dormant pile burn to reemerge. The Forest Service's mismanagement of forest fire activity creates an unreasonable risk of harm. Further, the resulting damage to federal and non-federal land, destruction of property, and displacement of people significantly outweighs any benefit of the prescribed burn and the dormant burn pile. See Hermit's Peak Act § 102(a)(2)-(3). Next, recklessness "is the intentional doing of an act with utter indifference to the consequences." NM Civil UJI NMRA 13-1827. Further, "[w]hen there is a high risk of danger, conduct that breaches the duty of care is more likely to demonstrate recklessness." NMRA 13-1827. Here, because prescribed burns and pile burns have a high risk of danger and high risk of forest fires, the Forest Service's conduct of mismanagement demonstrates recklessness. The Forest Service knows that mismanagement of its forest fires can lead to unreasonable risk of harm; it has prescribed burn policies to prevent harm. Yet the Forest Service failed to contain a prescribed burn and allowed a dormant pile burn to reemerge. As a result of the Hermit's Peak Fire, Forest Service Chief Randy Moore ordered a three-months long review of its prescribed burn policies. See Hermit's Peak Act § 102(a)(8).[26] The Court, therefore, concludes that the Forest Service's instigation of the Hermit's Peak/Calf Canyon Fire is an invasion of the Plaintiffs' land that constitutes recklessness, because the Forest Service mismanages its forest fires even knowing that mismanagement can create an unreasonable risk of harm.

---

[26]The correct sub-provision is the Hermit's Peak Act § 102(a)(7), which reads: "On May 20, 2022, U.S. Forest Service Chief Randy Moore ordered a 90-day review of prescribed burn policies to reduce the risk of wildfires and ensure the safety of the communities involved."

APA MOO, 760 F. Supp. 3d at 1242.  There is at least one additional Congressional finding that supports the Court's conclusion: "erratic winds were prevalent in the area that was also suffering from severe drought after many years of insufficient precipitation" further suggests that the Forest Service initiates a prescribed burn amidst and despite hazardous environmental conditions. Hermit's Peak Act § 102(a).  That the Forest Service Chief orders a "90-day review of prescribed burn policies," Hermit's Peak Act § 102(a)(7), after the Hermit's Peak/Calf Canyon Fire is just one of four Congressional findings that indicate that Congress -- not the Court -- concludes that the Forest Service acted negligently and recklessly in mishandling the prescribed burn and burn pile, see APA MOO, 760 F. Supp. 3d at 1242-43.

The Dolan Plaintiffs agree with FEMA that the Court need not determine tort liability, because the Hermit's Peak Act requires FEMA to compensate victims as if FEMA is liable under the FTCA.  See Dolan Hearing Tr. at 26 (Siminou).  The Dolan Plaintiffs believe that, because the Hermit's Peak Act's definition of "injury" incorporates the FTCA's use of the word "injury" in 28 U.S.C. § 1346(b)(1), the following is also incorporated: the FTCA's requirement that the United States compensate victims to the same extent that a negligent private party would be liable under the laws of the State where the injury occurred.  Dolan Hearing Tr. at 26 (Siminou).  In the APA MOO, the Court addresses and disagrees with the Plaintiffs' FTCA-incorporation argument:

> The Plaintiffs' theory, however, makes the tenuous assumption that merely borrowing the word "injury" from the FTCA more broadly imports the FTCA's waiver of sovereign immunity.  The Court disposes with the Plaintiffs' argument. The Hermit's Peak Act's explicit incorporation of a single word "injury" does not support implicit incorporation of a capacious waiver of sovereign immunity.  The Plaintiffs' better argument is that the Hermit's Peak Act's use of the term "actual compensatory damages" parallels the FTCA, which allows recovery of New Mexico State law damages including noneconomic damages.

APA MOO, 760 F. Supp. 3d at 1256.  The Court concludes that the Hermit's Peak Act incorporates damages recoverable under New Mexico law because of the NM State law provision and not

because of the FTCA.  Even if the Hermit's Peak Act incorporates the FTCA, the Court still needs

to determine tort liability under New Mexico State law, just as it would for any FTCA claim a

plaintiff brings in New Mexico federal court.  Thus, the Court disagrees with the Plaintiffs'

reasoning that the Court need not determine tort liability.  Furthermore, although the <u>Dolan</u>

Plaintiffs "really couldn't agree with that more" that the Court need not determine liability, <u>see</u>

<u>Dolan</u> Hearing Tr. at 26 (Siminou), the <u>Lands</u> Plaintiffs believe that the Court correctly anchors

damages to specific New Mexico tort violations, <u>see</u> <u>Lands</u> Hearing Tr. at 22 (Tosdal)("Because

how else are you going to figure out what remedies are available?  You can't pick them out of the

sky, given the language of the Hermit's Peak Act").  Because one but not all sets of Plaintiffs

concede that the Court's liability analysis is unnecessary, the Court sees another reason to keep its

liability analysis.

## B. NEW MEXICO'S PRESCRIBED BURNING ACT DOES NOT APPLY TO THE HERMIT'S PEAK/CALF CANYON FIRE.

FEMA challenges the Court's conclusion in the APA MOO that the Hermit's Peak/Calf

Canyon Fire is a nuisance, because the Prescribed Burning Act, N.M.S.A. § 68-5-3, establishes

that "[p]rescribed burning is considered in the public interest and not a public or private nuisance."

Motion at 9.  FEMA, therefore, believes that "[t]he Court's conclusion that a prescribed burn is a

private nuisance merits the amendment of the Opinion under Rule 59(e) because the conclusion is

contrary to New Mexico's statutory law."  Motion at 9.  In 2021, the New Mexico State Legislature

enacted the Prescribed Burning Act, N.M.S.A. §§ 68-5-1 to 68-5-8, which permits private

landowners to conduct controlled burns on their property when done under approved safety

protocols and establishes a liability framework for damages resulting from escaped controlled

burns, among other provisions.  <u>See</u> N.M.S.A. §§ 68-5-1 to 68-5-8.  The Prescribed Burning Act

reads in full:

**68-5-1.        Short title.**

Sections 1 through 8 [68-5-1 to 68-5-8 N.M.S.A. 1978] of this act may be cited as the "Prescribed Burning Act".

**68-5-2.        Definitions.**

As used in the Prescribed Burning Act [Chapter 68, Article 5 N.M.S.A. 1978]:

A.        "certified prescribed burn manager" means a person certified pursuant to the prescribed burn manager certification program;

B.        "department" means the energy, minerals and natural resources department;

C.        "division" means the forestry division of the department;

D.        "extension service" means the New Mexico state university cooperative extension service;

E.        "pile burning" means the burning of vegetation, usually sticks, limbs or boles of trees and brush, resulting from land management activities, that have been stacked in piles, but does not mean the burning of a single or few small piles of yard waste or pruning debris on an individual's property; and

F.        "prescribed burn" means the controlled application of fire to existing vegetative fuels through pile burning or the burning of vegetation over predefined areas under appropriate weather and environmental conditions for purposes of community protection, watershed resilience, silviculture, wildland fire hazard reduction, fuels reduction, rangeland improvement, wildlife management, habitat improvement, invasive species management and ecological maintenance or restoration, but does not include agricultural burning to clear fields of stubble or slash or to manage invasive species impacting crop production, as part of orchard management or to clear irrigation ditches of vegetation and debris in order to improve or restore efficient water flow and delivery.

**68-5-3.        Prescribed burn use.**

A.        Prescribed burning is considered in the public interest and not a public or private nuisance.

B.        Except as limited in Subsection C of this section, a private landowner or a private landowner's agent, contractor or legally authorized designee shall have a right to conduct a prescribed burn on the landowner's property, except when the state forester or a county or municipality issues restrictions prohibiting a prescribed burn because of drought or wind conditions; provided that the prescribed burn is conducted with appropriate precautionary measures, including: the use of sufficient

personnel and equipment; the prior notification of local fire officials; burn and contingency planning; and the use of appropriate prescribed burn techniques that cause the fire to be confined to a predetermined area.

C.    A prescribed burn shall not be started when the national weather service has issued a red flag warning for the area where the prescribed burn is planned to take place.

**68-5-4.    Civil liability.**

A.    A private landowner or a private landowner's agent, contractor or legally authorized designee who is a certified prescribed burn manager and who conducts a prescribed burn is liable for any damages to property or for personal injury caused by the prescribed burn, including the reignition of a previously contained prescribed burn, if that person was negligent in starting, controlling or extinguishing the prescribed burn.

B.    A private landowner or a private landowner's agent, contractor or legally authorized designee who is not a certified prescribed burn manager and who conducts a prescribed burn is liable for double damages to property or for personal injury caused by the prescribed burn, including the reignition of a previously contained prescribed burn, if that private landowner or that private landowner's agent, contractor or legally authorized designee was negligent in starting, controlling or extinguishing the prescribed burn.

**68-5-5.    Model prescribed burn permits.**

The department shall promulgate rules establishing a model prescribed burn permit for use by counties or municipalities. The rules shall provide for required terms and conditions of a prescribed burn permit, including:

A.    common terminology and definitions;

B.    standards for data collection regarding the ownership of land, fuels used, size of the prescribed burn, location of the prescribed burn and entity conducting the prescribed burn;

C.    the types of prescribed burning authorized by the permit;

D.    procedures to coordinate with the requirements of the department of environment's smoke management program;

E.    requirements for the distance of the prescribed burn from structures, buildings and fences;

F.      the number of acres and estimated number of burn piles authorized under the permit;

G.      requirements for notification of the public and of appropriate personnel, such as fire dispatch personnel, fire department personnel and county or municipal fire marshals, prior to and upon ignition and termination of the prescribed burn;

H.      procedures to permit prescribed burns that cross jurisdictions; and

I.      procedures to aggregate permit data and report annually on the effectiveness of the model prescribed burn permit.

**68-5-6.      Criteria for counties or municipalities issuing prescribed burn permits.**

A county or municipality may adopt an ordinance to require a private landowner to obtain a permit to conduct a prescribed burn. A county or municipality that requires landowners to obtain a permit to conduct a prescribed burn shall use the model prescribed burn permit adopted by the department.

**68-5-7.      Prescribed burn manager certification.**

A.      The division shall create a prescribed burn manager certification program accessible to private landowners and private landowners' agents, contractors or legally authorized designees who conduct prescribed burns. The certification program shall include training, which shall be provided by the extension service, on all relevant aspects of prescribed burn, including legal requirements, safety, weather, fire behavior, smoke management, prescribed burn techniques, public relations, planning and contingencies.

B.      The department shall adopt rules to create the prescribed burn manager certification program, including the training and certification of certified prescribed burn managers; training components and engagement of subject matter experts; application processes; qualification for and terms and durations of certification; types of certification, if applicable; oversight of the program; grounds and processes for renewal, suspension and revocation of certifications; and application, certification and renewal fees.

C.      The department, by rule, may establish a fee at an amount not to exceed the amount required to recover costs that the division incurs in providing certification and processing applications for persons seeking certification as certified prescribed burn managers pursuant to this section. All proceeds from that fee shall be deposited in the forest land protection revolving fund.

D.      Nothing in this section may be construed as creating a mandatory prescribed burn manager certification requirement to conduct prescribed burning.

**68-5-8.        Prescribed burn training.**

The extension service shall provide the training required for prescribed burn manager certification as specified in rules adopted by the department. The extension service may collect fees for providing the training. The fees shall not exceed the amount required to recover costs that the extension service incurs in providing the training.

Prescribed Burning Act, N.M.S.A. §§ 68-5-1 to 68-5-8.

The Court concludes that the Prescribed Burning Act does not apply to the Hermit's Peak/Calf Canyon Fire.  Although the Hermit's Peak/Calf Canyon Fire emerges from the merging of a prescribed burn and a dormant pile burn, which is a prescribed burn,[27] it is an uncontrolled forest fire that causes the Plaintiffs' harm.  The preamble of the Hermit's Peak Act makes the leap for the Court and for the parties: "the prescribed burn . . . was declared a wildfire."  Hermit's Peak Act § 102(a)(2).  Thereafter, the Hermit's Peak Act refers to the wildfire as either the Hermit's Peak/Calf Canyon Fire, or the "fire."    Hermit's Peak Act § 102(a)(4)-(5).  At no point does Congress refer to the Hermit's Peak/Calf Canyon Fire as a prescribed burn.  Congress has, with the finding, precluded the Court from saying that the fire that damaged the Plaintiffs is a prescribed burn; the fire that causes the Plaintiffs' damages is a "wildfire."  Hermit's Peak Act § 102(a)(2). The former is the "controlled application of fire" that is "confined to a predetermined area," see N.M.S.A. §§ 68-5-2 to 68-5-3, while the latter is a "wildfire" scorching 340,000 acres of public and private land and which causes the United States President to issue a major disaster declaration,

_____

[27]Pile burns are a type of prescribed fire where firefighters pile and burn forest debris to reduce an area's wildfire risk.  See Pile Burning, Forest Service, https://www.fs.usda.gov/r02/arp/fire/management/pile-burning (last updated March 10, 2025)("Pile Burning Information Page").  These piles are made from the debris left after fuel reduction projects that involve thinning or cutting of trees in the forest, and piles are ignited only under certain conditions, including favorable smoke dispersal and adequate snow cover, which helps contain the piles.  See Pile Burning Information Page.

see Hermit's Peak Act § 102(a)(2).  FEMA challenges the Court for allegedly making findings of

fact, but it is FEMA that is asking the Court to make a factual finding.  Moreover, FEMA's

requested finding of fact contradicts Congress' finding of fact.  The Court need not make findings

of fact and declines to make a finding of fact that contradicts the one that Congress clearly has

made.

In the same provision that says prescribed burns are not a nuisance, the State's Prescribed

Burning Act also establishes that private landowners have a right to conduct prescribed burns

> provided that the prescribed burn is conducted with appropriate precautionary
> measures, including: the use of sufficient personnel and equipment; the prior
> notification of local fire officials; burn and contingency planning; and the use of
> appropriate prescribed burn techniques that cause the fire to be confined to a
> predetermined area.

N.M.S.A. § 68-5-3(B)(Court adds ellipses).  Because here, the Forest Service does not confine the

prescribed burn to a predetermined area but instead loses control of the fire causing the fire to

escape, the Prescribed Burning Act does not insulate the escaped prescribed burn -- i.e., the

wildfire -- from nuisance liability.  While New Mexico's Prescribed Burning Act defines

prescribed burns only as controlled fires, at least one other State, Colorado, includes in its

Prescribed Burning Act separate definitions for prescribed burns and escaped prescribed fires;

further, Colorado's Prescribed Burning Act explicitly protects prescribed fires from nuisance

liability, but not escaped prescribed fires:

> § 24-33.5-1217.5.  Minimum Prescribed Burning Standards
>
> 1.      The prescribed burning standards adopted by the director pursuant to
>         section 24-33.5-1217 (5)(a)(II)(B) must, at a minimum:
>
>         a.      Ensure that prescribed burning is the controlled application of fire
>                 to vegetative fuels under specified environmental conditions in
>                 accordance with a written prescription plan, which plan:
>
>                 I.      Is designed to confine the fire to a predetermined area;

II.  Is designed to accomplish planned land management objectives, as those objectives are determined by the property owner or natural resource management authority; and

III.  Conforms to this article and the rules and standards adopted in accordance with this article;

. . . .

§ 24-33.5-1217.7. Escaped Prescribed Fires

1.  If a prescribed fire exceeds the control capability of on-site resources, the fire is deemed to be escaped and contingency actions shall be taken immediately to bring the escape under control.

. . .

3.  Wildfires burning uncontrolled on forested, brush, or grassland areas that pose a hazard to life and property constitute a public nuisance.

CO ST § 24–33.5–1217.7.  While Colorado statutes are not authority in New Mexico, the separate definitions for a prescribed burn and an escaped prescribed burn, and that each has different nuisance liability, further supports the conclusion that the Forest Service's escaped prescribed burn -- which results in the largest wildfire in New Mexico's history and scorches 340,000 acres of land, destroys 900 structures and forces over 15,000 households to evacuate -- does not meet the definition of a prescribed burn under New Mexico law.  See APA MOO, 760 F. Supp. 3d at 1208 (citing Hermit's Peak Act § 102(a)).

The Lands Plaintiffs argue that New Mexico's Prescribed Burning Act does not apply to FEMA, because the statute "applies to private landowners, not the federal government."  See Lands Response at 7.  The Lands Plaintiffs are correct that the New Mexico Prescribed Burning Act references the civil liability only of private landowners.  See N.M.S.A.  § 68-5-4.  By extension of the Lands Plaintiffs' argument, however, any State statute that only explicitly imposes liability on private individuals cannot apply to the United States, but this is not always true.  Under certain

- 107 -

circumstances, the United States can be liable for violating certain State laws: for example, the FTCA permits plaintiffs to sue the United States for conduct that violates State tort law, such as negligence, nuisance, or trespass, just as they would be able to sue a private party.   See 28 U.S.C. § 1346(b)(waiving the United States' sovereign immunity for claims for injury and death "caused by the negligent or wrongful act or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred"); 28 U.S.C. § 2674 (stating that the United States is liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private individual under like circumstances").  See also Coffey v. United States, 906 F. Supp. 2d 1114, 1165 (D.N.M. 2012)(Browning, J.)(stating that, under the FTCA, "[t]he United States' liability is coextensive with that of private individuals under the respective State's law"); Cortez v. EEOC, 585 F. Supp. 2d at 1284 ("[T]he United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the State in which the United States' action or inaction occurred.").   The Lands Plaintiffs' interpretation of the New Mexico Prescribed Burning Act is inconsistent with the FTCA's purpose, which allows the United States to be held liable under State tort law in the same manner as a private party.

Here, the New Mexico Prescribed Burning Act, as discussed above, establishes a negligence standard of liability on private landowners who cause property damage or personal injury when conducting a prescribed burn.  See N.M.S.A. § 68-5-4(A).  Barring the FTCA's exceptions from the sovereign immunity waiver, if the Forest Service negligently conducts a prescribed burn that causes harm, a plaintiff might bring an FTCA claim based in that negligence. The Court notes, however, that the plaintiff may be ultimately unsuccessful because of the FTCA's

discretionary-function exception, which bars claims challenging the Forest Service's decision to initiate or managed a prescribed burn if the decision is based in judgment and public policy. See supra at 75 (discussing relevant law regarding the FTCA's discretionary-function exception as applied to Forest Service's forest-fire related actions, including conducting prescribed burns). See also infra, at 129 (explaining why the FTCA will immunize the Forest Service from FTCA claims resulting from Forest Service-initiated escaped prescribed burns). The point is, however, that the Lands Plaintiffs' threshold argument -- that a State statute which exclusively refers to private landowners therefore must only apply to private landowners -- is incorrect. The FTCA contemplates State law and torts, even when the State law or tort fails to mention a public actor's liability. Nonetheless, the Court ultimately concludes that the Prescribed Burning Act does not govern the Forest Service's liability in this case, because the Hermit's Peak/Calf Canyon Fire is not a prescribed burn -- it just emerges from one. The fire that caused the harm is the wildfire, not the initial prescribed burn and burn pile.

### C.   THE PRESCRIBED BURN IS ABNORMALLY DANGEROUS ACTIVITY SUBJECT TO STRICT LIABILITY.

FEMA also argues that, contrary to the Court's conclusion in the APA MOO, a prescribed burn is not an abnormally dangerous or ultrahazardous activity that is subject to strict liability. See Motion at 10. In this Section, the Court first explains why the Forest Service's prescribed burn and pile burn activities that lead to the Hermit's Peak/Calf Canyon Fire meet the Restatement's definition of abnormally dangerous activity, which the Supreme Court of New Mexico would follow. Next, the Court dismisses FEMA's fear that a strict-liability standard will disincentivize FEMA from conducting future prescribed burning activities, primarily because the FTCA will immunize the Forest Service's actions. The Court then also discusses other secondary reasons

why the Forest Service will not be disincentivized to conduct prescribed burns when strict liability applies.

> ### a. <u>The Forest Service's Activities Meet the Restatement's and the Supreme Court of New Mexico's Definitions of Abnormally Dangerous or Ultrahazardous Activity.</u>

In the APA MOO, the Court predicts that the Supreme Court of New Mexico would conclude that the Forest Service's prescribed burn and pile burn activities that lead to the Hermit's Peak/Calf Canyon fire meet the Restatement's definition of abnormally dangerous activity: "situations where the risks involved cannot be eliminated by the exercise of reasonable care, or even the utmost care."  APA MOO, 760 F. Supp. 3d at 1243 (quoting <u>Saiz v. Belen School Dist.</u>, 1992-NMSC-018, ¶ 22, 113 N.M. 387, 397, 827 P.2d 102, 112).  The Restatement's strict-liability rule for abnormally dangerous activity is as follows:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519.  The Restatement (Third) of Torts provides a straightforward definition of abnormally dangerous activity:

> (a) An actor who carries on an abnormally dangerous activity is subject to strict liability for physical harm resulting from the activity.

> (b) An activity is abnormally dangerous if:

>> (1) the activity creates a foreseeable and highly significant risk of physical harm even when reasonable care is exercised by all actors; and

>> (2) the activity is not one of common usage.

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 20 (Am. L. Inst. 2010)("Restatement (Third) § 20").  The Restatement (Third) of Tort's commentary on its strict-liability rule states that a controlled burn can be an abnormally dangerous activity subject to strict liability:

Illustration:

1.    At the end of the planting season, farmer Fred needs to dispose of dry straw spread over much of his 50 acres.  He therefore initiates a controlled burn fire, with the aim of using the fire to destroy the straw.  For fires of this sort there are appropriate precautions, including placing various types of obstacles at the property's boundary line.  However, even when all reasonable precautions are adopted, such fires escape the farmer's property approximately 10 percent of the time.  Because of the size of such fires, when there is such an escape the damage done to neighboring property is likely to be substantial.  When Fred's fire is in progress, the wind unexpectedly picks up.  The fire spreads to the property of Emily, Fred's immediate neighbor, causing harm.  Fred's activity in conducting the fire satisfies the requirements of Subsection (b)(1).

Restatement (Third) § 20.  The Restatement (Third) of Torts illustrates a controlled burn similar to the ones that started the Hermit's Peak/Calf Canyon Fire in that, in all cases, the actor takes reasonable precautions to contain fire within a large area of land, and even still, weather conditions and other unpredictable factors cause the fire to spread beyond control.  See Restatement (Third) § 20.

Here, the Forest Service's act of intentionally starting a fire in a forest -- even for a beneficial environmental-protection purpose -- entails an inherent risk that the fire may escape control and cause significant damage to people, property, or the environment, even when using the utmost care.  Nature's unpredictable and uncontrollable elements can exacerbate fires and reignite dormant ones.  These risks are foreseeable, as the Restatement's strict-liability rule requires: like Farmer Fred's fires that have a ten percent chance of escaping, here, the Forest Service's prescribed-burn-turned-wildfires are a familiar occurrence -- as is their resulting litigation in

federal court.  See Anderson v. United States, 55 F.3d 1379, 1380 (9th Cir. 1995), as amended on

denial of reh'g (June 14, 1995)(seeking damages under the FTCA from a Forest Service and

California Department of Forestry prescribed burn in Cleveland National Forest, California, that

escapes and destroys part of a nearby residential neighborhood); Robinson v. United States, 175

F. Supp. 2d 1215, 1215 (E.D. Cal. 2001)(Damrell, J.)(seeking damages for a Bureau of Land

Management prescribed burn around Lewiston, California, that escapes and becomes a wildfire

that consumes twenty-three houses, damages dozens of other properties, and generates more than

350 FTCA compensation claims); Michigan Dep't of Nat. Res. v. United States, No. 2:11-CV-

303, 2012 WL 13028277, at *1 (W.D. Mich. May 29, 2012)(Edgar, J.)(seeking damages under the

FTCA from a Forest Service prescribed burn in Ottowa National Forest, Michigan, that escapes

and becomes a wildfire which causes damage to 1,127 acres outside); Casper v. United States, No.

CIV 15-5087, 2017 WL 11700094, at *2 (D.S.D. Sept. 12, 2017)(Viken, C.J.)(seeking damages

under the FTCA from a Forest Service prescribed burn in the Dakota Prairie Grasslands that

escapes and becomes a wildfire which burns 10,679 acres of federal land and private land);

Piccinini v. United States, No. 317CV00584HDMWGC, 2018 WL 2014068, at *1 (D. Nev. April

30, 2018)(McKibben, J.)(involving a Forest Service prescribed burn in White Pine County,

Nevada, that escapes and becomes a wildfire which damages the plaintiff's property).  The Forest

Service-ignited prescribed burn here, which results in the Hermit's Peak/Calf Canyon Fire, meets

the Restatement's elements of abnormally dangerous activities, and therefore, are subject to strict

liability.[28]

---

[28]Assigning strict liability to prescribed burning activities is not a new concept.  Most, but
not all, States have prescribed burning statutes which establish liability for damages resulting from
escaped prescribed burns.  There are three different liability standards that emerge from statutes
or caselaw: strict liability, negligence, and gross negligence.  Several States use strict liability, the

most stringent standard, or something very close to strict liability: New Hampshire, North Dakota, Oregon, Oklahoma, Ohio, Wisconsin, and Hawaii.  See New Hampshire, Woodland Fire Control, NH Rev Stat § 227-L:17 ("Every person who sets fire on any land, that runs upon the land of any other person, shall pay to the owner all damages done by such fire."); North Dakota, N.D. Cent. Code §18-08-04 (holding a person civilly liable for damage if a lawful grass fire or burning crop stubble "accidentally and without any negligence on the part of the person setting the fire gets beyond the person's control"); id. §18-08-08 (allowing an injured person to recover damages without needing to "allege or prove title to the real property over which the fire has spread," as long as the person "was in the occupancy or possession" of the property); Oregon, Koos v. Roth, 293 Or. 670, 678-685, 652 P.2d 1255, 1265 (Or. 1982).  Although Oklahoma does not explicitly use the term "strict liability," its plain language imposes liability for "damages or injury as a result of accident or by ordinary negligence . . . resulting from the prescribed burn."  Prescribed Burns, Okla. Stat. tit. 2, § 2-16-28.2.  Liability for an "accident" without any finding of fault suggests that the statute holds landowners responsible for prescribed burn damages regardless of intent.  Okla. Stat. tit. 2, § 2-16-28.2.  Ohio and Wisconsin impose strict liability specifically for fire-suppression costs.  See Ohio Rev. Code § 1503.17 (stating that a person who "is responsible for the spreading of a fire to a woodland, forest, or wild land . . . neglects to extinguish such fires . . . [o]ne-half of the costs of extinguishment shall be borne by" the person.").  Similarly, Wisconsin holds that:

> Persons causing fires in violation of this chapter shall be liable to the state in an action for debt, to the full amount of all damages done to the state lands and for all expenses incurred by the towns fighting forest fires and shall be liable to municipalities in an action for debt, to the full amount of all damages to the municipal lands and for all expenses incurred by the municipalities fighting such fires.

Wisconsin Stat. § 26.21.

While although not strictly strict liability, Oregon and Hawaii statutes establish that an escaped prescribed burn is prima facie evidence of wrongdoing.  Oregon holds that:

> Nothing in this section relieves a person starting a fire from responsibility for providing adequate protection to prevent injury or damage to the person or property of another.  If such burning results in the escape of fire and injury or damage to the person or property of another, such escape and damage or injury constitutes prima facie evidence that the burning was not safe.

Oregon Rev. Stat. § 478.960.  Similarly, Hawaii Land Fire Protection Law, Haw. Rev. Stat. § 185-7, states that "setting fires or causing them to be set or allowing them to escape" is "prima facie evidence of willfulness, malice, or negligence".  Several States impose criminal liability on escaped prescribed burns, regardless of mental state, or outright ban prescribed burns.  Minnesota and West Virginia impose criminal penalties on anyone who causes a fire to spread onto another's property without their consent.  See Minn. Stat. § 88.17; WV Code § 20-3-5.  Ohio bans prescribed burns in the months of March, April, May, October, and November, between 6 am and 6 pm.  See Ohio Revised Code § 1503.18.  The Court, therefore, concludes that its prediction that New

- 113 -

Mexico would apply strict liability or something very close to strict liability, to prescribed burns is consistent with several States' approach to prescribed burn liability and limiting the use of prescribed burns.

The majority of States, the Court notes, have a negligence standard of care. Alabama Prescribed Burning, Ala. Code § 9-13-273:

> No property owner or his or her agent, conducting a prescribed burn in compliance with this article, shall be liable for damage or injury caused by fire or resulting smoke unless it is shown that the property owner or his or her agent failed to act within that degree of care required of others similarly situated.

See Alaska Fire Prevention Statutes, Alaska Stat. § 41.15.160 ("[T]he escape of a fire is presumptive evidence of negligence by the person responsible for starting the fire and unless rebutted is sufficient to sustain the recovery.").

> A landowner or a landowner's agent who conducts a prescribed burning in compliance with this subchapter is not liable in a civil action for any damage or injury caused by a fire in the prescribed burning . . . unless the claimant proves by a preponderance of the evidence that the claimant suffered damages as a result of negligence by the landowner or the landowner's agent in planning, implementing, or conducting the prescribed burning.

Arkansas Prescribed Burning Act, Ark. Code § 15-30-104. See Illinois Prescribed Burning Act, 525 Ill. Comp. Stat. Ann. 37/15 ("The property owner and any person conducting a prescribed burn under this Act shall be liable for any actual damage or injury caused by the fire or resulting smoke upon proof of negligence."); Mississippi Prescribed Burning Act, Miss. Code Ann. § 49-19-307 (West)("No property owner or his agent, conducting a prescribed burn pursuant to the requirements of this section, shall be liable for damage or injury caused by fire or resulting smoke unless negligence is proven."); Missouri Prescribed Burning Act, MO ST 537.354 ("No owner of land or agent of an owner of land shall be liable for damage, injury, or loss caused by a prescribed burning or the resulting smoke of a prescribed burning unless the owner of land or agent of an owner of land is proven to be negligent.").

> [A] a certified prescribed fire manager or a landowner or landowner's agent using a certified prescribed fire manager who conducts a prescribed fire in compliance with [this section] . . . is not liable for injury to or destruction of property arising from a wildfire, except to the extent evidence demonstrates that: (1) an act or omission . . . constituted negligence or a higher degree of fault.

Montana HB84 (2025).

> A landowner or lessee  who conducts a prescribed burn in accordance with an approved prescribed burn plan, the requirements of the bill, and any rules and regulations adopted pursuant thereto would not be liable for any damages or injury

caused by fire or the resulting smoke or ash, unless it is proven that the landowner
or lessee was negligent in starting, executing, or controlling the prescribed burn.

New Jersey's Prescribed Burn Act, NJ ST 13:9-44.11.  See N.M.S.A. §§ 68-5-4 (stating that
certified prescribed burn managers are liable for damages "if that person was negligent in starting,
controlling or extinguishing the prescribed burn," while non-certified prescribed burners are liable
for double damages); North Carolina, North Carolina Prescribed Burning Act, NC Gen. Stat. §
106-967 ("[T]his section does not apply when a nuisance or damage results from negligently or
improperly conducted prescribed burning."); Pennsylvania, Pennsylvania's Prescribed Burning
Practices Act, 32 Pa. Stat. and Const. Stat. Ann. § 425.11 ("In a private civil action arising from
the conduct of a prescribed burn and damage or injury caused by the fire or resulting smoke, proof
of compliance with the requirements of this act and the standards shall be admissible evidence that
the duty of care for such activity has been met."); South Carolina, South Carolina Prescribed Fire
Act, S.C. Code Ann. § 48-34-50 ("A property owner or lessee or his agent or employee conducting
a prescribed fire pursuant to this chapter is not liable for damage, injury, or loss caused by fire or
other consequences of the prescribed fire, except for smoke, unless negligence is proven.");
Tennessee, Prescribed Burns, Tenn. Code § 11-4-1003 ("No property owner, person, corporation,
limited liability company, partnership, natural person, agent of the owner, or any other entity who
conducts a prescribed burn pursuant to the requirements of this part shall be liable for damage,
injury or loss caused by fire unless negligence is proven."); Virginia, Va. Code § 10.1-1150.5
("Subsections A and B of this section shall not apply whenever a nuisance or damage results from
the negligent or improper conduct of the prescribed burn.").

Some States do not have an explicit negligence standard of liability but adopt statutory
language to a similar effect.  See Kentucky, Ky. Rev. Stat. §§ 149.175, 149.375 ("It shall be
unlawful . . . for any person to set fire to . . . any flammable material upon land owned or leased
by him unless he previously shall have taken all reasonable care and precaution."); Louisiana, La.
Stat. § 3:17 (establishing a rebuttable presumption of non-negligence if property owner who
conducts a prescribed burn complies with the proper requirements and regulations); South Dakota
Cod. L. § 34-35-12 (establishing civil liability for damages for all injury and fire suppression and
extinguishment costs for anyone who sets fire to any "inflammable material at any time of the year
without first having in place a natural or manmade firebreak and without giving due caution to the
prevailing and forecasted weather conditions"); Washington Rev. Code § 76.04.495 ("Any person,
firm, or corporation: (a) Whose negligence is responsible for the starting or existence of a fire
which spreads on forestland . . . shall be liable for any reasonable expenses made necessary.");
Wisconsin Stat. § 26.21 (stating that those "whose property is injured or destroyed by forest fires,
may recover, in a civil action, double the amount of damages suffered, if the fires occurred through
willfulness, malice or negligence," as well as "reasonable costs for legal representation to provide
owners recovering damages under this subsection.").

Finally, a few states have a gross negligence standard of care.  See Colorado Prescribed
Burning Program, Colo. Rev. Stat. § 24-33.5-1217 ("A private landowner . . . who is certified by
the division as a certified burner or . . . a prescribed burn boss is not liable for any civil damages
for acts or omissions made in good faith resulting in damage or injury caused by fire or smoke
resulting from prescribed burns . . . unless such . . . acts or omissions are grossly negligent or
willful and wanton."); Georgia Prescribed Burning, Ga. Code § 12-6-148 ("No property owner or

owner's agent conducting an authorized prescribed burn under this part shall be liable for damages or injury caused by fire or resulting smoke unless it is proven that there was gross negligence in starting, controlling, or completing the burn."); Florida Stat. § 590.125 ("A property owner . . . is not liable . . . for damage or injury caused by the fire, . . . previously contained burn, or resulting smoke . . . unless gross negligence is proven."); Indiana House Bill 1557, effective July 1, 2025 ("Immunity . . . does not apply if the harm was the result of the: (1) negligence of the landowner . . . or (2) willful and wanton misconduct of the landowner."); Michigan Comp. Laws § 324.51503(b)(establishing immunity from liability only when "the property owner . . . is not grossly negligent"); Nevada Rev. Stat. § 527.16 (establishing governmental immunity from conducting prescribed fires "unless the fire was conducted in a grossly negligent manner."); New York Env. Cons. L. § 9-1105 (describing prescribed burn permits).  Additionally, South Carolina, which has a negligence standard of care, carves out a gross negligence or recklessness standard for damages or injuries resulting from a prescribed burn's smoke.  See South Carolina Prescribed Fire Act, S.C. Code Ann. § 48-34-50.

At least one State, Texas, grants complete immunity from liability in certain circumstances:

> [A]n owner, lessee, or occupant of agricultural or conservation land is not liable for property damage or for injury or death to persons caused by or resulting from prescribed burning conducted on the land owned by, leased by, or occupied by the person if the prescribed burning is conducted under the supervision of a certified and insured prescribed burn manager.

Tex. Nat. Res. Code §§ 153.081-153.084.  Additionally, some States do not have explicit standards of liability despite having legislation or regulations regarding prescribed burns.  See California, Cal. Civ. Code § 333.8 (discussing liability for costs recoverable from prescribed burns but only under Health & Safety Code §§ 13009-13009.1, which concerns reporting and administrative costs of fire suppression); Connecticut Gen. Stat. § 22a-174 (discussing open burning of brush on residential property, but imposing no standard of liability); Idaho Admin. Code R. 20.02.01.071 (defining the purpose, notification, and recommended practices of prescribed fires but no standard of liability); Kan. Admin. Regs. § 28-19-647 (discussing a public interest exception to the general prohibition on open burning for open burning of trees and brush from non-agricultural land clearing operations); Maine Rev. Stat. § 9325 (requiring a permit for open burning, including burning of leaves, brush, deadwood and tree cuttings on property, and burning of grass fields for hazard reduction purposes); Massachusetts Dep't of Envt. Prot. Reg. 310 CMR 7.07 (discussing exception to open burning prohibition for fire protection or prevention); Nebraska Rev. Stat. 81-520.05 (describing the permit requirement for land-management burning); Utah Code § 19-2a-105 (describing prescribed fires and pile burns); Wyoming 060-27 Wyo. Code R. §§ 27-1 to 27-7 (setting forth regulations on the process of conducting prescribed burns).

Some States do not have specific legislation regarding prescribed burns, but rather discuss open burning, which is a broad category of activities involving fire.  See Arizona Rev. Stat. § 49-501 (discussing unlawful open burning but no standard of liability); Delaware Admin. Code § 1113-6.0 (discussing open burning but no standard of liability); Iowa Admin. Code 567--23.2(455)B (discussing open burning, including controlled building burns, but not controlled forest burns); Maryland Md. Code Regs. § 08.07.04.03 (allowing open air burning under certain

FEMA cites to <u>Rodgers v. City of Loving</u>, 1977-NMCA-132, 91 N.M. 306, 573 P.2d 240, in which the Court of Appeals of New Mexico concludes that the defendant, who burns dead grass and weeds on his property, is not subject to the strict liability standard for abnormally dangerous activities. <u>See</u> 1977-NMCA-132, ¶ 23, 91 N.M. at 310, 573 P.2d at 244. <u>Rodgers v. City of Loving</u> is inapposite, however, for two reasons: the small property fire in <u>Rodgers v. City of Loving</u> is dissimilar to the national forest prescribed burn and burn pile in this case, and second, the Court of Appeals of New Mexico does not apply the Restatement's strict-liability rule for abnormally dangerous activities, which the Court thinks that the Supreme Court of New Mexico would apply.

First, the inherent risks in lawn-grass burning in <u>Rodgers v. City of Loving</u> are on a different level than the inherent risks in the Forest Service's prescribed burn here, or the Restatement's illustration of Farmer Fred's 50-acre controlled burn. <u>See</u> Restatement (Third) § 20. The fire in <u>Rodgers v. City of Loving</u> is a "weed fire" that burns a single property, 1977-NMCA-132, ¶ 20, 91 N.M. at 309, 573 P.2d at 243 (Sutin, J., concurring and dissenting), whereas the Hermit's Peak/Calf Canyon Fire is a "wildfire" that destroys 340,000 acres of land, 900 structures, and forces 15,000 households to evacuate, <u>see</u> APA MOO, 760 F. Supp. 3d at 1208. The Merriam-Webster Dictionary defines "wildfire" as "a sweeping and destructive conflagration especially in a wilderness or rural area." Wildfire, Merriam-Webster, https://www.merriam-webster.com/dictionary/wildfire (last accessed July 15, 2025). Furthermore, burning grass on a

---

conditions). Other States do not have any laws on any open burning; Rhode Island has a Fire Code, but it says nothing about prescribed burns or open burns. <u>See</u> RI Fire Code 450-RICR-00-00-7. Vermont has no statutory guidance. Nevertheless, that several States adopt strict liability or something very similar to strict liability for prescribed burns, and that no New Mexico caselaw discusses whether prescribed burns are ultrahazardous or abnormally dangerous activity, supports the Court's conclusion that the Supreme Court of New Mexico, too, would adopt a strict liability standard for prescribed burns as ultrahazardous or abnormally dangerous activity, if confronted with the issue.

private lawn as part of a property "clean-up campaign," that damages only the neighboring property, 1977-NMCA-132, ¶ 23, 91 N.M. at 310, 573 P.2d at 244, is different from the Forest Service's prescribed burn here, which involves intentionally igniting a forest fire to mitigate future wildfire risk to nearby communities and ecosystems, see Andrew Avitt, Forest Service professionals prepare for a prescribed burn, Forest Service, https://www.fs.usda.gov/about-agency/features/professionals-prepare-for-prescribed-burn (April 4, 2023).  Because the burn in Rodgers v. City of Loving poses less serious risks than a premeditated forest fire, the case is not a good predictor of what the Supreme Court of New Mexico would say about prescribed burns, including pile burns, nor the specific ones the Forest Service conducts.

Second, Rodgers v. City of Loving cites a treatise to conclude that the defendant's fire is not subject to strict liability:

> The rationale of the rule most generally followed on this question and which we elect to adopt, is the following:
>
> The dangerous potentialities of fire seem to have been recognized very early. Something approaching strict liability for fire apparently was imposed upon landholders by the early common law.
>
> . . .
>
> The American courts . . . have consistently rejected the older rule, and have held, in the absence of legislation, that there is no liability for the escape of fire where the defendant was not negligent.  It is recognized, of course, that fire is a dangerous thing, and a great amount of care is required in dealing with it. . . . But its utility is so great, and it is so clearly sanctioned by universal use, that strict liability, even on the part of industrial enterprises, is not considered convenient or desirable.
>
> W. Prosser, The Law of Torts (4th ed. 1971) § 77, at 503, 504.
>
> Even if we were to apply the rule of strict liability as stated in § 519 and § 520 of the Restatement (Second) of Torts, supra, the instant situation does not present one of the factors necessary for the imposition: "inability to eliminate the risk by the exercise of reasonable care."  The trial court erred in giving the instruction on strict liability.

Rodgers v. City of Loving, 1977-NMCA-132, ¶ 6, 91 N.M. at 307, 573 P.2d at 241.

The Court of Appeals of New Mexico's strict-liability analysis in Rodgers v. City of Loving is conclusory and does not analyze fully the Restatement's definition of abnormally dangerous activity, which the Court thinks that the Supreme Court of New Mexico would analyze.[29]  See 1977-NMCA-132, ¶¶ 25-26, 91 N.M. at 310, 573 P.2d at 244-45.  The Court of

---

[29]New Mexico courts often look to tort law as stated in the Restatement.  See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 49, 109 N.M. at 393, 785 P.2d at 736 ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas."); Montanez v. Cass, 1975-NMCA-142, ¶ 39, 89 N.M. at 38, 546 P.2d at 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d.").  The Court thinks that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico in Montanez v. Cass and conclude that New Mexico follows the Restatement, because the Supreme Court of New Mexico frequently cites to the Restatement for tort rule statements.  See APA MOO, 760 F. Supp. 3d at n. 19 (predicting that the Supreme Court of New Mexico would conclude that New Mexico tort law follows the Restatement).  The Supreme Court of New Mexico previously has cited to the Restatement to define private nuisance,  see State ex rel. Village of Los Ranchos De Albuquerque v. City of Albuquerque, 1994-NMSC-126, ¶ 51, 119 N.M. at 163, 889 P.2d at 198; Cooper v. Chevron U.S.A., Inc., 2002-NMSC-020, ¶ 26, 132 N.M. at 390, 49 P.3d at 69 (Serna, C.J., Dissenting)(citing to the Restatement's definition of private nuisance), and New Mexico courts use a definition of trespass similar to the Restatement's definition of trespass, see APA MOO, 760 F. Supp. 3d at 1247-48 (predicting that the Supreme Court of New Mexico would look to the Restatement's definition of trespass because the characterizations of trespass in Padilla, 1984-NMCA-064, ¶ 26, 101 N.M. at 563, 685 P.2d at 971, and in North v. Public Service Co. of New Mexico, 1980-NMCA-031, ¶ 4, 94 N.M. 246, 608 P.2d 1128, are consistent with the Restatement).  The Supreme Court of New Mexico adopts the Restatement's definition of intentional-infliction-of-emotional-distress tort.  See Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., 2002-NMSC-4, 131 N.M. 607, 616, 41 P.3d 333, 342 (2001); Mosley v. Titus, 762 F. Supp. 2d 1298, 1323 (D.N.M. 2010)(Browning, J.)(recognizing that, under Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., the New Mexico courts adopt the Restatement's approach for intentional-infliction-of-emotional-distress).  The Supreme Court of New Mexico, moreover, explicitly adopts the Restatement's definition of negligent entrustment of chattel.  See Morris v. Giant Four Corners, Inc., 2021-NMSC-028 ¶14, 498 P.3d 238, 243 (explicitly adopting the tort of negligent entrustment of chattel from the Restatement (Second) of Torts §§ 308, 390).

New Mexico courts also look to the Restatement for employer liability and inherently dangerous activities.  See Saiz v. Belen Sch. Dist., 1992-NMSC-018, ¶¶ 1-46, 113 N.M. 387, 387-403, 827 P.2d 102, 102-18 (citing Restatement § 409 for liability of an employer of an independent contractor, § 413 for the definition of "peculiar risks" and "special danger," § 416 for liability of an employer of an independent contractor for physical harm caused by failure to exercise reasonable care, § 426 for the nonliability of an employer for "collateral" negligence of an

independent contractor, § 427 for liability for inherently dangerous activities.).  New Mexico courts adopt the Restatement's definition of tortious breach of contract.  See Gose v. Bd. of County Comm'rs, 727 F. Supp. 2d 1256, 1261 (D.N.M 2010)(Browning, J.)(acknowledging that the Supreme Court of New Mexico adopts various torts from the Restatement including tortious breach of contract); Schmitz v. Smentowski, 1990-NMSC-002 ¶ 50, 109 N.M. 386, 393, 785 P.2d 726, 736 ("We have adopted the cause of action of intentional interference with prospective contractual relations, relying on the tort as articulated in Restatement (Second) of Torts § 766(B) (1977).").

The Court identifies one 2003 Court of Appeals of New Mexico case that declines to decide whether to adopt the Restatement's definition of liability to a third-party for negligence.  See Blake v. Public Serv. Co., 2004-NMCA-002 ¶¶ 25-26, 134 N.M. 789, 796, 82 P.3d 960, 967.  In Blake v. Public Service Co., the plaintiff argues that Public Service Company of New Mexico ("PNM"), a major utility contractor, breaches a duty to the public to maintain a streetlight near where the plaintiff gets into a car accident and is injured.  See 2004-NMCA-002 ¶1, 134 N.M. at 790, 82 P.3d at 961.  The Court of Appeals of New Mexico rejects the plaintiff's proposal to adopt the Restatement's definition of liability to a third-party for negligent performance of undertaking, noting that New Mexico courts have not adopted the relevant part of the Restatement, and that "the Restatement is merely persuasive authority entitled to great weight that is not binding on this Court."  Blake v. Public Serv. Co., 2004-NMCA-002 ¶¶ 25-26, 134 N.M. at 796, 82 P.3d at 967 (quoting Gabaldon v. Erisa Mortg. Co., 1999-NMSC-39 ¶ 27, 128 N.M. 84, 90, 990 P.2d 197, 203).  Even here, however, the Court of Appeals of New Mexico declines to adopt the Restatement only because no precedent case does.  The Court of Appeals of New Mexico does not explicitly disagree with the Restatement.  Where the Court of Appeals of New Mexico cites favorably to the Restatement or characterizes a tort consistent with the Restatement's definition of that tort, the Court thinks that the Supreme Court of New Mexico would follow the Restatement.

New Mexico courts also look to other bodies of law in the Restatement, such as agency law.  See Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶¶ 30-31, 135 N.M. 539, 552, 91 P.3d 58, 71 ("We do not believe that it would be a radical departure for this Court to adopt the aided-in-agency theory of vicarious liability.  New Mexico courts have routinely relied upon the Restatement (Second) of Agency in discussing issues of respondeat superior."); id. ¶ 32 n.1. ("[T]he result reached in this section . . . relies on the Restatement."); Pena v. Greffet, 110 F. Supp. 3d 1103, 1133 (D.N.M. 2015)(Browning, J.)(recognizing that in Ocana v. Am. Furniture Co., the Supreme Court of New Mexico adopts the Restatement's agency theory into New Mexico State law).  New Mexico, like the Tenth Circuit, adopts portions of the Restatement (Second) of Judgments.  See Grand River Enters. Six Nations, Ltd. v. Torres, 2025 U.S. Dist. LEXIS 78618, *4-5 (D.N.M. March 11, 2025)(Browning, J)(citing to Potter v. Pierce, 2015-NMSC-002, ¶ 11, 342 P.3d 54, 57; and Three Rivers Land Co. v. Maddoux, 1982-NMSC-111, ¶ 27, 98 N.M. 690, 652 P.2d 240).

The Court notes, however, that the New Mexico courts have not always followed the Restatement, particularly for medical and product liability.  See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1222 (D.N.M. 2008)(Browning, J.)(explaining that the Supreme Court of New Mexico would not adopt the Restatement's learned-intermediary doctrine as an exception to its strict-liability law because "of the erosion of the justifications for adoption of the doctrine, given the changing dynamics between doctors and patients, patients' self-diagnosis, and [direct-to-consumer] advertising by drug manufacturers.").  In making the prediction in Rimbert v. Eli Lilly

Appeals of New Mexico concludes that the private landowner's burning of grass on his property does not constitute an "inability to eliminate the risk by exercise of reasonable care," which is part of the Restatement's strict-liability rule.  1977-NMCA-132, ¶¶ 25-26, 91 N.M. at 310, 573 P.2d at 244-45.  The Court of Appeals of New Mexico, however, neither elaborates on its rationale nor states that he took reasonable care and therefore eliminated risk.  The Court of Appeals of New Mexico also does not speak to the foreseeability of the risk of harm, which is part of the Restatement's strict-liability rule.  See Restatement § 20.  The Court predicts that the Supreme

---

& Co., the Court disagrees with the Court of Appeals of New Mexico's discussion that applies the learned-intermediary doctrine and predicts that the Supreme Court of New Mexico would go the other way.  See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d at 1225.  In some product liability cases, the Supreme Court of New Mexico and the Court of Appeals of New Mexico do not cite to the Restatement.  See, e.g., Pharmaseal Laboratories, Inc. v. Goffe, 1977-NMSC-071 ¶ 1, 90 N.M. 753, 755, 568 P.2d 589, 591 (discussing a medical malpractice claim); Martinez v. Showa Denko, K.K., 1998-NMCA-111 ¶ 1, 125 N.M. 615, 616, 964 P.2d 176, 177 (discussing whether to apply the discovery rule or a statute of limitations to commence a complaint in a drug product liability action against manufacturer of L-Tryptophan (LT), a dietary supplement).  Although in these two product liability cases the New Mexico courts do not cite the Restatement, they also do not meaningfully reject it.  In Pharmaseal Laboratories, Inc. v. Goffe, the Supreme Court of New Mexico cites to an earlier case for the elements of a medical malpractice negligence claim: Cervantes v. Forbis, 73 N.M. 445, 448, 389 P.2d 210, 213 (1964), which states that a physician or surgeon must have departed from the recognized standards of medical practice in the community, or must have neglected to do something required by those standards.  Pharmaseal Laboratories, Inc. v. Goffe, 1977-NMSC-071 ¶ 14, 90 N.M. at 757, 568 P.2d at 593.  The Supreme Court of New Mexico case Cervantes v. Forbis, in turn, cites to a Supreme Court of Washington case, Derr v. Bonney, 38 Wash.2d 678, 231 P.2d 637 (1951), which summarizes the general rules governing actions for malpractice, including a negligence claim.  38 Wash.2d at 681, 231 P.2d at 638-39.  And in Martinez v. Showa Denko, K.K., 1998-NMCA-111 ¶ 1, 125 N.M. 615, 616, 964 P.2d 176, 177, the Court of Appeals of New Mexico does not state any elements of a drug product liability claim because the issue in that case is about procedural issues with timely filing of the complaint, not a substantive tort claim.

In sum, the Court has not found a case where the Supreme Court of New Mexico mentions the Restatement and refuses to follow it.  The only Court of Appeals of New Mexico case that the Court has found which explicitly rejects the Restatement is Rodgers v. City of Loving, 1977-NMCA-132, ¶6, 91 N.M. at 307, 573 P.2d at 241.  The Court is very reluctant to say that the Supreme Court of New Mexico would follow this outlier case, even though it is in the New Mexico case law, and refuse to follow the Restatement.

Court of New Mexico would not agree with the Court of Appeals of New Mexico' reasoning, and would analyze fully the Restatement's definition to determine whether the defendant's action in Rodgers v. City of Loving is abnormally dangerous activity.[30]

The Supreme Court of New Mexico analyzes whether strict liability for abnormally dangerous activity applies in one case from 1958.  See Thigpen v. Skousen & Hise, 1958-NMSC-084 ¶¶ 5-8, 64 N.M. 290, 293-96, 327 P.2d 802, 804-06.  There, the Supreme Court of New Mexico concludes that strict liability applies to the defendant's blasting activity by citing to numerous authorities on strict liability for abnormally dangerous activities.  See Thigpen v. Skousen & Hise, 1958-NMSC-084 ¶¶ 5-8, 64 N.M. at 293-96, 327 P.2d at 804-06.  First, the Supreme Court of New Mexico cites 22 Am. Jur. 179-180, §§ 53 and 54, which states that "where one explodes blasts on his own land and thereby throws rock, earth, or debris on the premises of his neighbor, he commits a trespass and is answerable for the damage caused, irrespective of whether the blasting is negligently done."  Thigpen v. Skousen & Hise, 1958-NMSC-084 ¶ 5, 64 N.M. at 293-96, 327 P.2d at 804.  The second cite is to an early English case, Rylands v. Fletcher, L.R. 3 H.L. 330, which the Supreme Court of New Mexico explains is "frequently given as the case launching the old doctrine, sic utere tuo ut alienum non laedas," Thigpen v. Skousen & Hise, 1958-NMSC-084 ¶ 6, 64 N.M. at 294, 327 P.2d at 805, meaning "use your own property in such a manner as not to injure that of another," sic utere tuo ut alienum non laedas, Oxford Public International Law,

---

[30]The Court of Appeals of New Mexico does not describe sufficient facts to determine whether the defendant's action in Rodgers v. City of Loving meets the Restatement's definition of abnormally dangerous activity.  The Court of Appeals of New Mexico does not discuss whether the defendant takes precautionary measures, whether he properly burned grass on his property before, or whether he knew that there is a chance the fire could escape.  The Court, therefore, does not make a prediction whether the Supreme Court of New Mexico would conclude the defendant is subject to strict liability, because there are insufficient facts.

https://opil.ouplaw.com/display/10.1093/law:epil/9780199231690/law-9780199231690-e1607

(last updated January 2022).  Finally, the Supreme Court of New Mexico cites to the Restatement

§§ 519 and 520 on ultrahazardous activities, which also specifically describes blasting:

> § 519. Except as stated in §§ 521-4 (not here pertinent) one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm.

> § 520. An activity is ultrahazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of utmost care, and

> (b) is not a matter of common usage

> (c) * * * Blasting is ultrahazardous because high explosives are used and it is impossible to predict with certainty the extent or severity of its consequences.

Thigpen v. Skousen & Hise, 1958-NMSC-084 ¶ 6, 64 N.M. at 294, 327 P.2d at 805 (quoting

Restatement of the Law of Torts, §§ 519 and 520).

More recently, the Supreme Court of New Mexico cites to the Restatement in defining

"abnormally dangerous activities" in Saiz v. Belen School District, 1992-NMSC-018, ¶ 22, 113

N.M. 387, 397, 827 P.2d 102, 112 ("Saiz"), as "situations where the risks involved cannot be

eliminated by the exercise of reasonable care, or even the utmost care."  1992-NMSC-018, ¶ 22,

113 N.M. at 397, 827 P.2d at 112.  Although the Supreme Court of New Mexico so far has applied

strict liability for abnormally dangerous activity only to blasting, the Court predicts that it would

apply the standard in other circumstances, such as here, based on the authorities on which Supreme

Court of New Mexico relies in Thigpen v. Skousen & Hise, 1958-NMSC-084 ¶¶ 5-8, 64 N.M. at

293-96, 327 P.2d at 804-06, and the strict liability definition in Saiz, 1992-NMSC-018, ¶ 22, 113

N.M. at 397, 827 P.2d at 112.  The Honorable Juan G. Burciaga, then-Chief Judge of the United

States District Court for the District of New Mexico, explains:

> Therefore, the New Mexico Supreme Court's statement in <u>Saiz</u>, "Application of the ultrahazardous activity doctrine has been restricted in [New Mexico] decisions to the use of explosives in blasting," [1992-NMSC-018, ¶ 22, 113 N.M. at 397, 827 P.2d at 112], must be construed merely as an historical observation, not a substantive limitation on strict liability doctrine. The court, by this dicta, did not, and could not have intended to, forever freeze the development of strict liability doctrine in New Mexico. That "New Mexico has not yet recognized the theory of a landowner's strict liability except [in blasting cases]," <u>Ruiz [v. Southern Pacific Transportation Co.</u>, 1981-NMCA-094, 97 N.M. 194, 200, 638 P.2d 406, 412], does not necessarily mean that New Mexico will never recognize strict liability outside the blasting context.

<u>Schwartzman, Inc., v. Atchison, Topeka & Santa Fe Ry. Co.</u>, 842 F. Supp. 475, 478 (D.N.M. 1993)(Burciaga, C.J.). Here, setting fire to a forest, even when following the utmost care under prescribed fire policy and safety protocol, creates ultrahazardous risks similar to blasting, because the risk of wildfire cannot be eliminated even "by the exercise of utmost care," <u>Thigpen v. Skousen & Hise</u>, 64 N.M. 290, 294 (quoting Restatement of the Law of Torts, §§ 519 and 520), or even "by the exercise of reasonable care," <u>Saiz</u>, 1992-NMSC-018, ¶ 22, 113 N.M. at 397, 827 P.2d at 112. This scenario keeps happening. <u>See</u> <u>Anderson v. United States</u>, 55 F.3d at 1380; <u>Robinson v. United States</u>, 175 F. Supp. 2d at 1215; <u>Michigan Dep't of Nat. Res. v. United States</u>, No. 2:11-CV-303, 2012 WL 13028277, at *1; <u>Casper v. United States</u>, No. CIV 15-5087, 2017 WL 11700094, at *2; <u>Piccinini v. United States</u>, No. 317CV00584HDMWGC, 2018 WL 2014068, at *1. Even harkening back to <u>Rylands v. Fletcher</u>, L.R. 3 H.L. 330's early English maxim, applying strict liability to prescribed burns reflects the concept of <u>sic</u> <u>utere</u> <u>tuo</u> <u>ut</u> <u>alienum non</u> <u>laedas</u>, meaning to use your own property in such a manner as not to injure that of another. L.R. 3 H.L. 330. This doctrine rings especially true where the "another" incurs injury at no fault of their own.

FEMA also cites a tort law treatise which explains similarly that, "in the absence of legislation, there is no liability for the escape of fire where the defendant is not negligent," and that "American courts reason that the utility of fire is too great and the usage too universal that it

would be very inconvenient to impose strict liability for the damage it causes."  Motion at 10 (quoting Speiser, 7 Am. Law of Torts § 19:22 (2024)).  But in departing from the Restatement's definition for strict-liability of abnormally dangerous activity, FEMA's cited treatise and the similar conclusion in Prosser's Law of Torts, cited in Rodgers v. City of Loving, make policy arguments with which the Court disagrees.  Fire's utility is great and universal; it has to be used. Strict liability is designed to protect "the innocent person who suffers harm as a result of" an "unavoidable risk of harm that is inherent" in the defendant's activity.  Restatement (Third) § 20(h).  Although prescribed burning carries inherent, unavoidable risks even during "the exercise of utmost care," Thigpen v. Skousen & Hise, 64 N.M. at 294, the defendant that is doing a prescribed burn is in the position to minimize those risks as much as possible; the law has an interest in putting maximum pressure on the defendant to keep the fire safe.  The defendant is also in the best position to insure around the risk; the plaintiffs do not know about the fire and are not aware the risks they are facing.  They cannot reduce the risk or insure around it.  In the specific case of a prescribed burn, the use of fire can cause harm, even when the person who conducts the prescribed burn takes all reasonable precautions.  Escaped prescribed burns cause harm on their own, without any meaningful contribution from the conduct of the victim or anyone else.  The danger, therefore, is inevitable, or even inherent, and the victim is blameless.  The Restatement's commentary on blasting, which is subject to strict liability is interchangeable with prescribed burns:

> Typically, the victim is a passive, uninvolved third party, who is connected to the blasting only in the sense that the victim owns property in the neighborhood and suffers harm on account of the blasting.  It is, then, the inevitably risky quality of the activity of blasting, the extent to which that activity is the almost exclusive cause of the resulting harm, the plaintiff's status as a wholly innocent and uninvolved third party, and the defendant's choice to engage for its own advantage in an activity that it knows to be inevitably risky, that makes blasting a paradigm case for strict liability.

Restatement (Third) of Torts § 20.  Here, the victims of the Hermit's Peak/Calf Canyon Fire are passive and uninvolved, connected only in that they own property within the burn scar.  The Hermit's Peak/Calf Canyon Fire is the exclusive cause of the victim's harm.  While the Forest Service is different from a private actor who conducts blasting in that the Forest Service does not conduct prescribed burns solely for its own advantage, a prescribed burn's inherent dangers and the non-culpability of victims is the circumstance to which strict liability should apply and thus weigh in favor of applying strict liability.

The Court also reads the full sections in the American Law of Torts Treatise and Prosser's Law on fire and strict liability and concludes that they support adopting strict liability for controlled burns.  The Fire section in the American Law of Torts, which includes but also expands on FEMA's cited excerpt, states:

> In at least one case, the doctrine of strict tort liability has been applied to field burning as an abnormally dangerous activity -- as where the burning was conducted by a farmer using the burning as an agricultural technique.[1]  However, for the most part, in the vast majority of cases and in usual instances, the American courts have rejected the ancient common-law rule and have held that, in the absence of legislation, there is no liability for the escape of fire where the defendant is not negligent.[2] The American courts reason that the utility of fire is too great and the usage so universal that it would be very inconvenient to impose strict liability for the damage it causes.[3]

Fire, 7 American Law of Torts § 19:22.  There are three footnotes in this excerpt.  Footnote 1 cites to the Oregon Supreme Court case Koos v. Roth, 293 Or. 670, 652 P.2d 1255 (1982), in which the court applies strict liability to a farmer who burns his field after creating a protective strip around the perimeter.  See 293 Or. at 672, 690, 652 P.2d at 1257.  The Oregon Supreme Court reasons that a farmer's field burning is different from other domestic and industrial uses of fire because, like with using explosives and herbicides, the farmer intends to destroy his or her surroundings. 293 Or. at 682, 652 P.2d at 1265.  The Oregon Supreme Court explains that a "backyard burner"

is not alone an abnormally dangerous activity, but it is a matter of scale as well as location: when the user starts a fire in a large area open to the winds, even doing so with reasonable care, there is a possibility that it will spread beyond its intended bounds. 293 Or. at 685, 652 P.2d at 1265. The Oregon Supreme Court explains that, while the use of fire is not abnormally dangerous in the great majority of locations, there are clearly situations in which courts should be willing to impose strict liability for damage that the escape of fire causes. 293 Or. at 678, 652 P.2d at 1265. Although this case is not controlling authority in New Mexico, the Court thinks its reasoning is applicable to this case, where the Supreme Court of New Mexico would impose strict liability. Given the "scale and location" of the Forest Service's prescribed burn and burn pile at two different locations within the Sante Fe National Forest, even with the Forest Service's precautionary measures, the environment creates a "possibility that [the fire] will spread beyond its intended bounds." 293 Or. at 685, 652 P.2d at 1265.

The remaining footnote citations further support the Court's conclusion, because they refer to cases, including Rodgers v. City of Loving, 1977-NMCA-132, 91 N.M. 306, 573 P.2d 240, that are distinct in that they describe the "vast majority" of cases and "usual situations" that are not prescribed burns. Fire, 7 American Law of Torts § 19:22. See B. W. King, Inc. v. Town of W. New York, 49 N.J. 318, 323, 230 A.2d 133, 136 (1967)(involving a fire that starts when three teenage boys throw a lighted cigarette into a coal hopper); Minto v. Sprague, 124 P.3d 881, 883 (Colo. App. 2005)(involving a neighbor who operates a bulldozer on his land which scrapes a rock and causes a fire); King v. U.S., 53 F. Supp. 2d 1056, 1077 (D. Colo. 1999)(Babcock, J.)(determining that building a campfire in a forest is not an ultrahazardous activity for the purposes of strict liability). The one case cited which does involve a forest fire that emerges from a burn pile is Heritage Farms, Inc. v. Markel Insurance Co., 2012 WI 26, 339 Wis.

2d 125, 810 N.W.2d 465 (Wis. 2012), but, there, the plaintiffs bring an action claiming negligence, trespass, and nuisance, but do not allege strict liability, so the court does not analyze whether the defendant is strictly liable for the damage resulting from the burn pile.  See 2012 WI 26, ¶ 10, 339 Wis. 2d at 136, 810 N.W.2d at 471.  Moreover, the Court also looks at the entire section titled "Fire" in The Law of Torts by William Prosser, which provides more context to the excerpt that Rodgers v. City of Loving, 1977-NMCA-132, ¶6, 91 N.M. at 307, 573 P.2d at 241, selectively cites.  See W. Prosser, The Law of Torts (4th ed. 1971) § 77, at 503, 504.  There, Prosser acknowledges that, despite fire's utility being so great that strict liability is "not considered convenient or desirable," many States enact statutes that "restore the rule of strict liability in certain very dangerous situations -- as where a fire is set during a specific dry season, or a prairie fire is started intentionally."  W. Prosser, The Law of Torts (4th ed. 1971) § 77, at 504.  These strict-liability statutes, Prosser concludes, "have been held constitutional, as reasonable measures for the protection of property and the adjustment of an inevitable risk."  W. Prosser, The Law of Torts (4th ed. 1971) § 77, at 504.  Prosser, therefore, explicitly discusses that controlled burns can be subject to strict liability.  FEMA's citations, when including more context, support the application of strict liability to controlled burns even more than they caution against it.

Finally, the Court makes clear that while the New Mexico Prescribed Burning Act imposes a negligence liability standard for prescribed burns in general, the Court's analysis imposes a strict liability standard for prescribed burns within a specialized category that the Act does not contemplate: Forest Service-initiated, forest-fire magnitude prescribed burns.  Prescribed burning legislation, based on the Court's analysis of the New Mexico Prescribed Burning Act as well as all fifty States' prescribed burn legislation, is not equipped to deal with the full spectrum of prescribed burns, particularly not those at the outermost dangerous extremity, where federal

agencies ignite large-scale fires in dense forests.  The Court, therefore, applies strict liability to the ultrahazardous and abnormally dangerous activity of Forest Service initiated prescribed burns, including the Las Dispensas-Gallinas prescribed burn on federal land in the Santa Fe National Forest that becomes the Hermit's Peak/Calf Canyon Fire.  See Hermit's Peak Act § 102(a)(1).

b.    **The FTCA's Discretionary-Function Exception Immunizes the Forest Service From Prescribed-Burn Related Lawsuits.**

FEMA also argues that designating prescribed burns as abnormally dangerous and ultrahazardous activities "risk chilling" the Forest Service's discretion and "deterring beneficial fire prevention efforts," like prescribed burns.  Motion at 11-12.  FEMA does not support, however, its argument with evidence that imposing strict liability will choke the Forest Service's operations.  See Motion at 12.  Even if the Forest Service's prescribed burning and pile burn activities here are subject to strict liability, the FTCA immunizes the United States from lawsuits when the Forest Service conducts prescribed burns that escape and cause damage.  The Tenth Circuit affirms the Court's conclusion in De Baca v. United States, 403 F. Supp. 3d at 1121, that the FTCA does not waive the United States' sovereign immunity when the Forest Service undertakes various fire-prevention actions and management decisions, including deciding whether to masticate an area in the Cibola National Forest, New Mexico, and conduct prescribed burns.  See De Baca v. United States, 399 F. Supp. 3d 1052, 1052, aff'd sub nom. Ohlsen v. United States, 998 F.3d 1143 (10th Cir. 2021).  In De Baca v. United States, the Court concludes that the FTCA's discretionary-function exception applies to several of the Forest Service's fire-related decisions including whether to protect fire-based destruction and implement site-specific fire restrictions, as well as whether to implement a policy about site-specific assessments and delegate site-thinning projects to contractors.  See 399 F. Supp. 3d at 1211-13.  The Court reasons that the FTCA discretionary-function exception applies because the Forest Service's decisions are "discretionary in nature, acts

that 'involve an element of judgment or choice,'" and are "based on considerations of public

policy." 399 F. Supp. 3d at 1206-07 (quoting United States v. Gaubert, 499 U.S. at 322-3 (quoting

Berkovitz by Berkovitz v. United States, 486 U.S. at 536-37)).

The Tenth Circuit also holds in other cases that, when a wildfire naturally occurs and the

Forest Service responds to -- but does not initiate -- the fire, the discretionary-function exception

bars FTCA lawsuits against the United States.  See Knezovich v. United States, 82 F.4th 931, 934

(10th Cir. 2023)(concluding that the discretionary-function exception bars suit against the Forest

Service for allegedly negligently delaying suppression response to the 2018 Roosevelt Fire in

Wyoming); Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d 1216, 1222-23 (10th Cir.

2016)(reasoning that a Forest Service decision only to partially suppress a wildfire requires a

"balancing of the needs to protect private property, ensure firefighter safety, reduce fuel levels,

and encourage natural ecological development," and that "[t]he nature of the [Forest Service's]

actions in fighting the . . . [f]ire are susceptible to a policy analysis grounded in social, economic,

or political concerns"); Miller v. United States, 163 F.3d at 595-96 (concluding that "the decision

regarding how to best approach the Bald Butte fire also required consideration of fire suppression

costs, minimizing resource damage and environmental impacts, and protecting private property,"

as well as safety, and that "the Forest Service's decision is susceptible to a policy analysis

grounded in social, economic, or political concerns").  Other Courts of Appeals with similar cases,

in which plaintiffs sue the United States under the FTCA for tort damages resulting from Forest

Service-initiated prescribed burns, also apply the discretionary-function exception.  See Miller v.

United States, 163 F.3d at 592 (holding that the discretionary-function exception bars plaintiff's

suit against the Forest Service where a forest fire spreads from Ochoco National Forest onto the

plaintiff's property); Esquivel v. United States, 21 F.4th at 572-73 (holding that the discretionary-

function exception bars suit against the Forest Service's actions when a wildfire threatened private property and a fire crew obtained a resident's verbal consent before starting suppression activities, but the crew's fire suppression activities damages plaintiff's property); Woodward Stuckart LLC v. United States, 650 F. App'x at 383 (applying the discretionary-function exception to the Forest Service's decisions whether and when to suppress a naturally caused wildfire, explaining that the Forest Service's response to "multiple wildland fires as being grounded on competing public policy considerations"); Miller v. Gammie, 335 F.3d at 899 (describing the Forest Service's allocation of fire-suppression resources to multiple fires as involving a balancing of competing policy interests); Backfire 2000 v. United States, 273 F. App'x 661, 662-63 (9th Cir. 2008)(finding that the Forest Service's use of backfires to fight the Bitterroot wildfires is subject to the discretionary-function exception). The Eleventh Circuit applies the discretionary function exception when a Forest Service's prescribed fire in a national forest escapes and damages private property. See Foster Logging, Inc., v. United States, 973 F.3d at 1167 (explaining "that alleged conduct -- the steps and measures taken to safely execute a controlled burn -- by its nature, involves an exercise of discretion and considerations of social, economic, political, and public policy").

The Court concludes that, in light of the Tenth Circuit's application of the discretionary-function exception when the Forest Service responds to wildfires and its affirming of the Court's decision in De Baca v. United States, 403 F. Supp. 3d at 1121, regarding the Forest Service's various forest-fire related actions, including its decision not to conduct a prescribed burn, and the Ninth and Eleventh Circuit's similar applications, the Tenth Circuit also would apply the discretionary-function exception when the Forest Service initiates a prescribed fire that turns into a wildfire. First, conducting a prescribed burn is a discretionary act that "involve[s] an element of judgment or choice," Berkovitz by Berkovitz v. United States, 486 U.S. at 536, because the Forest

Service does not have any mandatory requirements to conduct prescribed burns, but rather decides to conduct them depending on environmental conditions.  Second,  both the decision to conduct a prescribed burn and the decisions about how to conduct that prescribed burn are "based on considerations of public policy," Berkovitz by Berkovitz v. United States, 486 U.S. at 537), for similar reasons that the Tenth Circuit identifies in Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1222-23, and in Miller v. United States, 163 F.3d at 595-96.  Prescribed burns in national forests mitigate the future risk of wildfires, which protect private property, ensure public safety, encourage natural ecological development, and minimize environmental damage and impact.[31]  The Court predicts that the Tenth Circuit would apply the discretionary-function exception to the Forest Service's conduct in initiating prescribed burns, because the Forest Service's prescribed burning actions -- both its decision to initiate the prescribe burn and its methods of conducting the prescribed burn -- meet Berkovitz by Berkovitz v. United States's two requirements to apply the discretionary-function exception.  Even if prescribed burns are subject to strict liability under the Restatement, the discretionary-function exception immunizes the United States from FTCA lawsuits for conducting prescribed burns that turn into wildfires.  The Court addresses the point that the discretionary-function exception likely bars victims of the Hermit's Peak Fire from bringing FTCA claims against the United States in Vigil v. FEMA:

> The Supreme Court mandates a two-prong analysis for determining when the FTCA's discretionary function exception applies.  See Berkovitz v. United States, 486 U.S. 531, 536 (1988)("Berkovitz").  First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" United States v. Gaubert, 499 U.S. 315, 322 (1991)(quoting Berkovitz, 486 U.S. at 536).  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'"  United States v. Gaubert, 499 U.S. at 322 (1991)(quoting Berkovitz,

---

[31]United States Forest Service, National Prescribed Fire Resource Mobilization Strategy at iii (June 2023), https://www.fs.usda.gov/sites/default/files/2023-06/Rx-Fire-Strategy.pdf

486 U.S. at 536).  Second, the conduct must be "'based on considerations of public policy.'"  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).

In De Baca, 399 F. Supp. 3d 1052, property owners brought FTCA claims against the United States seeking to recover damages for injuries sustained in the Dog Head Fire, which began after a masticator, a type of tractor-mounted woodchipper used in forestry management to reduce wildfire risk, hit a rock and ignited dry brush.  See De Baca, 399 F. Supp. 3d at 1072-73; Ohlsen, 998 F.3d at 1151-52.  "The fire raged for about three months, burning 17,912 acres and destroying twelve residences and forty-four other structures" in the Manzano Mountains in central New Mexico.  Ohlsen, 998 F.3d at 1152.  The Court dismissed the property owners' claims, concluding, among other things, that the United States' actions in causing the fire fell within the discretionary exception to the FTCA's sovereign immunity waiver.  De Baca, 399 F. Supp. 3d at 1206-28 ("The Court concludes . . . that it lacks subject-matter jurisdiction over the . . . Plaintiffs' . . . claims because of the discretionary function exception.").

The Tenth Circuit affirmed the Court's judgment in denying the property owners' FTCA claims.  Ohlsen, 998 F.3d at 1160-64.  Specifically, the Tenth Circuit held that the USFS's decisions "to allow slash to accumulate beyond the eighteen-inch limit," and "its decisions regarding fire suppression, namely, not to post a fire guard or truck at the mastication site and not to impose fire restrictions on the day of the fire," fell within the discretionary function exception.  Ohlsen, 998 F.3d at 1160.  The Tenth Circuit took an expansive view of the discretionary function exception, reasoning that "decisions regarding fire safety" such as "deciding whether to impose fire restrictions" involve "balancing practical considerations of funding and safety as well as concerns of a fire's impact on wildlife, vegetation, and human life."  Ohlsen, 998 F.3d at 1163.

In line with the Court's and the Tenth Circuit's analysis in De Baca and Ohlsen, courts assessing whether the United States' decisions regarding fire suppression, and, specifically, the management of prescribed burns, have concluded that "claims involving how the government conducts fire suppression operations are generally barred by the discretionary function exception . . . ."  Esquivel v. United States, 21 F.4th 565, 574 (9th Cir. 2021).  See Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d 1216, 1222-23 (10th Cir. 2016)("[T]he balancing of the needs to protect private property, ensure firefighter safety, reduce fuel levels, and encourage natural ecological development . . . are precisely the kind of social, economic, and political concerns the discretionary function exception was designed to shield from 'judicial second guessing.'" (quoting Berkovitz, 486 U.S. at 536-37)); Green v. United States, 630 F.3d 1245, 1251 (9th Cir. 2011)(acknowledging that decisions regarding how to fight a fire, attack a fire, and allocate fire suppression resources are decisions grounded in public policy).  Recognizing this line of caselaw and highlighting that decisions regarding fire management generally involve discretionary decision making

grounded in public policy determinations, the Tenth Circuit recently remarked: "It is no wonder that, time and again, the courts have declined to manage the firefighting role."  Knezovich v. United States, 82 F.4th 931, 937-43 (10th Cir. 2023), cert. denied, No. 23-968, 2024 WL 2116299 (U.S. May 13, 2024).  Moreover, courts have extended the general proposition that decisions regarding fire management fall within the discretionary function exception to USFS employees' specific decisions whether to light a prescribed burn, see Thune v. United States, 872 F. Supp. 921, 924 (D. Wyo. 1995)(Brimmer, J.)("Mr. Chapman's decision to set the controlled burn was based on many different factors before him at that time.  He had to consider the temperature, the wind, the weather forecast, the season and other considerations, including the broad policy behind the burns."), and, following ignition, "choices and decisions as to how to observe, monitor, and maintain" the controlled fire also fall under the exception, Foster Logging, Inc. v. United States, 973 F.3d 1152 (11th Cir. 2020).

Given the degree of discretion involved in decisions related to controlled burns, an FTCA claim based on the USFS's negligence regarding the Hermit's Peak Fire is not likely to survive a motion to dismiss on jurisdictional grounds.  First, each of the potentially challengeable actions are "matter[s] of choice for the acting employee." Berkovitz, 486 U.S. at 536.  For example, the decision to ignite the controlled burn in the first place "was based on many different factors before" the decision makers, such as "the temperature, the wind, the weather forecast, the season and other considerations, including the broad policy behind the burn[]." Thune v. United States, 872 F. Supp. at 924.  See Gallinas-Las Dispensas Prescribed Fire Declared Wildfire Review at 17, Forest Service, U.S. Department of Agriculture (April 2022)("Hermit's Peak Fire Report")("The decision was made to start the test fire there because there was minimum heavy fuel within the test fire area.").  The existence of the Gallinas Watershed Prescribed Fire Plan, which provides guidance on wildfire mitigation measures, such as prescribed burns, that could be undertaken in the area, see Hermit's Peak Fire Repot at 7, "did not remove USFS employees' choice or judgment regarding what measures to take," because "it did not 'specifically prescribe[] a course of action for an employee to follow.'" Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1221 (quoting Berkovitz, 486 U.S. at 536).  See Thune v. United States, 872 F. Supp. at 924 ("Although burn plans had been developed, the ultimate decision of whether the burn should proceed was based on the judgment of Mr. Chapman.").  Likewise, decisions regarding how the USFS "observed, monitored, and maintained the controlled burn" involve "element[s] of judgment or choice," Foster Logging, Inc. v. United States, 973 F.3d at 1158, as do the USFS's response to the prescribed burn as it developed in intensity, see Hardscrabble Ranch, L.L.C. v. United States, 840 F.3d at 1220 (concluding that the USFS has "discretion in this case about how to respond to the Sand Gulch Fire").  Finally, USFS decision regarding the monitoring of smoldering debris piles following a nearby fuel treatment project which, despite being covered by snowfall, grew into the Calf Canyon Fire, which later merged with the Hermit's Peak Fire, involves discretionary decisions.  See Bill Gabbert, Investigators Determine Calf Canyon Fire Caused by Holdover From Prescribed Fire, Wildfire

Today (May 28, 2022); <u>Ruffino v. United States</u>, 583 F. Supp. 3d 1288, 1290 (E.D. Cal. 2022)(Mueller, C.J.)(acknowledging the discretion involved in the USFS's monitoring of snow-covered, still-smoldering vegetation following a controlled burn).

Second, each of these decisions relating to forest management and fire suppression "necessarily 'involve[] balancing practical considerations of funding and safety as well as concerns of a fire's impact on wildlife, vegetation, and human life,'" <u>Knezovich v. United States</u>, 82 F.4th at 943 (quoting <u>Ohlsen</u>, 998 F.3d at 1163), and, accordingly, "the judgment the USFS exercised was 'susceptible to policy judgment' and 'involve[d] an exercise of political, social, or economic judgment,'" <u>Knezovich v. United States</u>, 82 F.4th at 942 (quoting <u>Duke v. Dep't of Agric.</u>, 131 F.3d 1407, 1410 (10th Cir. 1997)). "The task of balancing these interests is best lodged with officials and experts on the ground than with judges aided by the benefit of hindsight." <u>Knezovich v. United States</u>, 82 F.4th at 942. In sum, despite the FTCA's waiver of sovereign immunity, an FTCA claim based on the USFS's negligence regarding the Hermit's Peak Fire is unlikely to succeed, because the discretionary function exception likely applies. Finally, the Court thinks the same hurdle would face an FTCA claim based on agency flood control efforts within burn scar areas in the aftermath of the Hermit's Peak Fire. Decisions regarding minimizing flood risk -- including whether to plant trees, build berms, and divert streams -- involve substantial discretion based on policy concerns. <u>See</u> <u>Ohlsen</u>, 998 F.3d at 1163 (recognizing that decisions involving "balancing . . . concerns of a fire's impact on wildlife, vegetation, and human life" involve discretion).

<u>Vigil v. FEMA</u>, 2024 WL 2404487, at \*34 n.9. Given that the FTCA is the major vehicle for seeking damages from the United States for uncontrolled wildfires when Congress has not enacted a specific remedy, the Forest Service will not experience a chilling effect on prescribed burn operations. Sovereign immunity protects the Forest Service in any FTCA lawsuit in which a plaintiff challenges the Forest Service's decision to conduct a prescribed burn.

**c.    <u>Applying Strict Liability to New Mexico Prescribed Burns Does Not Deter the Forest Service's Prescribed Burn Activity.</u>**

Even notwithstanding immunity under the FTCA, the Court does not think that FEMA would forego conducting a prescribed burn out of fear of liability if the fire escapes at the risk of increasing wildfire risk to communities, to important infrastructure, and to cultural and natural resources, as well as at the risk of threatening forest resiliency. <u>See</u> National Prescribed Fire

Resource Mobilization Strategy at ii, Forest Service (June 2023)(describing the Forest Service's purposes in conducting prescribed burns).  Strict liability does not per se penalize the act of conducting a prescribed burn; it just assigns liability to the entity -- the Forest Service -- who is in the best position to minimize the risk.  Instead, it internalizes the burden of risk to the burner when harm ensues, and by doing so, incentivizes the burner to take whatever actions necessary to reduce the chance of escape when conducting a prescribed burn.  See Ind. H. B. R.R. Co. v. Am. Cyanamid Co., 916 F.2d 1174, 1177 (7th Cir. 1990)(Posner, J.)("The greater the risk of an accident ((a)) and the costs of an accident if one occurs ((b)), the more we want the actor to consider the possibility of making accident-reducing activity changes; the stronger, therefore, is the case for strict liability.").  Indeed, "regression results show that stringent statutory liability laws and regulations tend to reduce the number and severity of escaped prescribed fires on private land."  Jonathan Yoder, Liability, Regulation, and Endogenous Risk: The Incidence and Severity of Escaped Prescribed Fires in the United States, 51 J.L. & ECON. 297, 297 (2008).[32]  Imposing strict liability will not discourage the Forest Service from taking appropriate fire safety precautions.  Instead, imposing strict liability will encourage the Forest Service to take those fire safety precautions in the safest way possible.  FEMA's policy concerns are misplaced.

## III.    THE APA MOO COMPELS FEMA TO AWARD NONECONOMIC DAMAGES WHERE APPROPRIATE.

---

[32]Yoder's study explicitly notes that it does not assess the impact of statutory liability laws and regulations on escaped prescribed fires on federal land, which are not subject to State laws. Jonathan Yoder, Liability, Regulation, and Endogenous Risk: The Incidence and Severity of Escaped Prescribed Fires in the United States, 51 J.L. & ECON. at 297.  Nevertheless, evidence that stringent liability laws reduce the quantity and severity of escaped prescribed fires is relevant here because it illustrates that strict liability effectively incentivizes those who bear the risk to prevent accidents.

FEMA argues that the Court's ruling that the Hermit's Peak Regulations violate the APA by precluding noneconomic damages is incorrect, because the Hermit's Peak Regulations do not mention noneconomic damages.  See Motion at 17.  The Court disagrees with FEMA.  That the Hermit's Peak Regulations do not use explicitly the phrase "noneconomic damages" is not determinative, because the Regulations' language indicates that FEMA precludes recovery of noneconomic damages under the Hermit's Peak Act.  44 C.F.R. § 296.21(a) states that "[t]he Act provides for the payment of actual compensatory damages for injury or loss of property, business loss, and financial loss."  This language indicates that FEMA intends to compensate only for property, business loss, and financial loss, and not noneconomic damages.  44 C.F.R. § 296.21(a) reflects FEMA's position that only the property, business loss, and financial losses that the Allowable Damages provision explicitly lists are recoverable, and noneconomic damages are not recoverable.  The Court discusses in great length in its APA MOO why the property, business loss, and financial losses that the Allowable Damages provision explicitly lists are nonexhaustive, and thus, why noneconomic damages are also allowable damages.  44 C.F.R. § 296.21(a) also reflects FEMA's position that it will not compensate claimants for noneconomic damages under the Hermit's Peak Act.  FEMA first asserts its position at the end of the public comment period, responding to numerous comments urging FEMA to compensate noneconomic damages:

> FEMA recognizes the significant injuries suffered by claimants and the long-term recovery needed for the communities impacted by the Fire.  The Act at section 104(c)(3)(A) limits payment to "actual compensatory damages measured by injuries suffered."  Section 104(d) of the Act limits allowable damages to uncompensated damages for loss of property, business loss, and financial loss; and therefore, limits the actual compensatory damages FEMA may provide to economic damages.  This limitation of the Act with respect to allowable damages excludes non-economic damages such as pain and suffering.  FEMA recognizes that making people whole for the full scope of loss after a devastating fire may not be possible.  The Act authorizes payment of damages, and money cannot restore the full array of the human experience.

88 Fed. Reg. 59743.  In response to other comments, FEMA similarly states that the Hermit's Peak

Act does not allow claimants to recover for nuisance and trespass damages under New Mexico

law, because such damages are noneconomic, see 88 Fed. Reg. 59743, and that the Hermit's Peak

Act does not allow claimants to recover for "emotional distress, disturbance, and annoyance,"

because such damages are noneconomic, 88 Fed. Reg. 59744.

The Court links FEMA's position to 44 C.F.R. § 296.21(a) in the APA MOO when it

explains that, "[i]n accordance with FEMA's commentary on the interim final rule, 88 Fed. Reg.

at 59767, the allowable damages of 'property, business loss, and financial loss' exclude

noneconomic damages.  See 44 C.F.R. § 296.21(a)."  APA MOO, 760 F. Supp. 3d at 1212.

44 C.F.R. § 296.21(a), therefore, is the regulatory basis of FEMA's continuous denial of the

Plaintiffs' claims for noneconomic damages, and, thus, is arbitrary and capricious under the APA.

FEMA does not dispute the "general principle" that the Plaintiffs can challenge an agency action

outside of a regulation's text.  See Dolan Reply at 11.  The Court, therefore, first concludes that

FEMA's action of denying claims for noneconomic damages is arbitrary and capricious in

violation of the APA, because it is based on an erroneous interpretation of the Hermit's Peak Act.

Second, the Court concludes that 44 C.F.R. § 296.21(a), which reflects FEMA's erroneous

interpretation of the Hermit's Peak Act, is also arbitrary and capricious in violation of the APA.

The Court, therefore, also correctly "holds unlawful and sets aside the Defendant Federal

Emergency Management Agency's Hermit's Peak/Calf Canyon Fire Assistance Regulation,

44 C.F.R. § 296.1" in its Final Judgments in both Dolan and Lands.  Dolan, Final Judgment at 1,

filed December 31, 2024 (Doc. 61); Lands, Final Judgment at 1, filed December 31, 2024 (Doc.

60).

FEMA also argues that the Court acts beyond its APA review scope by forcing FEMA to award noneconomic damages regardless of a noneconomic-damages-claim's merits. See Motion at 19; Dolan Reply at 12. FEMA misreads, however, the Court's conclusion in the APA MOO. The Court does not mandate that FEMA bypass the claim evaluation process and indiscriminately award noneconomic damages. Additionally, at no point do the Plaintiffs' request that FEMA skip the standard claim evaluation process. See Dolan Hearing Tr. at 60 (Siminou)("I think the amount is certainly something that needs to be determined on a case-by-case basis."). When the Court compels FEMA to award noneconomic damages under the Hermit's Peak Act, the Court does so with the understanding that FEMA must still conduct its usual process to determine whether each individual claimant should receive noneconomic damages. The Court concludes in the APA MOO that "FEMA's decision to not allow noneconomic damage awards" is an "unlawfully withheld" agency action under the APA, 5 U.S.C. § 706(1). Accordingly, the Court compels FEMA to allow noneconomic damage awards, not to pay noneconomic damages awards for unsubstantiated claims.

Furthermore, FEMA argues that the Court's language that it "sees no sound reason to remand the Plaintiffs' claims to FEMA for further determination" suggests that the Court intends to circumvent the claims evaluation process. See Lands Reply at 13. The Court is not circumventing the claims evaluation process, but the Court sees no sound reason to remand for further determination of the issue whether noneconomic damages, such as for the New Mexico torts of nuisance and trespass, are recoverable under the Hermit's Peak Act. To the extent FEMA needs more guidance, the Court compels FEMA to award noneconomic damages under the Hermit's Peak Act where a Plaintiff has a valid noneconomic-damages claim. In any case, the Court ultimately does not remand the Plaintiffs' claims to FEMA for further determination,

because, most recently, the Court concludes that, as to all of the Plaintiffs' claims, "whatever is on the table at day 180" is "a final, judicially reviewable denial of noneconomic damages." <u>Gallegos v. FEMA</u>, 2025 WL 961665 at *42. In other cases such as <u>Gallegos v. FEMA</u>, claimants ask the Court to review FEMA's judicially reviewable decision denying noneconomic damages. Because those claimants have judicially reviewable decisions, and those claimants seek judicial review under the Hermit's Peak Act, the Court reviews those denials in accordance with the Hermit's Peak Act and its permitted recovery of noneconomic damages.

**IT IS ORDERED** that: (i) the Respondents' Motion to Alter or Amend Judgment, filed January 14, 2025 (<u>Dolan v. FEMA</u>, No. CIV 23-0908 Doc. 62)("<u>Dolan</u> Motion"), is denied; and (ii) the Respondents' Motion to Alter or Amend Judgment, filed January 14, 2025 (<u>Lands v. FEMA</u>, No. CIV 23-0869 Doc. 63)("<u>Lands</u> Motion"), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Thomas Tosdal
Tosdal Law Firm
Solana Beach, California

-- and --

Ty Tosdal
Tosdal APC
San Diego, California

-- and --

Mark Dow
Cynthia Weisman
Bauman & Dow, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff Charles William Paynter*

Thomas Tosdal
Tosdal Law Firm
Solana Beach, California

-- and --

Ty Tosdal
Tosdal APC
San Diego, California

    *Attorneys for the Plaintiff Marianna Lands*

Brian Colon
Jesse Gallegos
Jacob Payne
Singleton Schreiber
Albuquerque, New Mexico

-- and --

Gerald Singleton
Benjamin Siminou
Jonna D. Lothyan
Krystle D. Berkstresser
Alicia Zimmerman
Singleton Schreiber
San Diego, California

    *Attorneys for Plaintiffs Tobin Dolan, Lydia Dolan, Tangee Dolan, Dorothy Jones, Brian Rodgers, Barbara Rodgers, Michael Salazar, Linda Salazar, Reynaldo Herrera, and Kathy Valera*

Joe Lovell
Lovell Hoffman Law, PLLC
Amarillo, Texas

    *Attorneys for the Plaintiff Kathy Valera*

Ryan Ellison
  United States Attorney
Nicholas Sydow
Brett Eaton
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Defendants*